IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. MINOGUE, | ) | |
| CO-TRUSTEE OF THE PHYLLIS | ) | |
| ANDREWS FAMILY TRUST, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. CCB 03-3391 |
| v. | ) | |
| | ) | |
| ARTHUR B. MODELL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT #2: VOIDABILITY AND LACK OF CONSIDERATION

Pursuant to Federal Rule of Civil Procedure 56(b), defendant Arthur B. Modell hereby moves for summary judgment on all claims in plaintiffs' Amended Complaint.

In support of this motion, Mr. Modell relies upon and incorporates by reference the attached memorandum, including its supporting exhibits, and states that he is entitled to summary judgment on all claims because (a) Mr. Modell's attorneys labored under an impermissible conflict of interest that makes the Letter Agreement voidable by Mr. Modell, and (b) the Letter Agreement is unenforceable due to lack of consideration.

## REQUEST FOR HEARING

Defendant respectfully requests that the Court convene a hearing on this motion.

A proposed Order is attached.

Respectfully submitted,

_____/s /_____

Michael D. Colglazier, # 05074
Steven F. Barley, # 10049
Douglas R. M. Nazarian, # 23402
Meredith S. Abrams, # 26761
Michael J. O'Connor #27604
HOGAN & HARTSON L.L.P.
111 South Calvert Street, Suite 1600
Baltimore, Maryland  21202
(410) 659-2700
(410) 539-6981

Counsel for Defendant Arthur B. Modell

February 2, 2005

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| THOMAS E. MINOGUE,<br>CO-TRUSTEE OF THE PHYLLIS<br>ANDREWS FAMILY TRUST, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ARTHUR B. MODELL,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. CCB 03-3391<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT #2:
## VOIDABILITY AND LACK OF CONSIDERATION

### INTRODUCTION

In 1961, defendant Arthur B. Modell purchased a stake in a corporation that owned the professional football team then known as the Cleveland Browns. Vincent S. Andrews, Sr. had agreed to be his partner in this purchase, but was unable to muster the necessary funds, withdrew, and released any right to a finder's fee. Two years later, at the behest of a lawyer who unbeknownst to Mr. Modell represented them both, Messrs. Andrews and Modell signed an agreement (the "Letter Agreement")[1] purporting to promise Mr. Andrews a "finder's fee" for his role in Mr. Modell's acquisition. The plaintiffs, the trustees of a trust created by

---

[1]    A copy of the Letter Agreement is attached as Exhibit 1. To the extent this or any other exhibit attached to this Motion was designated confidential by Mr. Modell, Mr. Modell hereby waives that designation.

Mr. Andrews's wife,[2] now seek to enforce the Letter Agreement and collect the finder's fee.

In addition to the reasons raised in other motions,[3] Mr. Modell is entitled to summary judgment on all counts in the Amended Complaint because (a) Mr. Modell's attorneys labored under an impermissible conflict of interest that renders the Letter Agreement voidable by Mr. Modell, and (b) even if the Letter Agreement is not voidable, it was not supported by consideration and, therefore, is not an enforceable contract.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Mr. Andrews Released All Rights To A Finder's Fee in 1961.

In 1961, Mr. Modell heard rumors that the Cleveland Browns football franchise[4] might be for sale.[5]  When Mr. Andrews offered to introduce him to people who were authorized to sell the team – Roger Struck and Fred "Curly" Morrison – (whom Mr. Andrews had met through Mr. Walter Routson) Mr. Modell "seized the

---

[2]     *See* Amended Complaint at ¶¶ 1-2.  This memorandum will refer collectively to plaintiffs Thomas E. Minogue and Thomas O. Callaghan, Co-Trustees of the Phyllis Andrews Family Trust, as "the Trust."

[3]     Mr. Modell is filing two other motions for summary judgment simultaneously with this motion – Motion #1, which demonstrates the Trust's lack of standing to pursue these claims, and Motion #3, which demonstrates that the events necessary to trigger any obligations on the part of Mr. Modell under the Letter Agreement have not yet occurred. Mr. Modell expressly reserves, and does not waive, any arguments raised in those motions, whether or not mentioned here.

[4]     In 1996, the Cleveland Browns moved to Baltimore and became the Baltimore Ravens.  For purposes of clarity, the franchise will be referred to as the "Browns," the "team," or the "Ravens," as appropriate.

[5]     Transcript of June 16, 2004 Deposition of Arthur B. Modell ("Modell Dep."), attached as Exhibit 2, at 29:1-3.

opportunity."[6]  Initially, Mr. Modell and Mr. Andrews each planned to contribute $250,000.00 toward the purchase price.[7]  When it came time to produce money, however, Mr. Andrews fell short and told Mr. Modell he did not have any money to contribute.[8]  Mr. Modell overcame Mr. Andrews's last-minute failure, found a replacement investor (R. J. Schaefer), and purchased the team.[9]

Mr. Modell paid the three "finders" – Messrs. Struck and Morrison and Walter Routson – a total of $200,000.00 in fees in connection with his purchase of the team.[10]  (Mr. Routson, who had dealt only with Mr. Andrews and was not a representative of the Browns, received only $25,000 for his limited role.[11])  In exchange for this payment, on January 25, 1961 the three finders waived and released all claims related to the purchase of the team.[12]

---

[6]  *Id.* at 28:4-9.

[7]  *See* December 14, 1960 Memorandum Re: Cleveland Browns, Inc. Proposed Offer of Purchase, attached as Exhibit 3, at 1.

[8]  *See* Transcript of May 10, 2004 Deposition of Vincent Andrews, Jr. ("V. Andrews Dep."), attached as Exhibit 4, at 21:21 – 22:12.

[9]  *See* January 26, 1961 Memorandum Re: Cleveland Browns, Inc., attached as Exhibit 5, at ¶¶ (p) & (q) (describing deal closing and the "Agreement dated January 26, 1961 between Arthur B. Modell and R. J. Schaefer relating to the purchase by Modell of Cleveland Browns, Inc. and delivery by Schaefer to Modell of check for $250,000 to be used therefore").

[10]  *See* January 25, 1961 letter from F. Morrison, R. Struck, and W. Routson to A. Modell, attached as Exhibit 6.

[11]  *See* January 25, 1961 letter agreement between A. Modell and W. Routson, attached as Exhibit 7; *see also* January 25, 1961 letter agreement between A. Modell and F. Morrison, attached as Exhibit 8; December 28, 1960 letter from W. Routson to F. Morrison, attached as Exhibit 9.

[12]  *See* January 25, 1961 letter agreement between A. Modell, F. Morrison, R. Struck, and W. Routson, attached as Exhibit 6.

Mr. Andrews signed a separate waiver and release of all claims that same day (the "Release").[13]  In exchange for consideration in the amount of one dollar, Mr. Andrews waived any claim relating to the Cleveland Browns, Inc., "and the sale and purchase of its assets and the payment of finders' or similar fees, brokerage fees or commissions in respect thereto."[14]

**B.   Mr. Modell Neither Knew About Nor Consented To His Attorneys' Simultaneous Representation Of Mr. Andrews In Connection With The Letter Agreement.**

After Mr. Andrews signed the Release, Mr. Modell had no legal obligation to pay him anything more in connection with the acquisition of the team. Nevertheless, Mr. Andrews several times approached Mr. Modell about the possibility of further compensation.[15]  Approximately two years later, at the urging of his attorneys, Mr. Modell signed the Letter Agreement.[16]  And although Mr. Modell testified that he later learned that his attorneys represented Mr. Andrews in other matters,[17] discovery in this litigation revealed that Mr. Modell's attorneys simultaneously (and impermissibly) represented both him <u>and</u> Mr. Andrews <u>in connection with the Letter Agreement</u>.

---

[13]      A copy of the Release is attached at Exhibit 10.

[14]      *Id.*

[15]      *See* April 11, 1961 Memorandum from R. Frisch to J. Wells, attached as Exhibit 11; January 29, 1963 Letter from R. Frisch to V. Andrews, attached as Exhibit 12.

[16]      *See* Letter Agreement, attached as Exhibit 1; Modell Dep., attached as Exhibit 2, at 21:19-22:6.

[17]      *See* Modell Dep., attached as Exhibit 2, at 21:19-23:2.

Mr. Modell's counsel in connection with the Letter Agreement was John Wells and his colleagues in the New York City law firm Royall, Koegel & Rogers – a predecessor to the present-day law firm Clifford Chance US LLP ("Clifford Chance").[18]  Mr. Wells first represented Mr. Modell during his acquisition of the Browns and had represented him since that time.[19]

After the Trust initiated this lawsuit in 2003, Mr. Modell contacted Clifford Chance to obtain any relevant documents.  Among the documents produced by Clifford Chance was a January 29, 1963 letter from one of Mr. Modell's former attorneys, Robert Frisch, to Mr. Andrews.  The letter, previously produced by the Trust as well,[20] referenced a draft of the Letter Agreement.  But the following handwritten note appears on the document as produced by Clifford Chance: "See the files of Vincent S. Andrews, # 4501 W, for additional papers on this matter."[21]

Intrigued by this note and its potential implications, Mr. Modell promulgated discovery asking whether Clifford Chance had ever represented Mr. Andrews.  When the Trust responded that it did not know,[22] Mr. Modell served a

---

[18]    Royall, Koegel & Rogers later became known as Rogers & Wells, which later merged with the present-day law firm Clifford Chance US LLP.

[19]    *See e.g.* July 17, 2003 letter from R. Stephanz to E. Harris, attached as Exhibit 13; Modell Dep., attached as Exhibit 2, at 34:6-16.

[20]    *See* January 29, 1963 letter from R. Frisch to V. Andrews, attached as Exhibit 12.

[21]    *See* January 29, 1963 letter from R. Frisch to V. Andrews (containing Clifford Chance notes), attached as Exhibit 14.

[22]    *See* Plaintiffs' Responses to Defendant's First Requests for Admission, attached as Exhibit 15, at response to request number 2.  The Trust eventually provided an amended interrogatory response conceding that Clifford Chance and Mr. Andrews did have a lawyer-client relationship.  *See* Plaintiff's Amended Response to Request No. 2 of Defendant's First Request for Admission, attached as Exhibit 16.

subpoena on Clifford Chance.[23]  In response, Clifford Chance produced responsive documents and a privilege log that identified three documents purportedly relating to Mr. Modell.[24]  When Mr. Modell challenged the withholding, Clifford Chance twice admitted that the documents "relate to the firm's representation of Andrews in relation to the agreement between Andrews and Modell,"[25] and possibly contain Mr. Andrews's "secrets" under the New York Code of Professional Responsibility.[26] That is, Clifford Chance admitted that it represented <u>both</u> Mr. Modell and Mr. Andrews in connection with the Letter Agreement, and asserted that some of the materials created in that representation were "secrets" with respect to Mr. Modell.

### C.   Mr. Modell Signed The Letter Agreement On The Advice Of His Attorneys.

After Mr. Andrews executed the Release in January 1961, Mr. Modell was not obligated to pay him a finder's fee (or anything else) in connection with the acquisition of the team.  And for two years he refused to do so.  Mr. Modell testified in his deposition that John Wells "persuaded"[27] him to sign the Letter Agreement

---

[23]   *See* Subpoena, attached as Exhibit 17.

[24]   *See* Clifford Chance cover letter and privilege log, attached as Exhibit 18.

[25]   *See* Transcription of July 15, 2004 voicemail from R. Stephanz to M. Colglazier, attached as Exhibit 19.  This voice mail message was transcribed by Hogan & Hartson staff in the normal course of business and is confirmed by the letter described in n.26 below.

[26]   *Id.*; *see also* July 20, 2004 letter from R. Stephanz to M. Colglazier, attached as Exhibit 20.  The Trust eventually waived privilege and the documents were produced.

[27]   *See* Modell Dep., attached as Exhibit 2, at 21:19-22:6.

and that he relied upon Mr. Wells and his colleagues for advice with respect to the Letter Agreement.[28]

The manner in which Mr. Modell's attorneys procured his assent is revealing. On January 29, 1963 Mr. Frisch sent a letter to Mr. Andrews, to which he attached a draft of the Letter Agreement.[29] The letter stated, "I enclose a copy of a draft letter agreement I have prepared, between you and Arthur." It continued, "I am sending you this draft without sending a copy to Arthur, in order that I may review it with you before sending it on to Arthur. . . . After you have had an opportunity to consider it, I would appreciate your giving me your comments."[30] Mr. Wells was sent a carbon copy of the letter and the draft. Mr. Modell was not copied nor made aware of this communication.

On Friday, February 1, 1963, Mr. Andrews and Frisch discussed the draft, which Mr. Frisch revised as a result of that discussion.[31] Several days later, on February 4, 1963, Mr. Frisch sent another letter and two draft copies of the Letter Agreement to Mr. Andrews. The letter concluded, "If you approve the agreement, please sign the original and one copy and send them to Arthur under

---

[28]    *Id.* at 34:6-16.

[29]    *See* January 29, 1963 Letter from R. Frisch to V. Andrews and draft agreement, attached as Exhibit 12.

[30]    *Id.*

[31]    *See* February 4, 1963 Letter from R. Frisch to V. Andrews, attached as Exhibit 21. The Letter Agreement signed by Messrs. Modell and Andrews differs from the draft sent to Mr. Andrews several days earlier.

cover of the letter that I have written him and enclose herewith."[32]  Again, Mr. Wells was carbon copied but Mr. Modell was not.

The Letter Agreement promised an enormous windfall to Mr. Andrews. Back in 1961, at the time of the acquisition, Mr. Modell paid the other three finders $200,000.00 to split. [33]  Of this amount, Mr. Routson (whose role, like that of Mr. Andrews, was limited to introducing the parties) received only $25,000.[34]  Two years later, Mr. Wells and his colleagues persuaded Mr. Modell to promise Mr. Andrews $3,000.00 per year for nine years plus five percent of Mr. Modell's "net gain" upon the occurrence of enumerated triggering events – a claim the Trust now values at more than $21 million.[35]

The promise appears even more impressive in light of Mr. Andrews's last-minute failure to come up with the necessary funds and his subsequent release of any right to compensation for his role in Mr. Modell's acquisition.  Approximately two months after Mr. Modell signed the Letter Agreement, Mr. Andrews acknowledged the gratuitous nature of the "agreement" and its favorable terms when he wrote Mr. Modell, "I really do appreciate your kindness in your agreement with me.  Please remember that my office and my services are available to you at all

---

[32]  *Id.*

[33]  *See* January 25, 1961 letter from F. Morrison, R. Struck, and W. Routson to A. Modell, attached as Exhibit 6.

[34]  *See* January 25, 1961 letter agreement between A. Modell and W. Routson, attached as Exhibit 7; *see also* January 25, 1961 letter agreement between A. Modell and F. Morrison, attached as Exhibit 8.

[35]  *See* Amended Complaint ¶ 47; Expert Report of William F. Chandler, attached as Exhibit 22, at 14-15; Plaintiffs' Motion for a Preliminary Injunction at 1.

times."[36]  Although Mr. Modell kept Mr. Andrews on retainer as his business

manager as promised in the Letter Agreement, Mr. Andrews never performed any

services for Mr. Modell.[37]

## ARGUMENT

**I.    Summary Judgment Is Appropriate Where, As Here, The Material Facts Are Not In Dispute And The Moving Party Is Entitled To Judgment As A Matter Of Law.**

The summary-judgment standard is a familiar one:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment
>
> > shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:
>
> > By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

---

[36]    *See* April 8, 1963 letter from V. Andrews to A. Modell, attached as Exhibit 23.

[37]    *See* Modell Dep. at 25:21-26:19, attached as Exhibit 2.

A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. The court must view the evidence in the light most favorable to the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility, but the court also must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.[38]

The Court should find the Letter Agreement voidable based on the application of three undisputed facts – (1) Mr. Wells's representation of Mr. Modell, (2) Mr. Wells's simultaneous representation of Mr. Andrews, and (3) Mr. Wells's failure to disclose the latter to Mr. Modell – to straightforward principles of the law of lawyers.[39] The Letter Agreement is voidable because Mr. Modell's lawyers breached their duties to him by simultaneously representing Mr. Andrews's adverse interests without revealing their dual allegiances.

The Court also should find a complete lack of consideration supporting the Letter Agreement. It is undisputed that Mr. Andrews signed the Release (a document the Trust produced in discovery) that was properly supported by

---

[38]   *Machovec v. Prudential Ins. Co.*, No. Civ. CCB-03-1920, 2004 WL 1505523, at *2-3 (D. Md. June 28, 2004) (Blake, J.) (internal citations, quotation marks, ellipses, and brackets omitted).

[39]   As set forth more fully in Mr. Modell's <u>Motion for Summary Judgment # 3: No Triggering Event</u>, at pages 10-13, either New York or Ohio contract law may control the substantive issues – voidability and consideration. But to decide this motion, the Court need not decide which law governs because the outcome is the same under either State's substantive law except, as discussed below, as to one New York exception to the law of consideration in contracts.

consideration.  And the terms of the Letter Agreement itself reveal that no consideration supports it.

## II. The Letter Agreement is Voidable by Mr. Modell Based on His Attorneys' Conflict of Interest.

An attorney may simultaneously represent adverse interests only where the dual representation is known to both parties <u>and</u> the parties consent freely.  Here, Mr. Wells and his colleagues represented both parties to the Letter Agreement without informing Mr. Modell or obtaining his consent.  Because Mr. Modell neither knew of nor consented to the dual representation, the Letter Agreement is voidable.

### A. Mr. Modell's Attorneys Simultaneously Represented Mr. Andrews In The Same Transaction.

Under New York law in effect in 1963 when the Letter Agreement was signed (and which governed the New York attorneys' conduct at that time) "a lawyer, as one in confidential relationship and as any fiduciary, is charged with a high degree of undivided loyalty to his client."[40]  "Thus, with rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship."[41]  "In the exceptional situations where representation may be permissible . . . the lawyer must, at the very least, disclose to

---

[40]   *Kelly v. Greason*, 244 N.E.2d 456, 460 (N.Y. 1968) (citing New York authorities dating back to 1917); *see also City Bank Farmers Trust Co. v. Cannon*, 51 N.E.2d 674, 675-76 (N.Y. 1943); *In re Mahan*, 262 N.Y.S. 702, 704 (App. Div. 1933); *People v. Peoples Trust Co.*, 167 N.Y.S. 767, 768 (App. Div. 1917).

[41]   *Kelly*, 244 N.E.2d at 460 (citing various New York authorities dating back to 1916).

all affected parties the nature and extent of the conflict and obtain their consent to the continued representation."[42]  These propositions are hardly remarkable.

Clifford Chance has admitted that Mr. Wells and his colleagues represented Mr. Andrews with respect to the Letter Agreement – it even withheld documents relating to the Letter Agreement from Mr. Modell on the basis that they contained Mr. Andrews's client "secrets."  As such, Mr. Wells and his colleagues breached their duties of undivided loyalty to Mr. Modell when they failed to disclose and obtain Mr. Modell's consent to their dual representation.  Mr. Modell learned of the dual representation only through discovery in this litigation.  There is no evidence that Mr. Wells disclosed the conflict at the time Mr. Modell signed the Letter Agreement in February 1963, and thus Mr. Modell could not have known with any certainty that his trusted advisors were simultaneously representing Mr. Andrews's interests.[43]  Mr. Modell therefore could not have consented to the dual representation, nor can the Trust, as the party seeking to enforce the Letter Agreement, demonstrate (or create a dispute of fact) that Mr. Modell ever consented.

**B.  The Conflict Makes The Letter Agreement Voidable.**

Where an agent acts on behalf of both parties to a contract without dual consent, the contract is voidable whether or not either principal knew of the

---

[42]     *Id.* (citing various New York authorities dating back to 1928); *see also id.* at nn.1-2.

[43]     *See* Modell Dep., attached as Exhibit 2, at 21:19-22:6; *see also id.* at 32:6-14.

dual agency.[44]  "The law is quite clear that an agent may not place himself during his agency in a position which is adverse to that of his principal where his individual interest will conflict with the interest of his principal. . . . Unless the principal approves the contract with full knowledge of all the facts, an agent is precluded absolutely from dealing with himself either directly or indirectly, and if he does so deal, the contracts made by him are voidable as against his principal."[45] In such cases of self dealing (whether direct or indirect), the principal need not show economic loss to void the contract.[46]  The Letter Agreement thus is voidable by Mr. Modell based on his attorneys' undisclosed conflict of interest.

---

[44]     *See, e.g., Winget v. Rockwood*, 69 F.2d. 326, 330 (8th Cir. 1934) ("To be secretly acting for the benefit of an adverse party, while ostensibly acting for one of the parties, is fraud upon the latter, and a breach of public morals" and a "contract secured under such circumstances may be rescinded"); 27 Richard A. Lord, *Williston on Contracts* § 69:44 (4th ed. 2004) (Conflict of Interest by Agent) ("If one party enters into a contract through an agent who is also secretly acting for the other party, the contract is not only unenforceable specifically against the principal, but, unless ratified, is subject to a defense in any court on the ground of at least constructive fraud if the other party knew of the double employment, and of mutual mistake if neither principal knew of it.") (internal citation omitted); *see also Hasbrouck v. Rymkevitch*, 268 N.Y.S.2d 604, 606 (App. Div. 1966) ("It is fundamental that an agent cannot take unto himself incompatible duties, or act in a transaction where he represents a person having an adverse interest.  Where he does act for adverse interests he must necessarily be unfaithful to one or the other as the duties which he owes to his respective principals are conflicting and incapable of faithful performance by the same person.  No man can serve two masters.") *Beasley v. Trontz*, 677 S.W.2d 891, 894 (Ky. App. 1984) ("all transactions in which the agent has either acted for himself or for a party whose interest is adverse to his principle are voidable by the principle").

[45]     *Gray v. Avco Realty & Dev. Co.*, No. 1943, 1981 WL 6237, at *3 (Ohio App. April 23, 1981) (affirming trial court's voidance of real estate contract where agent urged seller to lower price for buyer to whom agent was related) (citing *Young v. State*, 184 N.E. 24 (Ohio App. 1932)).

[46]     *See Myer v. Preferred Credit, Inc.*, 766 N.E.2d 612, 624-25 (Ohio Ct. Comm. Pl. 2001) ("Basically, self-dealing relates to transactions wherein a fiduciary . . . seeks to consummate a deal wherein self-interest is opposed to duty.  Equity, in such cases, pauses not to inquire whether the principal has sustained a loss.") (internal brackets and ellipses omitted).

Likewise, "if the second employer has knowledge of the first engagement, then both he and the agent are guilty of the wrong committed against the first employer, and the law will not enforce an executory contract entered into in fraud of the rights of the first employer."[47]  Because Mr. Andrews knew that Mr. Wells and his colleagues represented Mr. Modell, both generally and in connection with the Letter Agreement,[48] he is equally "guilty of the wrong committed against" Mr. Modell, and his successors may not enforce the Letter Agreement against Mr. Modell.[49]

### III.   No Consideration Supports The Letter Agreement.

The Letter Agreement also is unenforceable for lack of consideration. The Letter Agreement defines the consideration supporting the finder's fee as Mr.

---

[47]   *Bell v. McConnell*, 37 Ohio St. 396, 399-400 (1881) (holding that real estate broker acting for both parties may recover where dual agency was disclosed and consent given); *Palmer v. Gould*, 39 N.E. 378, 383 (N.Y. 1895) (refusing to enforce contract where "at the time of the execution . . . and during negotiations preceding the same, [the defendant's attorney] was secretly, and without the knowledge or assent of the defendant . . . acting as attorney or agent for the plaintiff"); *see also, e.g., Harry M. Fine Realty Company v. Stiers*, 326 S.W.2d 392, 400 (Mo. App. 1951) ("The cases are nearly if not quite uniform, where the double employment exists and is not known.  No recovery can be had against the party kept in ignorance, and the result is not made to turn on the presence or absence of designed duplicity and fraud, but is a consequence of established policy.") (internal quotation marks omitted).

[48]   *See, e.g.,* April 11, 1961 Memorandum from R. Frisch to J. Wells, attached as Exhibit 11, (describing conversation where Mr. Andrews asked Mr. Frisch to draw papers relating to agreement with Mr. Modell); November 4, 1964 letter from V. Andrews to R. Frisch, attached as Exhibit 24 ("As attorneys for the Cleveland Browns, you are aware of a certain contract between myself and Arthur Modell wherein I am  to receive certain payments in the event of a sale of the Cleveland Browns stock.").

[49]   This is not to say that Mr. Andrews or his appropriate successor is left entirely without a remedy – to the extent Mr. Wells's or his firm's professional failure results in the loss of an otherwise viable claim, the right plaintiff could have a claim against Clifford Chance, even to this day.

Andrews's "effort[ ] in the negotiations and transactions leading to [Mr. Modell's]
ownership of stock in Cleveland Browns, Inc. . . . and the acquisition by that
corporation on March 22, 1961, of substantially all the assets of Cleveland Browns,
Inc. . . ."[50]  By definition, Mr. Andrews's efforts leading to Mr. Modell's stock
ownership occurred in the months leading up to January 1961.  By the time Messrs.
Andrews and Modell signed the Letter Agreement in 1963, Mr. Andrews had long
since released any purported right to a finder's fee arising from the 1961
transaction.  Accordingly, any promise by Mr. Modell to pay him any such finder's
fee was gratuitous and is not enforceable.

### A.    A Promise Lacking Consideration Is Unenforceable.

It is textbook law that a promise is not legally binding absent
consideration.[51]  Consideration consists either of a benefit to the promisor or a
detriment to the promisee.[52]  Stated another way, the party making the promise
must get something in return for that promise.  "To constitute consideration, the
benefit or detriment must be bargained for."[53]  A gratuitous promise, therefore,

---

[50]    Letter Agreement, attached as Exhibit 1.

[51]    *See, e.g., Carlisle v. T & R Excavating,* 704 N.E.2d 39, 43 (Ohio App. 1997) (Ohio
law); *Wood Realty Trust v. N. Storonske Cooperage Co, Inc.,* 646 N.Y.S.2d 410, 411 (App.
Div. 1996) (New York law).

[52]    *See, e.g., Carlisle,* 704 N.E.2d at 43; *Hamer v. Sidway,* 27 N.E. 256, 257 (N.Y. 1891);
*see also* Restatement (Second) of Contracts, § 79 (1981).

[53]    *Carlisle,* 704 N.E.2d at 43; *Payne v. Connelly,* 299 N.Y.S.2d 1013, 1016 (App. Div.
1969).

generally is not enforceable because it lacks consideration.[54]  Whether consideration

exists is a question of law to be determined by the court.[55]

### 1.    Mr. Andrews's Past Efforts Cannot Serve As Consideration For The Finder's Fee.

A promise premised on past consideration does not create an

enforceable contract.  Under the laws of most states, including Ohio, past action

cannot constitute consideration to support a promise.  This is "because past

consideration cannot be a bargained-for benefit or detriment, since it has already

occurred or accrued."[56]

Mr. Andrews did not provide consideration to support Mr. Modell's

promise to pay him a finder's fee.  The Letter Agreement explicitly recites that the

consideration supporting the finder's fee is Mr. Andrews's "effort[ ] in the

negotiations and transactions leading to [Mr. Modell's] ownership of stock in

Cleveland Browns, Inc. . . . and the acquisition by that corporation on March 22,

1961, of substantially all the assets of Cleveland Browns, Inc. . . ."[57]  That is, the

purported consideration was Mr. Andrews's past action.  In 1961, Mr. Andrews

introduced Mr. Modell to people authorized to negotiate a sale of stock in the team,

then released any right to a finder's fee arising from that transaction.  The Letter

---

[54]    *Carlisle,* 704 N.E.2d at 43; *Umscheid v. Simnacher,* 482 N.Y.S.2d 295, 297 (App. Div. 1984) (setting forth general rule and New York statutory exception).

[55]    *Carlisle,* 704 N.E.2d at 43.

[56]    *Id.* at 44.

[57]    Letter Agreement, attached as Exhibit 1.

Agreement, however, was not executed until 1963.  Mr. Andrews's 1961 efforts

therefore are legally insufficient to constitute consideration for the finder's fee.[58]

### 2.      New York's Narrow Exception Does Not Apply Here.

New York has created a narrow statutory exception[59] to the general

rule that contracts premised on past consideration are unenforceable:

> A promise in writing and signed by the promisor or his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.[60]

The exception, however, does not apply to contingent and uncertain promises such

as this one because New York courts consistently have held that to take advantage

of the narrow exception, "the writing must contain an unequivocal promise to pay a

sum certain, at a date certain, and must express consideration for the promise[.]"[61]

The Letter Agreement does not satisfy these criteria, and thus the narrow New

York exception does not apply.

---

[58]     *See Carlisle*, 704 N.E.2d at 44 ("past consideration is not legally sufficient to prove a contract.").

[59]     The exception applies only if the Court finds that New York law governs the Trust's claims.  This is one of only two issues (and the only issue in this motion) as to which the choice of law distinction matters.

[60]     N.Y. Gen. Ob. Law § 5-1105.

[61]     *See, e.g., Umscheid*, 482 N.Y.S.2d at 297 (emphasis added) (citing cases).

In *Umscheid v. Simnacher*, the plaintiff sought reimbursement for services she rendered to an elderly woman.  The Appellate Division held that the defendant's promise "when I sell a piece of property" to "reimburse [the plaintiff] for all the things she paid for me, taxes, oil, groceries and so on" did not "contain an unequivocal promise to pay a sum certain at a date certain."[62]  In the same way, Mr. Modell's promise in the Letter Agreement is not enforceable because it fails to specify a "sum certain, at a date certain."

First, the Letter Agreement does not contain an unequivocal promise to pay Mr. Andrews a "sum certain."  It states, "when, as and if you ever completely divest yourself of all your stock interest in the Browns . . . you shall pay me an amount equivalent to 5% of your net gain."[63]  Even assuming (and Mr. Modell does not) that "5%" contains the required level of specificity, <u>any payment</u> is wholly contingent upon the realization by Mr. Modell of a "net gain" from the sale of his stock, a far-from-certain outcome in 1963.  If, for example, in the early years of professional football – even before the first Super Bowl in 1967 – the league or the team would have folded or encountered difficulties, Mr. Modell's shares may have become worth less than he paid for them or completely without value.  The finder's fee contemplated by Mr. Modell and Mr. Andrews in 1963 was <u>wholly contingent</u> on uncontrollable future events.  Hence Mr. Andrews's Estate's 1969 characterization of the Letter Agreement as "Contract with Arthur Modell for unknown possible

---

[62]   *Id. Cf. Sarama v. Mee*, 422 N.Y.S.2d 582, 583 (Civ. Ct. 1979) (promise to pay $5,000 Christmas bonus in "March or April" satisfied requirements).

[63]   Letter Agreement, attached as Exhibit 1, at 1-2.

amount at some time in future, if at all."[64]   And in a 1971 letter to the Clerk of New

York's Surrogate Court, Mr. Andrews's Estate described the Letter Agreement by

writing that the "contract is to be deemed as valueless inasmuch as it is unlikely

that the team will be sold by Modell in the foreseeable future, if ever; <u>also whether

there would be any gain on the sale is obviously wholly a matter for speculation</u>."[65]

Likewise, the Letter Agreement does not satisfy New York's

requirement of a "date certain."  The Letter Agreement explicitly states, "as a

finder's fee . . . you agree that when, as and <u>if you ever</u> completely divest yourself of

all your stock. . . ."[66]  The Letter Agreement contemplates that the future event may

never occur – "if you ever."[67]  Mr. Andrews's Estate acknowledged as much in 1969

when it characterized the Letter Agreement as "Contract with Arthur Modell for

unknown possible amount <u>at some time in future, if at all</u>."[68]

The Letter Agreement does not contain an unequivocal promise to pay

a sum certain on a date certain.  Because the Trust cannot invoke New York's

narrow exception to the general rule, the Letter Agreement fails for lack of

consideration under New York (as well as Ohio) law.

---

[64]     *See* February 10, 1969 Vincent S. Andrews United States Estate Tax Return, attached as Exhibit 25, at Schedule F.

[65]     See June 21, 1971 Letter from L. Lighter to Clerk, Surrogate's Court, attached as Exhibit 26, at 2.

[66]     Letter Agreement, attached as Exhibit 1, at 1 (emphasis added).

[67]     *Cf. Umscheid*, 482 N.Y.S.2d at 297 (holding writings insufficient where caregiver to elderly woman would be paid when elderly woman sold a specific piece of real estate).

[68]     *See* February 10, 1969 Vincent S. Andrews United States Estate Tax Return, attached as Exhibit 25, at Schedule F.

### B. Mr. Andrews's Business-Manager Services Cannot Qualify As Consideration.

The Trust may argue that Mr. Andrews's services as Mr. Modell's business manager constitute consideration for the finder's fee. This argument necessarily fails, however, because the Letter Agreement is severable.

Where multiple promises are exchanged simultaneously in a single agreement and one of the promises lacks independent consideration, the unsupported promise is unenforceable if the agreement is severable.[69] The key inquiry to severability lies in whether the contract "consists of several distinct and independent parts, each of which can be performed without reference to the other. . . ."[70] If each promise on one side is supported by a promise or performance allotted to it exclusively as consideration, the contract is severable.[71] Where a contract is severable and one portion of the contract lacks consideration, that portion is unenforceable.[72]

---

[69] *See, e.g., Toledo Police Patrolmen's Assoc. v. City of Toledo*, 641 N.E.2d 799, 803 (Ohio App. 1994) ("Courts will enforce a contract to the extent it conforms to the law if part of the consideration is legal and part unenforceable or illegal, and if the contract is severable); *Ripley v. Int'l Rys.*, 171 N.E.2d 443, 445 (N.Y. 1960) ("When a contract is separable or divisible into a number of elements or transactions, each of which is so far independent of the others that it might stand or fall by itself, and good cause for rescission exists as to one of such portions, it may be rescinded and the remainder of the contract affirmed.").

[70] *Ripley*, 171 N.E.2d at 446; *Police Patrolmen's Assoc.*, 641 N.E.2d at 740

[71] *See* 4 Williston on Contracts § 7:49 (4th ed. 2004).

[72] *See, e.g., Spaulding v. Benenati*, 442 N.E.2d 1244, 1245 (N.Y. 1982) ("a contract involving multiple promises, each of which is exchanged for a specifically identified portion of the entire consideration, is enforceable in part even though one of the bargained for promises is unenforceable for lack of consideration).

"Whether a contract is entire or severable is a question of intention, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted."[73] If, as here, the terms of the contract are not in dispute, severability is a question of law to be determined by the language of the contract.[74]

The finder's fee portion of the Letter Agreement is severable because it effectively is one of two separate, independent agreements. First, the Letter Agreement contained an employment contract (the "Employment Agreement") which stated that Mr. Modell would retain Mr. Andrews as his business manager at a salary of $3,000.00 per year. The Employment Agreement makes clear that Mr. Andrews's services as business manager were exchanged exclusively for the retainer.[75] Likewise, the consideration recited for the second contract (the "Finder's Fee Agreement") is limited by its express terms to Mr. Andrews's "efforts in the negotiations and transactions leading to [Mr. Modell's] ownership of stock in Cleveland Browns, Inc. . . ."[76] The two halves depend on altogether separate conditions: Mr. Modell's obligation to make payment under the Employment

---

[73]    *Lai v. Lau,* 670 N.Y.S.2d 724, 726 (Sup. Ct. 1998) (internal citation omitted).

[74]    *See, e.g., Noto v. Satloff,* 239 N.Y.S.2d 324, 330 (Civ. Ct. 1963); *Police Patrolmen's Assoc.,* 641 N.E.2d at 740 ("severability of a contract is a question of law").

[75]    Letter Agreement, attached as Exhibit 1, at 1. ("In consideration of such retainer, I shall render to you at reasonable times and places such business advice, including the preparation of federal and other income and similar tax returns, as you may request.").

[76]    *Id.*

Agreement is conditioned upon Mr. Andrews's "continued ability to perform,"[77] whereas Mr. Modell's obligation to make payment under the Finder's Fee Agreement is in no way conditional on Mr. Andrews's job as business manager.[78]  In other words, the Employment Agreement can be breached (as it was by Mr. Andrews's death prior to December 31, 1970) without a simultaneous breach of the Finder's Fee Agreement.

These separate and distinct agreements set forth within the Letter Agreement render it severable, and Mr. Andrews's employment services as Mr. Modell's business manager cannot serve as consideration for the finder's fee.  Thus, Mr. Andrews did not furnish consideration for the Finder's Fee Agreement, and Mr. Modell's promise to pay was gratuitous and, consequently, unenforceable.

---

[77]   *Id.* at 2 ("your obligation to make the payments specified in Section 1 above shall be contingent upon my continued ability to perform.").

[78]   *Id.*

## CONCLUSION

For the foregoing reasons, the Letter Agreement is voidable by Mr. Modell, is not supported by consideration, and is not enforceable.  The Court should grant summary judgment in favor of Mr. Modell on all counts in the Amended Complaint.

Respectfully submitted,

_____/s/_____

Michael D. Colglazier, # 05074
Steven F. Barley, # 10049
Douglas R. M. Nazarian, # 23402
Meredith S. Abrams, # 26761
Michael J. O'Connor, # 27604
HOGAN & HARTSON L.L.P.
111 South Calvert Street, Suite 1600
Baltimore, Maryland  21202
Telephone:   (410) 659-2700
Facsimile:   (410) 539-6981

Counsel for Defendant
Arthur B. Modell

February 2, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. MINOGUE, CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. CCB 03-3391 |
| v. | ) ) | |
| ARTHUR B. MODELL, | ) ) | |
| Defendant. | ) ) | |

## ORDER

Upon consideration of defendant's Motion for Summary Judgment #2: Voidability and Lack of Consideration, plaintiffs' response thereto, and defendant's reply, if any, the arguments of counsel, and the entire record herein, it is this

_____ day of _____ 2005:

ORDERED, that defendant's Motion for Summary Judgment be and hereby is GRANTED, and it is further

ORDERED, that judgment shall be entered for defendant on all counts in the Amended Complaint.

_____
Catherine C. Blake
United States District Judge

cc:     Counsel of Record

\\\BA - 66910/0005 - 180795 v5