## IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| THOMAS E. MINOGUE, TRUSTEE, CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST, et al., )))))  Plaintiffs,  )  v.  )  ARTHUR B. MODELL,  )  Defendant. | CASE NO. 1:03-CV-03391CCB |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

Andrew W. Hayes, Esq.
Christopher M. Green, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

Neil McGinness, Esq.
McGinness, Painter & McGinness
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH 44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)

Andrew Jay Graham, Esq.
  (Fed. Bar No.: 00080)
George E. Brown, Esq.
  (Fed. Bar No.: 14681)
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030 (telephone)
(410) 539-1269 (facsimile)
agraham@kg-law.com
gbrown@kg-law.com

*Attorneys for Plaintiffs*
*Thomas E. Minogue and*
*Thomas O. Callaghan, Co-Trustees of the*
*Phyllis Andrews Family Trust*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ............................................................. 4

LEGAL STANDARDS .......................................................................................... 21

CHOICE OF LAW................................................................................................. 21

ARGUMENT.......................................................................................................... 22

I.      MODELL'S STANDING ARGUMENTS ARE INAPPOSITE,
MISCONSTRUE NEW YORK PROBATE LAW, AND IN ANY EVENT
CANNOT PRECLUDE PLAINTIFFS' CLAIMS............................................... 22

      A.      Modell Has No Standing to Challenge Mrs. Andrews'
Administration of Mr. Andrews' Estate.................................................... 23

      B.      Mrs. Andrews Had the Power to Distribute the Letter Agreement
to Herself, and She Exercised that Power. ............................................... 23

      C.      Mrs. Andrews Was Not Required to Obtain a Formal Accounting
or an Order Closing Mr. Andrews' Estate, or Even to Pay the
Estate's Creditors Before Distributing the Letter Agreement to
Herself. ..................................................................................................... 25

II.     MODELL'S MOTION FOR SUMMARY JUDGMENT ON CONFLICT
OF INTEREST AND CONSIDERATION GROUNDS MUST BE
DENIED............................................................................................................ 28

      A.      Modell's Conflict of Interest Claims Do Not Provide Any Basis for
Summary Judgment. ................................................................................. 28

            1.      Because They Should Be Stricken as Untimely Raised,
Modell's Conflict of Interest Defenses Cannot Form a
Basis for Summary Judgment in This Litigation. ........................ 29

            2.      Summary Judgment for Modell in this Litigation Is Not an
Appropriate Legal Remedy for Any Alleged Conflict of
Interest on the Part of Modell's Former Attorneys. ..................... 31

            3.      Genuine Issues of Material Fact Exist as to Whether
Modell's Former Counsel Actually Represented Andrews
in Connection with the Letter Agreement..................................... 33

      a.      The "Admission" of a Present-Day Associate at Clifford Chance concerning Events about which She Concededly Has Personal Knowledge Is Irrelevant to Whether Rogers & Wells Represented Andrews in Connection with the Letter Agreement. ........ 33

      b.      Modell Has Himself Insisted that the Documentary Evidence Does Not by Itself Demonstrate that Rogers & Wells Represented Andrews in Connection with the Letter Agreement. ........................... 34

      c.      The 1961 Frisch Memo Does Not Demonstrate that Rogers & Wells Represented Andrews in Connection with the Letter Agreement ............................ 35

    4.     The Documentary Evidence Does Not Compel the Conclusion that Rogers & Wells Represented Andrews in Connection with the Letter Agreement ......................... 36

    5.     Even if Rogers & Wells Represented Andrews in Connection with the Letter Agreement, Modell Waived Any Conflict of Interest. ............................................................. 38

    6.     Genuine Issues of Material Fact, and Credibility, Exist Regarding Whether Modell Consented to Any Dual Representation. ........................................................................... 39

B.    Modell's "No Consideration" Argument Does Not Mandate Summary Judgment. ............................................................................... 43

    1.     A Material Issue of Genuine Fact Exists as to Whether Andrews' Past Acts Were Performed at Modell's Request, Thus Making the Finder's Fee Provision Binding under Ohio Law and Foreclosing Summary Judgment for Modell. ....... 44

    2.     Andrews' Promise to Render Business Advice to Modell on Request Provided Adequate Consideration for the Entire Letter Agreement. ...................................................................... 46

    3.     The Doctrine of Contractual "Severability" Does Not Apply Here to Allow Modell to Defeat His Unwanted Finder's Fee Obligation on Consideration Grounds. ................... 47

      a.      Ohio Law Does Not Allow Parties to Sever a Contractual Provision Merely Because It Is Unsupported by Consideration. ........................................ 47

        b.      Far from Requiring Severance, Ohio Law
Endorses the Enforcement of Contracts Governing
Transactions that Are in Part a Bargain and in Part a
Gift. ................................................................................. 49

    4.     Alternatively, the Finder's Fee Provision of the Letter
Agreement Is Enforceable as a Charitable Subscription. .............. 51

III.    MULTIPLE GENUINE ISSUES OF MATERIAL FACT
PRECLUDE MODELL'S MOTION FOR SUMMARY
JUDGMENT #3 ("NO TRIGGERING EVENT") ................................................. 52

    A.    Under the Doctrine of Prevention, Whether Modell Acted in Bad
Faith when He Engineered the April 8, 2004 Nevermore
Arrangement Is a Genuine Issue of Material Fact that Precludes
Summary Judgment for Modell. ............................................... 53

        1.     The Doctrine of Prevention Applies Precisely when the
Defendant Prevents the Condition Precedent from
Occurring. ................................................................... 53

        2.     Modell's Obligation to Pay the Finder's Fee Attached on
March 18, 2004. .......................................................... 54

        3.     Modell Ignores Controlling Precedent that an Act of
Prevention Motivated by Bad Faith Is Necessarily
Wrongful. ................................................................... 55

        4.     Modell's Nevermore Arrangement Need Not "Prevent the
Completion of the Letter Agreement" to Violate the
Doctrine of Prevention. ................................................. 58

        5.     A Genuine Issue of Material Fact Exists as to Whether
Modell Acted in Bad Faith when He Engineered the April
8, 2004 Nevermore Arrangement. ................................... 60

            a.      Modell's Explanations for Why He Retained an
Indirect Interest in 1% of the Team Are
Contradicted by Other Witnesses, NFL Rules and
Practices, and Common Sense. ......................... 60

b.      Modell's Pre-2000 Desire to Maintain Minority
        Ownership and Bisciotti's Desire to Have Modell
        Keep 20% of the Team Do Not Explain Why
        Modell Changed His Mind and Decided to Retain
        an Indirect 1% Interest in the Ravens After Being
        Sued. ............................................................................... 63

c.      Undisputed Evidence in the Record Raises a
        Genuine Issue of Material Fact as to Whether
        Modell Acted in Bad Faith when He Engineered the
        April 8, 2004 Nevermore Arrangement. ........................... 64

B.      Genuine Issues of Material Fact Exist as to Both the Character of
        the Nevermore Arrangement Itself and the 1% Interest Retained by
        Nevermore, Precluding Summary Judgment for Modell. ......................... 65

        1.      Genuine Issues of Material Fact Exist as to Whether
                Nevermore's 1% Interest in BRLP Has in Substance Been
                Sold to BFC, Resulting in the Divestment of Modell's
                "Stock Interest" in the Team. ......................................................... 65

        2.      A Genuine Issue of Material Fact Exists as to Whether the
                Character of Nevermore's 1% Interest Is So Materially
                Different from the "Stock Interest" that Was the Subject of
                the Letter Agreement that It Is Appropriate to Conclude
                that Modell Has Divested All of His "Stock Interest" in the
                Team. ................................................................................................ 68

        3.      The Substance of the Nevermore Arrangement and the
                Character of the 1% Interest Retained by Nevermore Are
                Questions of Fact. ....................................................................... 69

C.      Whether the Nevermore Arrangement Breached the
        Implied Covenant of Good Faith and Fair Dealing Is a
        Genuine Issue of Material Fact that Precludes Summary
        Judgment for Modell. ................................................................................71

        1.      Technical Compliance with Contractual Provisions Does
                Not Preclude Liability for Violation of the Implied
                Covenant of Good Faith and Fair Dealing. ................................... 71

        2.      The Implied Covenant of Good Faith and Fair Dealing
                Applies Precisely Because the Letter Agreement Does Not
                Explicitly Address the Challenged Conduct. ................................ 73

3.      Whether Modell Violated the Implied Covenant of Good
Faith and Fair Dealing is a Question of Fact for the Jury. ............ 75

D.      A Genuine Issue of Material Fact Exists as to Whether the Trust
Represented by Plaintiffs Is a Third Party Beneficiary of the
Option Purchase Agreement. .................................................................. 77

CONCLUSION ...................................................................................................................... 80

TABLE OF AUTHORITIES

FEDERAL CASES

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884 (7th Cir. 2004) ................21

*Auer v. Kawasaki Motors Corp., USA*, 830 F.2d 535 (4th Cir. 1987) ..........................78

*Brantley Venture Partners, II. L.P. v. Dauphin Deposit Bank and Trust Co.*,
     7 F. Supp. 2d 936 (N.D. Ohio 1998)..............................................50

*Burns v. Gen. Motors Corp.*, 950 F. Supp. 137 (D. Md. 1996) ....................................78

*Busch v. Commissioner*, 728 F.2d 945 (7th Cir. 1984) ..................................70

*Butler v. Sun Refining and Mktg. Co.*, 658 F. Supp. 858 (D. Md. 1987) ......................................80

*Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570 (7th Cir. 1987) ..........................41

*Charbonnages De France v. Smith*, 597 F.2d 406 (4th Cir. 1979) ................21, 25, 36, 41, 45, 52

*Chase Manhattan Bank v. Keystone Distribs. Inc.*, 873 F. Supp. 808 (S.D.N.Y. 1994) .........72, 77

*Cleveland v. Cleveland Elec. Illuminating Co.*,
     440 F. Supp. 193 (D. Ohio 1976), *aff'd*, 573 F.2d 1310 (6th Cir. 1977) ..........................39

*Crowley v. Commissioner*, 962 F.2d 1077 (1st Cir. 1992) ............................................70

*Dantz v. Am. Apple Group, LLC*, 2005 WL 465253 (6th Cir. Mar. 1, 2005) ...............................50

*Dolese v. United States*, 605 F.2d 1146 (10th Cir. 1979) ...............................................70

*ECE Technologies Inc. v. Cherrington Corp.*, 168 F.3d 201 (5th Cir. 1999)...............................70

*Fla. Progress Corp. and Subsidiaries v. C.I.R.*, 348 F.3d 954 (11th Cir. 2003) ..........................70

*Gridiron Steel Co. v. Jones & Laughlin Steel Corp.*, 361 F.2d 791 (6th Cir. 1966) ....................56

*Morgan Guar. Trust Co. of N.Y.  v. Blum*, 649 F.2d 342 (5th Cir. 1981) ......................................31

*Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir. 1998)...........................................21

*Pasant v. Jackson Nat'l Life Ins. Co.*, 52 F.3d 94 (5th Cir. 1995).................................................50

*Resolution Trust Corp. v. Southwest Dev. Co.*, 807 F. Supp. 375 (E.D.N.C. 1992),
    *order amended*, 837 F. Supp. 122, *aff'd in part and rev'd in part on other grounds sub*
    *nom.*, *Resolution Trust Corp. v. Cunningham*, 14 F.3d 596 (4th Cir. 1993) ...................30

*In re Rex Group, Inc.*, 80 B.R. 774 (Bankr. E.D. Va. 1987).........................................................70

*Rice's Toyota World, Inc. v. C.I.R.*, 752 F.2d 89 (4th Cir. 1985) .................................................70

*Ritz-Craft Corp. v. Stanford Mgmt. Group*, 800 F. Supp. 1312 (D. Md. 1992) ...........................31

*Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667 (6th Cir. 1980) ....................................2-3, 56-57

*Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985)..........21, 25, 36, 41, 45, 52

*S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367 (4th Cir. 2003) ...............30

*Scheck v. Burger King Corp.*, 798 F. Supp. 692 (S.D. Fla. 1991) .................................................76

*Shear v. Nat'l Rifle Ass'n*, 606 F.2d 1251 (D.C. Cir. 1979) ....................................................58-59

*Thomas v. Great Atl. & Pac. Tea Co., Inc.*, 233 F.3d 326 (5th Cir. 2000) ...................................43

*Toth v. Glazer*, 163 F.R.D. 549 (E.D. Wis. 1995) .......................................................................31

*Unicredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485 (S.D.N.Y. 2003).........74

*VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773 (S.D.N.Y. 1969) ..........................74

*Walter v. Atha*, 262 F. 75 (3d Cir. 1919) ...................................................................................71

*Weisbart v. Commissioner*, 564 F.2d 34 (10th Cir. 1977) ...........................................................70

*Williams v. The Gradall Co.*, 990 F. Supp. 442 (E.D. Va. 1998) ...........................................30-31

*Wm. P. Zinn & Co. v. Shawnee Pottery Co.*,
    148 F. Supp. 322 (S.D. Ohio 1955), *aff'd*, 240 F.2d 958 (6th Cir. 1956)........................59

*Wong v. Aragona*, 815 F. Supp. 889 (D. Md. 1993)...................................................................80

STATE CASES

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002) ....................76

*Acciai Speciali Terni USA, Inc. v. M/V Berane*, 181 F. Supp. 2d 458 (D. Md. 2002)..................21

*Benatty Corp. v. Transatlantic Energy Corp.*,
    1994 WL 668103 (Ohio Ct. App. Nov. 8, 1994) ........................................................53, 55

*Bennco Liquidating Co. v. Ameritrust Co. Nat'l Ass'n*,
    621 N.E.2d 760 (Ohio Ct. App. 1993)..............................................................................74

*Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*,
    752 A.2d 265 (Md. Ct. Spec. App. 2000) ........................................................................79

*Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995)........................................................76

*Dist. Moving & Storage Co., Inc. v. Gardiner & Gardiner, Inc.*,
    492 A.2d 319 (Md. Ct. Spec. App. 1985) ........................................................................78

*Ed Schory & Sons, Inc.  v. Soc'y Nat'l Bank*, 662 N.E.2d 1074 (Ohio 1996) ..............................75

*Estate of Vaughn*, 267 A.D.2d 763 (N.Y. App. Div. 1999)..........................................................23

*Evans v. Famous Music Corp.*, 807 N.E.2d 869 (N.Y. 2004) ......................................................76

*Frantz v. Maher*, 155 N.E.2d 471 (Ohio Ct. App. 1957)..............................................................48

*Friends of Lubavitch/Landow Yeshiva v. Northern Trust Bank of Fla.*,
    685 S.O.2d 951 (Fla. Dist. Ct. App. 1996) ......................................................................51

*Galmish v. Cicchini*, 734 N.E.2d 782 (Ohio 2000)..........................................................3-4, 72-73

*Gilbert-Varker Corp. v. Carrig*, 50 N.E.2d 59 (Mass. 1943) ......................................................49

*Guardian Trust Co. v. Rapid Transit Land Co.*,
    1932 WL 2305 (Ohio Ct. App. Jan. 25, 1932)................................................................56

*In re Covanagh's Will*, 218 N.Y.S.2d 241 (N.Y. App. Div. 1961)................................................26

*In re Estate of LaFave*, 456 N.Y.S.2d 964 (N.Y. Surr. Ct. 1982) ................................................24

*In re Estate of Seife*, 235 N.Y.S.2d 514 (N.Y. Surr. Ct. 1962)....................................................27

*In re Mullon's Estate*, 39 N.E. 821 (N.Y. 1895)..........................................................................26

*In re Zahoudanis*, 612 N.Y.S.2d 667 (N.Y. App. Div. 1994).........................................26

*Jewish Fed'n of Cent. N.J. v. Baroness*, 560 A.2d 1353 (N.J. Super. Ct. Law Div. 1989) .........51

*Just-Irv Sales, Inc. v. Air-Tite Bus. Ctr., LLC.*, 237 A.D.2d 793 (N.Y. App. Div. 1997)..............71

*King County v. Taxpayers of King County*, 949 P.2d 1260 (Wash. 1997) ....................46

*Lai v. Lau*, 670 N.Y.S.2d 724 (N.Y. Sup. Ct. 1998) ........................................................48

*Montgomery County Cmty. Coll. Dist. v. Donnell, Inc.*,
    752 N.E.2d 342 (Ohio Ct. App. 2001)..............................................................74

*Morgan v. Rusk*, 174 N.E. 142 (Ohio Ct. App. 1930) ....................................................44

*Noto v. Satloff*, 239 N.Y.S.2d 324 (N.Y. Civ. Ct. 1963)................................................48

*Olympus Hills Shopping Ctr., Ltd. v. Smith's Food and Drug Ctrs., Inc.*,
    889 P.2d 445 (Utah Ct. App. 1995) ................................................................77

*Owens v. Baker*, 193 N.E. 778 (Ohio 1933) .........................................................44-45

*Reece v. Reece*, 212 A.2d 468 (Md. 1965)...................................................................45

*Ripley v. Int'l Railways of Central America*, 171 N.E.2d 443 (N.Y. 1960) ..................47

*Salsbury v. Northwestern Bell Tel. Co.*, 221 N.W.2d 609 (Iowa 1974) ........................51

*Sannes v. Jeff Wyler Chevrolet, Inc.*, 736 N.E.2d 112 (Ohio Ct. Com. Pl. 1999) ........49

*Shampton v. City of Springboro*, 786 N.E.2d 883 (Ohio 2003) ....................................51

*Shofer v. Stuart Hack Co.*, 723 A.2d 481 (Md. Ct. Spec. App. 1999)..........................79

*Spates v. Spates*, 296 A.2d 581 (Md. 1972) ................................................................78

*Spaulding v. Benenati*, 442 N.E.2d 1244 (N.Y. 1982)................................................48

*Stortecky v. Mazzone*, 650 N.E.2d 391 (N.Y. 1995)....................................................23

*Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304 (Ohio 1919) ................................53, 59

*Tishman Equip. Leasing, Inc. v. Levin*, 202 A.2d 504 (Conn. 1964)............................70

*Toledo Police Patrolmen's Ass'n v. City of Toledo*, 641 N.E.2d 799 (Ohio Ct. App. 1994) ........48

*Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*,
    807 N.E.2d 953 (Ohio Ct. App. 2004) ................................................................73

*Women's Fed. Sav. & Loan Ass'n v. Potz*, 1983 WL 2790 (Ohio Ct. App. Nov. 17, 1983) .........50

*Worner Agency, Inc. v. Doyle*, 479 N.E.2d 468 ...........................................................45

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ...................................................................................................21

## STATE STATUTES

N.Y. EST. POWERS & TRUSTS LAW § 11-1.1...............................................................23, 27

N.Y. EST. POWERS & TRUSTS LAW § 11-1.5....................................................................27

N.Y. EST. POWERS & TRUSTS LAW § 11-4.5....................................................................27

N.Y. EST. POWERS & TRUSTS LAW § 12-1.1....................................................................27

N.Y. SURR. CT. PROC. ACT § 201 ..................................................................................23

N.Y. SURR. CT. PROC. ACT § 1802 .................................................................................27

N.Y. SURR. CT. PROC. ACT § 2203 .................................................................................26

N.Y. SURR. CT. PROC. ACT § 2211.03 ............................................................................23

N.Y. SURR. CT. PROC. ACT § 2308 .................................................................................26

RESTATEMENTS OF LAW

RESTATEMENT (THIRD) OF AGENCY § 1.01 (Tentative Draft No. 2, 2001) ....................................31

RESTATEMENT (SECOND) OF CONTRACTS § 71 (1981) ...................................................................50

RESTATEMENT (SECOND) OF CONTRACTS § 79 (1981) ...................................................................46

RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981) ...................................................................51

RESTATEMENT (SECOND) OF CONTRACTS § 133 (1981) .................................................................78

RESTATEMENT (SECOND) OF CONTRACTS § 183 (1981) .................................................................49

RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981) .................................................................54

RESTATEMENT (SECOND) OF CONTRACTS § 225 (1981) .................................................................54

RESTATEMENT (SECOND) OF CONTRACTS § 311 (1981) .................................................................78

LEGAL TREATISES

2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 440 (1776) ....................46

CALAMARI AND PERILLO, CONTRACTS § 4-7 (3d ed. 1987) ..........................................................50

3A CORBIN ON CONTRACTS § 767 (1960) ....................................................................................53

3A CORBIN ON CONTRACTS § 654B (2d ed. 1993)........................................................................77

ELLIOTT ON CONTRACTS, Vol. 1, §§ 205, 214...............................................................................44

41 N.Y. JUR. 2D, *Decedents' Estates* § 1967 (2004) ...................................................................27

17 OHIO JUR. 3D, *Contracts* § 54 (2004)......................................................................................44

HON. EVE PREMINGER, ET AL., NEW YORK PRACTICE SERIES – TRUSTS AND
     ESTATES PRACTICE IN NEW YORK § 8.25 (2004) ............................................................27

HON. EVE PREMINGER, ET AL., NEW YORK PRACTICE SERIES – TRUSTS AND
     ESTATES PRACTICE IN NEW YORK § 12.49 (2004). .........................................................23

4 WILLISTON ON CONTRACTS § 8:11 (4th ed. 2004)......................................................................44

13 WILLISTON ON CONTRACTS § 39:4 (4th ed. 2004) ....................................................................54

10A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2726 (2d ed. 1983) .................41

10A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2726 (1998) ...........................42

## OTHER AUTHORITY

BLACK'S LAW DICTIONARY (6th ed. 1990) ..................................................................46

John C. Coffee Jr., *Unstable Coalitions: Corporate Governance as a Multi-Player Game,* 78 GEO. L.J. 1495 (1990) ..........................................................75

Thomas A. Diamond & Howard Foss, *Proposed Standards for Evaluating When the Covenant of Good Faith and Fair Dealing Has Been Violated: A Framework for Resolving the Mystery*, 47 HASTINGS L.J. 585 (1996) .............................75

Charles J. Goetz & Robert E. Scott, *The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms,* 73 CAL. L. REV. 261 (1985) ..................................................................................75

MERRIAM-WEBSTER ONLINE .........................................................................15

R. Posner, *Gratuitous Promises in Economics and Law,* 6 JOURNAL OF LEGAL STUDIES 411 (1977) ......................................................51

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Thomas E. Minogue and Thomas O. Callaghan respectfully submit this memorandum of law in opposition to Defendant Modell's three motions for summary judgment: #1 (Standing); #2 (Voidability and Lack of Consideration); and #3 (No Triggering Event).[1]

## PRELIMINARY STATEMENT

In his latest attempt to end this litigation prematurely – the Court having denied his initial, pre-discovery motion for summary judgment – Defendant Modell relies on arguments that are as ill founded on the facts and unsupported by the law as they are distasteful.

Modell purchased the Cleveland Browns in 1961 for less than $4 million and recently sold at least 99% of the team, now known as the Baltimore Ravens, to Stephen Bisciotti for $579 million. Having agreed in both 1961 (orally) and 1963 (in writing) to pay Vincent Andrews, Sr., or his heirs a finder's fee of at least $21.5 million (equivalent to 5% of Modell's net gain on the sale of the team), Modell again seeks to avoid paying the fee to Andrews' heirs.

The record shows that Modell has already taken improper steps to avoid paying the fee he promised to pay. In his first motion for summary judgment, before any discovery at all, Modell argued that he was not obligated to pay the fee because he had not sold his entire interest in the team. For evidence, he relied exclusively on his own sworn affidavit, which was designed to communicate to the Court that Bisciotti had *committed* to let Modell retain an indirect 1% interest in the Ravens. The record – developed after the Court denied Modell's motion and permitted discovery to proceed – shows that claim to be false. Bisciotti testified that he had

---

[1]   The three memoranda in support of Defendant's three summary judgment motions are referred to hereinafter as "MSJM #1", "MSJM #2", and "MSJM #3", respectively.

made no such commitment at that time, and the key transactional document (an "Option Exercise Notice" dated March 18, 2004[2]) confirms that testimony.  Yet even after his motion was denied, and Plaintiffs specifically and repeatedly asked Modell for this document, Modell failed without explanation or justification to produce it.  Instead, Plaintiffs had to obtain it from the NFL.[3]

Modell's latest motions for summary judgment again show how far he will go to avoid the commitment he made to Andrews.  Modell now argues that the finder's fee agreement is void because his attorney at the time – John A. Wells, of the law firm Rogers & Wells, one of the most distinguished American lawyers of the last half of the twentieth century – was secretly representing Andrews to Modell's detriment.  Modell relies upon the supposed absence of contradictory evidence to support this argument; indeed, Wells and Andrews are both long dead, and thus are unavailable to refute Modell's claim.  But there is in fact voluminous evidence contradicting Modell's claim.  Not content to accuse Well of being merely a cheat, Modell also paints him as incompetent – arguing that the agreement Wells secretly plotted to "persuade" Modell to sign in 1963 is actually *unenforceable* for lack of consideration.  Plaintiffs show herein that the foregoing arguments, and Modell's claim that Plaintiffs have no standing to sue him simply because Andrews' estate may have unsatisfied creditors, are legally and factually unavailing.

As for the merits, the doctrine of prevention precludes Modell's argument that he has not yet sold his entire interest in the team.  Under Ohio law, as plainly set forth in the controlling case of *Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667 (6th Cir. 1980), Plaintiffs' claim for

---

[2]   *See* Exhibit 37, a letter from Stephen Bisciotti to Arthur B. Modell, et al., dated March 18, 2004, enclosing the Option Exercise Notice.

[3]   *See* Reply in Support of Plaintiffs' Motion for Modification of the Scheduling Order and for Leave to File an Amended Complaint at 3-6.

violation of the doctrine of prevention presents a jury issue.  Under *Rohde*, Modell's obligation to pay the finder's fee attached no later than March 18, 2004, when Bisciotti delivered him the Option Exercise Notice, which contractually required Modell to sell his entire remaining interest in the Ravens to Bisciotti for a sum certain on a defined date.  When, three weeks later, Modell amended his contract with Bisciotti to retain a 1% indirect interest in the Ravens, he prevented the occurrence of the condition precedent to his obligation to pay the finder's fee.

*Rohde* teaches that when one party to a contract acts *in bad faith* to prevent the occurrence of a condition precedent, the other party is entitled to recover the full value of the contract *even though* the occurrence of the condition precedent could have been prevented by the good faith conduct of the party who prevented it.  *Id.* at 670.  *Rohde* thus precludes Modell's position that "[t]here was nothing remotely wrongful about [his] decision to retain an interest in the team, *whatever his motives*."  MSJM #3 at 26 (emphasis added).  Under *Rohde*, "the issue of defendant's good or bad faith is primarily a question of fact requiring an examination of defendant's intent or state of mind."  *Id.  Rohde* thus prohibits summary judgment for Modell.

In addition, the Ohio Supreme Court has held – contrary to Modell's arguments – that the implied covenant of good faith and fair dealing *can* and *does* impose duties in addition to those imposed by the literal words of the parties' contract.  *Galmish v. Cicchini*, 734 N.E.2d 782 (Ohio 2000).  In *Galmish*, the Ohio Supreme Court held that the defendant could not wrongfully manipulate the timing of a transaction with a third party in order to defeat a contractual obligation to the plaintiff that was conditioned solely on the completion of the transaction between the defendant and the third party.  The facts in *Galmish* are in effect foursquare with the facts here, where Modell has sought to "reconfigure" a third party transaction to avoid a contractual obligation to Plaintiffs that is conditioned solely on the completion of that

transaction.  *Galmish* thus squarely refutes Modell's argument "that the implied covenant does not, as the [Plaintiffs] seem to claim, arise in connection with Mr. Modell's dealings with third parties," MSJM #3 at 15, and requires that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing also be tried to a jury.

Plaintiffs further show below that Modell's motion on the merits also fails because there are genuine issues of material fact as to (i) whether his retained indirect interest in 1% of the Ravens has in fact and substance been sold to Bisciotti, and (ii) whether the character of that interest is so materially different from the "stock interest" referred to in the finder's fee agreement that Modell can be said to have sold his entire "stock interest" in the team.

In short, the Court should deny Modell's motions and allow this case to proceed to trial.

## STATEMENT OF UNDISPUTED FACTS

Vincent Andrews brought his friend Arthur Modell the opportunity to acquire the Cleveland Browns.  In 1960, when Andrews learned that the Browns were for sale, he asked Modell if he was interested in buying a professional football team.[4]  When Modell answered yes, Andrews introduced him to Fred "Curly" Morrison, a former Browns player who was seeking a buyer for the team on behalf of the Browns' then-current ownership.[5]  Modell and Andrews agreed between themselves to buy the Browns together, acting through Morrison, and they

---

[4]  *See* Exhibit 1, an excerpt from Modell's July 12, 1984 trial testimony, at 5:21 – 6:11.  In the event that Defendant challenges the authenticity or admissibility of this or any of the other exhibits to this memorandum, Plaintiffs respectfully request that they be allowed by the Court to respond as appropriate.

[5]  ***Plaintiffs dispute*** Modell's current attorneys' assertion that "Mr. Andrews offered to introduce him to people who were authorized to sell the team."  MSJM #2 at 2.  Modell's testimony does not address this point, *see* Exhibit 1 at 5:21 – 6:11; Exhibit 2, excerpts from Modell deposition transcript, at 28:2-17.  It is at least equally probable that Modell *asked Andrews* to introduce him to people who were authorized to sell the team.

engaged John Wells and Robert Frisch of the law firm Royall, Koegel & Rogers (later known as, and referred to hereinafter as, "Rogers & Wells") to act as their counsel.[6]  Although Modell had known Wells before,[7] Wells had never previously represented him.[8]  Wells had, however, represented Andrews since 1957.[9]

    After many of the preliminary negotiations were completed, Andrews found that he was unable to raise the money for his share in the team.[10]  Modell then found a new partner, brewing executive R. J. Schaefer.  *Id.*  On January 25, 1961, a day before coming to final terms on the purchase, the customary releases were given:  the then-current owners of the Browns agreed to pay Morrison and others finder's fees of $200,000 in connection with the anticipated sale to

---

[6]   *See, e.g.,* Exhibit 3, an unsigned January 1961 agreement between Modell and Andrews; Exhibit 4, a Rogers & Wells memorandum from Frisch to Wells dated December 14, 1960, in which Frisch gave identical legal advice to both Andrews and Modell prior to the initial purchase of the Browns.

[7]   *See* Exhibit 5 at P00433, a contemporaneous *curriculum vita* for Modell, listing Wells as a personal reference.

[8]   *See* MSJM #2 at 5.

[9]   *See* Exhibit 6, the Clifford Chance privilege log, at entries 48 and 49, listing letters from December 1957 concerning "Employment Contract" and "Retainer Agreement."

[10]   *See* MSJM #2 at 3-4.  Rogers & Wells continued as counsel to the Browns, and to Modell himself, until about 1987.  *See* Exhibit 7, Defendant's original privilege log, dated March 1, 2004, listing as privileged over 200 communications between Modell and Rogers & Wells, including documents generated by Rogers & Wells in 1985 and 1987.  *See id.* at 31, 33 & 48. *See also* Exhibit 8, Defendant's Revised Privilege Log, dated March 11, 2005, which lists two documents from 1961 relating to Andrews, a January 26, 1961 inter-office memo from Rogers & Wells regarding "Andrews release logistics" that was "prepared in anticipation of litigation" (ABM00049), and a May 17, 1961 inter-office memo from Rogers & Wells "reflecting and responding to client communications regarding," *inter alia*, "V. Andrews" (ABM01228 – ABM01230).

Modell, and those individuals gave releases to Modell.[11]  Andrews was paid no fee but also gave

Modell a release from any claim for a finder's fee in connection with the Browns purchase.[12]

The next day, January 26, 1961, Modell signed an agreement to buy the Browns for $3.925

million.[13]

On March 22, 1961, the Browns' assets were transferred to a Delaware corporation

named Cleveland Browns, Inc. ("CBI"),[14] of which Modell was the controlling shareholder, a

director, Chairman of the Board, and Chief Executive Officer.[15]  For the closing, CBI obtained

$2.7 million in purchase money financing from the Union Commerce Bank of Cleveland.[16]

Attorneys Wells and Frisch were named director and Secretary of CBI, respectively.[17]  Of the

925 outstanding shares in CBI on March 22, approximately 910 were owned by thirteen

---

[11]   *See* Exhibit 9, an agreement, dated January 18, 1961, by and between Cleveland Browns, Inc. and Roger S. Struck, Fred L. Morrison, Paul Jones, Jr. and Albert Lee; Exhibit 10, a memorandum authored by Eugene L. Bondy, Jr., dated January 26, 1961, concerning execution and delivery of documents on January 25, 1961 and January 26, 1961.

[12]   *See* Exhibit 10.  ***Plaintiffs dispute*** Modell's current attorneys' assertion that "Mr. Modell paid the three 'finders' – Messrs. Struck and Morrison and Walter Routson – a total of $200,000.00 in fees in connection with his purchase of the team."  MSJM #2 at 3.  The sellers, not Modell, paid these fees.  *See* Exhibit 9.

[13]   *See* Exhibit 1 at 7:18-21.

[14]   *See* Exhibit 11, an agreement, dated March 16, 1961, by and between Arthur B. Modell and Cleveland Browns, Inc., an Ohio corporation.

[15]   *See* Exhibit 12, a letter from Royall, Koegel & Rogers to the National Football League, dated March 15, 1961.

[16]   *See* Exhibit 1 at 8:21 – 9:6.

[17]   *See* Exhibit 12.

shareholders, including Modell, while 15 shares remained unsold.  *Id.*  Those last 15 shares were

sold within weeks to Wells, Frisch, and their law partner William Rogers.[18]

On April 11, 1961, Frisch wrote the following memo to Wells, which he entitled

"Vincent Andrews":

> Vinnie called me today to say that Arthur Modell had agreed to retain Vincent
> Andrews, Inc. as his business manager at the standard fee of 5% of annual gross
> earned income, and to pay a 5% fee on any proceeds realized by Arthur from sale
> of his Cleveland Browns stock.  Presumably, this latter item would go into
> Vinnie's corporation as well.  Vinnie wants us to draw the necessary documents.
> Have you any objection?

In a handwritten marginal notation, Wells responded, "No!  Provided we first check with

Artie – you can do it Monday night."[19]

In February 1963, this oral agreement between Modell and Andrews was reduced to a

written contract (the "Letter Agreement"), in which Modell agreed to compensate Andrews for

making possible the 1961 transaction that enabled Modell to acquire control of the Browns.[20]

---

[18]   *See* Exhibit 13, redacted minutes of a special meeting of the Board of Directors of Cleveland
Browns, Inc., on April 16, 1963, at ABM03327.

[19]   *See* Exhibit 14, a memorandum from R. E. Frisch to Mr. Wells, dated April 11, 1961.  Based
upon the text of this document, ***Plaintiffs dispute*** Modell's current attorneys' assertions that
Modell refused to pay Andrews a finder's fee for two years after January 1961 (MSJM #2 at 6)
and that "Mr. Wells and his colleagues persuaded Mr. Modell to promise Andrews" the
payments required by the Letter Agreement (MSJM #2 at 8).  The far more likely scenario is that
Modell's lenders required him to have releases from any persons who could sue for a finder's fee
before closing, and when Andrews and Modell could not come to terms on that fee, Andrews
graciously agreed to give the release, trusting Modell's word that they would work out a fair
arrangement afterwards.

[20]   *See* Exhibit 15, the Letter Agreement between Vincent S. Andrews and Arthur B. Modell,
dated February 4, 1963.  Although Modell does not dispute the Letter Agreement's terms,
Modell appears to suggest that he and his estate can avoid paying any fee indefinitely, *see*
Exhibit 2 at 5:9 – 6:14, and he contests the validity of the Letter Agreement.  *See generally*
MSJM #2.

The Letter Agreement was drafted by Wells and Frisch[21] – Frisch described it to Modell as "an agreement I have prepared for you and Vinnie"[22] – but it was executed by Modell and Andrews.[23]

In the provision of the Letter Agreement that is the subject of this lawsuit, Modell promised to pay Andrews a finder's fee amounting to 5% of Modell's "net gain" from either the liquidation of the Browns or the divestment of all of Modell's "stock interest" in the team.[24] The Letter Agreement also stated that any such finder's fee was to be paid to Andrews' estate in the event of his death, and that in the event of Modell's death the fee would be payable by his estate. *Id.*

---

[21] *Plaintiffs dispute* Modell's current attorneys' assertions that "Mr. Modell neither knew about or consented to his attorneys' simultaneous representation of Mr. Andrews in connection with the Letter Agreement," that "Mr. Modell testified that he later learned that his attorneys represented Mr. Andrews in other matters," and that "discovery in this litigation revealed that Mr. Modell's attorneys simultaneously (and) impermissibly represented both him and Mr. Andrews in connection with the Letter Agreement."  MSJM #2 at 4.  *See* Memorandum in Support of Plaintiffs' Motion to Strike Modell's New Conflict of Interest Defenses at 10, n.12; *see also* discussion, *infra*, at Part II.A.

[22] *See* Exhibit 16, a letter from Robert E. Frisch to Arthur B. Modell, dated February 4, 1963, enclosing the Letter Agreement.

[23] *Plaintiffs dispute* Modell's current attorneys' assertion that "Mr. Andrews several times approached Mr. Modell about the possibility of further compensation" in connection with the purchase of the Browns.  MSJM #2 at 4.  There is no evidence in the record for this assertion, and the evidence cited by Modell does not support it.

[24] *See* Exhibit 15.  *Plaintiffs dispute* Modell's current attorneys' assertions that "[b]y its very terms, [the] finder's fee obligation is inchoate and contingent;" that the Letter Agreement is "unambiguous" that "[b]efore any rights to Mr. Andrews or an appropriate successor, one of the two 'triggering events' – either Mr. Modell's complete divestiture of all of his stock interest in the Browns or the Browns' complete liquidation – must occur;" and that "[t]he dubious merits of [Plaintiffs'] arguments aside, they require the Court to ignore and deviate from the demonstrable terms and form of Mr. Modell's actual holdings."  MSJM #3 at 3.  These legal arguments are not properly included in a statement of undisputed facts.

As of February 1963, Modell's "stock interest" in the Browns was comprised of 250 shares of CBI common stock that Modell owned directly.[25]  Those shares were held by Modell subject only to (i) a "Voting Trust Agreement" between Modell and Schaefer, in which the two men agreed to vote in lockstep the stock each held individually,[26] and (ii) a second agreement in which Schaefer agreed that Modell should be the company's "principal executive officer" and each man granted the other a ten-year right of first refusal on the purchase of their respective CBI shares.[27]

In the Letter Agreement, Modell also agreed to retain Andrews as his business manager for an eight-year period beginning January 1, 1963, and to compensate Andrews $750 quarterly for that service.[28]  As required, Modell paid Andrews this amount on a quarterly basis for the remainder of Andrews' life.[29]

In a 1965 corporate reorganization – the first of many – all outstanding stock in CBI was traded "share for share" by its holders, including Modell, for stock in Cleveland Browns Football

---

[25]   *See* Exhibit 12.

[26]   *See* Exhibit 17, a Voting Trust Agreement, dated March 22, 1961, by and between Arthur B. Modell and R. J. Schaefer.

[27]   *See* Exhibit 18, an agreement, dated January 26, 1961, between Arthur B. Modell and R. J. Schaefer.

[28]   *See* Exhibit 15.  ***Plaintiffs dispute*** Modell's current attorneys' assertion that a letter from Andrews to Modell dated April 8, 1963, "acknowledged the gratuitous nature" of the Letter Agreement.  The letter in question speaks for itself.

[29]   *See* Exhibit 19, invoices for services rendered to Arthur B. Modell by Vincent S. Andrews.

Company ("CBFC").[30]  In this transaction, which Plaintiffs understand to have been a tax-free

exchange, CBI became a wholly-owned subsidiary of CBFC.  *Id.*

On January 2, 1969, Andrews died.[31]  His last will and testament named his widow

Phyllis as the executrix of his estate and his sole heir.[32]  The estate, which filed an intermediate

accounting with the Surrogate's court that identified the Letter Agreement as an "asset remaining

on hand" and assigned it a value of zero, had significant liabilities and apparently was never

formally closed.[33]

In March 1980, the estate's attorney, Richard Blumenthal, wrote to Modell, requesting

that he "confirm the status of the stock owned or previously owned by [him] in the Cleveland

Browns, Inc."  Modell, who at that point owned stock in CBFC, not CBI, nevertheless responded

that "I continue to own my stock in the Browns."[34]  According to Modell's expert in this

---

[30]  *See* MSJM #3 at 4.

[31]  *See* MSJM #1 at 2.

[32]  *See* MSJM #1 at 2; Exhibit 20, the Last Will and Testament of Vincent S. Andrews.

[33]  *See* MSJM #1 at 6, 9-10.  ***Plaintiffs dispute*** Modell's current attorneys' assertion that "the
burden is on [Plaintiffs] to affirmatively prove" the occurrence of "a final accounting, transfers
of Estate assets or an official closing of the Estate."  *See* discussion, *infra*, at Part I.

[34]  *See* Exhibit 21, a letter from Richard Blumenthal to Arthur B. Modell, dated March 6, 1980;
Exhibit 22, a letter from Arthur B. Modell to Richard L. Blumenthal, dated March 28, 1980.
***Plaintiffs dispute*** Modell's current attorneys' assertion that "[t]o the extent the Trust were to
claim that the shift from direct to indirect ownership constituted a liquidation or divestiture, the
limitations period on that theory began running forty years ago."  *See* MSJM #3 at 4, n.9.  This
legal argument is not properly included in a statement of undisputed facts.  Moreover, it is
without merit.  If the Plaintiffs wished to claim that the 1965 share exchange constituted a
liquidation or divestiture, the limitations period on that theory would have only begun to run
from the point during this litigation when Plaintiffs discovered that the 1965 share exchange
actually occurred.  Modell concealed the 1965 share exchange from Andrews' heirs by the
manner in which he answered Blumenthal's March 1980 request.

litigation, it was reasonable for Modell not to treat the 1965 "share swap" as a triggering event because doing the opposite would have nullified any fee payable to Andrews, since there was no "net gain" on the transferred stock.[35]   Modell thus apparently understood in 1965 that he could not properly frustrate Andrews' rights under the Letter Agreement.

Through a series of treasury redemptions (*i.e.*, repurchases by the company of stock held by other shareholders) and stock purchases from other shareholders (including the purchase of Schaefer's stock in 1965), Modell acquired over half of the outstanding issued stock in the Cleveland Browns by 1996.[36]   In that year, Modell moved the Cleveland Browns to Baltimore, Maryland, and the team was renamed the Baltimore Ravens.[37]   In 1997, the remaining minority stockholders were redeemed, and entities controlled by Modell came to own 100% of the Ravens.[38]

In 1999, Baltimore businessman Stephen Bisciotti offered to purchase a minority interest in the Ravens from Modell, but only on the condition that Modell would grant him an irrevocable option to purchase the remainder of the team.[39]   Because of his pressing need to pay

---

[35]   *See* Exhibit 23, excerpts from transcript of deposition of D. Lee McCreary, Jr., July 13, 2004, at 75:11 – 78:4.

[36]   *See* Exhibit 24, a chart of the existing ownership structure of Cleveland Browns Football Company, Inc. and Cleveland Browns, Inc., as of February 5, 1996, showing that Modell held 216 of the 422.5 outstanding shares in CBFC, which in turn owned 100% of CBI.

[37]   *See* MSJM #3 at 4.

[38]   *See id.* at 4-5.

[39]   *See* Exhibit 25, excerpts from transcript of deposition of Stephen Bisciotti, June 14, 2004, at 15:16 – 16:15.

creditors,[40] Modell agreed to Bisciotti's offer, thereby foregoing any guarantee of permanently

retaining an interest in the Ravens.[41]

Bisciotti made certain that Modell could continue to be actively involved in team affairs,

even if Bisciotti were to become the sole owner.  He promised to appoint Modell as "Chairman

Emeritus" of the Ravens,[42] a promise that he later kept,[43] and agreed to provide Modell's family

with a stadium suite and access to Super Bowl tickets.[44]  He also told Modell that he was

welcome to continue attending Ravens' practices and participating in personnel meetings,[45] and

---

[40]    *See* Exhibit 26, selected press reports:  Jon Morgan, *Modell to Sell Part of Ravens; Non-Controlling Partner Would Ease Debt, Estate Planning; Cash-Flow Problems Denied; Sources: NFL May Need to Help Make Payments*, Baltimore Sun, June 17, 1999 ("Modell acknowledges that taking on a new investor would help finances. It would also aid his estate planning, he said. 'It would reduce our debt. It puts the company in a more solid position,' Modell said."); Ed Bouchette, *Out on a Limb; Modell Thinks the Rewards Were Worth the Risks*, Pittsburgh Post-Gazette, January 28, 2001 ("Modell was running out of time . . . .  Last year, he sold 49 percent of his franchise for $275 million to Stephen Bisciotti with an option for Bisciotti to purchase the remaining 51 percent for $325 million within three to five years. Modell was forced to sell because of mounting debt."); Thomas Heath, *Modell to Sell Share of Ravens, Debt of 180 Million-Plus Forces Owner to Pursue Buyer*, The Washington Post, June 18, 1999 ("Baltimore Ravens owner Art Modell said yesterday he will try to sell a minority share of the franchise to erase some of the team's large debt and to facilitate estate planning.").

[41]    *See* Exhibit 25 at 29:4 – 30:12.

[42]    *See* Exhibit 27, a letter from Stephen J. Bisciotti to Arthur B. Modell, dated December 17, 1999, at ABM04572.

[43]    *See* Exhibit 25 at 80:1-3.

[44]    *See* Exhibit 27.

[45]    *See* Exhibit 28, Ed Waldman, *Modell Doesn't Look Back; Football:  As His Long Career in the NFL Winds Down, the Ravens Owner Refuses to Replay the Past*, Baltimore Sun, December 28, 2003.

he agreed to give Modell a position as consultant to the Ravens and an office in the team's new training facility.[46]

In the agreement between Bisciotti and Modell that was announced in December 1999 and finalized in February 2000, companies owned and controlled by Modell and his wife committed to sell 100% of the Ravens to Bisciotti's Baltimore Football Company ("BFC") for approximately $600 million.[47]   Pursuant to two contracts between the relevant parties – the Preferred Unit Purchase Agreement ("PUPA"), executed on February 25, 2000, and the Option Purchase Agreement ("OPA"), executed on April 19, 2000 – the sale was to take place in two stages.[48]   In the first stage, which occurred on February 25, 2000, BFC purchased 49% of BRLP, the limited partnership that owns the Ravens.  *Id.*  At that time, BFC also obtained an option to purchase the remaining 51% of BRLP in the transaction's second stage, to occur on or before December 1, 2005.  *Id.*

Shortly after the December 1999 announcement of Modell's sale of the Ravens to BFC, Phyllis Andrews – then eighty-three years old – created the Phyllis Andrews Family Trust (the "Trust") for the benefit of her children and grandchildren.[49]   On January 27, 2000, she entered

---

[46]   *See* Exhibit 29, Jamison Hensley, *Bisciotti Plans to Buy Out Modell;  Minority Owner Reiterates His Intention to Exercise Option to Purchase Ravens; He'd Pay $325 Million in January; 2003 Season Would Be Last for Modell as NFL Owner*, Baltimore Sun¸ March 21, 2003, at 1; Exhibit 30, Jamison Hensley, *Modell: I'll Never Forget Farewell;  Outgoing Ravens Owner 'Overwhelmed' by Ovation from Crowd and Players*, Baltimore Sun¸ January 6, 2004, at 1.

[47]   *See* Exhibit 31, Jon Morgan, *Modell agrees to sell Ravens*, Baltimore Sun, December 20, 1999; Exhibit 27.

[48]   *See* Exhibit 32, the Preferred Unit Purchase Agreement, dated February 25, 2000; Exhibit 33, the Option Purchase Agreement, dated April 19, 2000.

[49]   *See* Exhibit 34, the Phyllis Andrews Family Trust Agreement, dated December 27, 1999.

into a written Purchase Agreement in which she transferred to the Trust all of her interest in the

Letter Agreement.[50]   In that Purchase Agreement, Mrs. Andrews represented and warranted that

she had taken "all necessary action required to have been taken by or on [her] behalf . . . by

applicable law" to authorize her as an individual to transfer the Letter Agreement to the Trust.[51]

Although her sons were the initial co-trustees of the Trust, they later resigned and were replaced

as co-trustees by the Plaintiffs in this litigation.[52]

In the spring of 2003, Bisciotti reconsidered his prior insistence on owning 100% of the

team.[53]   However, when he asked Modell to retain up to a 20% minority interest in the Ravens,

Modell declined to retain any interest in the team.[54]

---

[50]   *See* Exhibit 35, a Purchase Agreement, dated January 27, 2000, by and among Phyllis
Andrews and Trustees of the Phyllis Andrews Family Trust.

[51]   *See* Exhibit 35 at P50157, §§ 4.1, 4.4.  In giving this representation, Mrs. Andrews confirmed
that she had (in her capacity as executrix) previously distributed the Letter Agreement to herself
(in her capacity as beneficiary).  ***Plaintiffs dispute*** Modell's current attorneys' assertions that
"the absence of any direct transfer of the Letter Agreement from the Estate to Mrs. Andrews
precludes her from taking title to it by operation of law;" that "the Trust was formed hastily to
shield any judgment in this case from the son's creditors;" that "the timing of these transactions
is no coincidence either, since the Andrews brothers had sought protection that same year from
the bankruptcy courts from a multi-million dollar jury verdict;" that "[b]y having the Trust
'purchase the Letter Agreement for value from Mrs. Andrews, the sons presumably sought to
prevent the Letter Agreement (or any 'finder's fee' that might flow from it) from passing directly
to them at Mrs. Andrews's death, which would expose their recovery to execution by the sons'
creditors;" that "the case suffers from a fatal flaw: the Trust does not own the Letter Agreement,
or any rights inchoate in it, because the Estate never transferred it to Mrs. Andrews, and the
Trust, which has the burden of proof, cannot prove otherwise;" and that "[p]ut another way, Mrs.
Andrews never had a Letter Agreement to assign to the Trust in January 2000, even if it were a
proper sale, and therefore the Trust has no rights to enforce now against Mr. Modell."  MSJM #1
at 11-14.  These *ad hominem* attacks and legal arguments are not properly included in a
statement of undisputed facts.

[52]   *See* MSJM #1 at 14.

[53]   *See* Exhibit 25 at 30:13 – 34:18.

On May 23, 2003, after Modell repeatedly refused to provide relevant information requested by Mrs. Andrews and the Trust[55] despite numerous press reports on the planned sale of the entire team,[56] Plaintiffs filed this lawsuit.[57]

In the "summertime" of 2003,[58] *after* Modell had been served with the Complaint, Modell's banker Ned Kelly asked Bisciotti if Modell could retain a 1% interest in the Ravens.[59] Although Bisciotti was amenable to Modell retaining a 1% interest in the team,[60] he testified that from his point of view, he was not "actually bound to allow Mr. Modell to retain the 1% interest until [April 2004,] the time [he] actually signed the agreements that provided for Mr. Modell to retain [that] interest."[61]

On March 18, 2004, Bisciotti initiated the second stage of the Ravens sale by delivering to Modell and his companies an "Option Exercise Notice" in which BFC elected to exercise its

---

[54]   *See* Exhibit 25 at 36:21 – 37:15.

[55]   *See* Exhibit 21; Exhibit 22; Exhibit 36, a letter from David Boies to Art Modell, dated January 27, 1998, a letter from George Beall to David Boies, dated February 13, 1998, a letter from Andrew Hayes to George Beall, dated March 13, 1998, and a letter from Andrew W. Hayes to George Beall, dated April 14, 1998.

[56]   *See, e.g.,* Exhibit 31; Exhibit 29.

[57]   *See* Plaintiffs' original Complaint.

[58]   MERRIAM-WEBSTER ONLINE defines "summertime" as "the summer season or a period like summer" and "summer" as "the season between spring and autumn comprising in the northern hemisphere usually the months of June, July, and August or as reckoned astronomically extending from the June solstice to the September equinox."

[59]   *See* Exhibit 25 at 36:21 – 40:11  ("It was definitely the summertime.").

[60]   *See id.* at 40:1-6.

[61]   *See id.* at 73:4-12.

option to buy the remaining 51% of BRLP.[62]  It is undisputed that no binding agreement was

then in place between Bisciotti and Modell that would allow Modell or any of his companies to

retain any interest in the Ravens.[63]  Accordingly, from March 18 forward, barring changes in the

parties' existing contractual relationships, the OPA required the Modell companies to sell their

entire remaining interests in the Ravens to BFC on the "Option Closing Date."[64]

On April 8, 2004, almost a year *after* the Complaint in this action was filed, Modell

revised his contractual relationship with Bisciotti.[65]  The two men amended the OPA to release

---

[62]  *See* Exhibit 37, a letter from Stephen Bisciotti to Arthur B. Modell, et al., dated March 18, 2004, enclosing the Option Exercise Notice.

[63]  The OPA required that "at the Option Closing, Purchaser [*i.e.*, BFC] will purchase from BRI and BSC [two of the Modell companies], and BRI and BSC will sell, transfer and deliver to Purchaser, all of the Call Shares free and clear of all Liens, in exchange for the Option Purchase price." *See* Exhibit 33 at § 2.1.  It is undisputed that transfer of the "Call Shares," as that term is defined in the OPA, would have resulted in BFC owning 100% of the Ravens.  *See* MSJM # 3 at 5 ("In February 2000, Stephen Bisciotti purchased a 49% preferred partnership interest" in BRLP and "he also purchased an option to acquire the remaining 51% interest in the Ravens under the Option Purchase Agreement . . . .").  Under Section 5.1(c) of the OPA, "[i]f Purchaser decides to exercise the Call Option . . ., Purchaser shall deliver notice of such exercise (the "Option Exercise Notice") and Schedule 4.1 to each of the Owners [*i.e.*, Modell and his affiliates] and the Partnership pursuant to the provisions of Section 9.1 hereof . . . ."  *See* Exhibit 33 at § 5.1.  It is undisputed that BFC delivered the Option Exercise Notice on March 18, 2004.  *See* Exhibit 37.  Under the OPA, this delivery required that "[a]t the Option Closing . . . BRI and BSC *shall deliver to Purchaser such instruments as Purchaser and its counsel may reasonably request in order to effect the sale, assignment, transfer and delivery of the Call Shares to Purchaser. . . ."  *See* Exhibit 33 at § 2.5(b) (emphasis added).

[64]  *See* Exhibit 37.

[65]  *See* MSJM #3 at 6-7.  **Plaintiffs dispute** Modell's current attorneys' assertion that "[t]he Option Purchase Agreement was amended at Mr. Bisciotti's request because he wanted Mr. Modell to remain involved with the team."  *See id.*  The Bisciotti deposition testimony cited by Modell in support of this assertion does not come close to supporting it.  *See* MSJM #3 at 7, n.21; Exhibit 25 at 30:13 – 33:13.  As Plaintiffs explain, *infra*, at III.A.5.b, retaining an indirect interest in 1% of the team was Modell's idea, not Bisciotti's.  Indeed, Bisciotti testified that Modell's retention of such a small percentage was no practical help to him.  *See* Exhibit 25 at 30:13 – 32:1; 40:1-6.

the Modell companies from their existing legal obligation to sell all their remaining interests in the Ravens to BFC.[66]  As amended, the OPA instead allowed a recently-formed Modell company named Nevermore, LLC ("Nevermore"), to retain a 1% limited partnership interest in BRLP.[67]  That same day, BFC purchased 50 of the 51 remaining "Common Units" in BRLP, giving it a 99% unrestricted ownership interest in the Ravens.[68]  At the completion of that purchase, the total consideration paid by BFC to the Modell companies for its ownership interest (in both 2000 and 2004) amounted to approximately $579 million.[69]

Also on April 8, 2004, Modell and Bisciotti subjected Nevermore's 1% interest in BRLP to "puts", "calls", restraints on transferability, and an irrevocable voting proxy, all in favor of BFC or Bisciotti.[70]  Under the "Investors' Rights Agreement" executed that day, Nevermore was granted the right to "put" its 1% interest to BFC (*i.e.*, require BFC to purchase that interest) at any time prior to April 9, 2014, for a price of $6 million plus interest at a 3% simple annual

---

[66]  *See* MSJM #3 at 6-7; Exhibit 38, Amendment No. 2 to the Option Purchase Agreement.

[67]  *See* "The Raven" by Edgar Allen Poe, first published in 1845:

> And the raven, never flitting, still is sitting, still is sitting
> On the pallid bust of Pallas just above my chamber door;
> And his eyes have all the seeming of a demon's that is dreaming,
> And the lamp-light o'er him streaming throws his shadow on the floor;
> And my soul from out that shadow that lies floating on the floor
> Shall be lifted – nevermore!

[68]  *See* MSJM #3 at 7.

[69]  *See* Exhibit 39, the text of the Expert Report of William F. Chandler, at 9, n.14.

[70]   *See* Exhibit 40, the Investors' Rights Agreement, dated April 8, 2004; Exhibit 41, the Irrevocable Proxy, dated April 8, 2004.

rate.[71]  In the event of Nevermore's failure to "put" its 1% interest to Bisciotti during that ten-year period, BFC was granted the right to "call" that 1% interest in 2014 for a price equal to the greater of (i) Nevermore's BRLP capital account balance, or (ii) the fair market value of Nevermore's 1% interest.  *Id.*  The Investors' Rights Agreement also imposed permanent and severe restrictions on the transferability of Nevermore's 1% interest in BRLP, as well as on the transferability of interests in Nevermore and the entities owning direct and indirect interests in Nevermore.[72]  Finally, under the "Irrevocable Proxy" agreement executed on April 8, 2004, Nevermore permanently transferred its BRLP voting rights to BFC.[73]

When Modell was asked at his deposition if the Letter Agreement entered into his mind at all when he was arranging to retain an indirect interest in 1% of the Ravens, he answered "No. . . . Not at all.  I wanted continued ownership in the NFL which I had for 43 years."[74]  But the Ravens' accountant, Art Yonowitz, confirmed that Modell's advisors told him that one of the two reasons why Modell retained that interest was that doing so "would have the salutary effect of avoiding a finder's fee" under the Letter Agreement.[75]

---

[71]  *See* Exhibit 40.

[72]  *See id.*  Modell owns 100% of the stock in Baltimore Ravens, Inc. ("BRI"), which in turn owns a 99% membership interest in Nevermore.  *See* MSJM #3 at 7.  Modell also owns 65% of the stock in MSLP, Inc., a corporation which owns the remaining 1% membership interest in Nevermore and acts as the "Manager" of Nevermore.  *See* Exhibit 42, a letter from the National Football League to Stephen Bisciotti, et al., dated April 8, 2004, at ABM06108.  Modell's wife Patricia owns the remaining stock in MSLP, Inc.  *Id.*

[73]  *See* Exhibit 41.

[74]  *See* Exhibit 2 at 120:3-10.

[75]  *See* Exhibit 43, excerpts from transcript of deposition of Arthur J. Yonowitz, June 21, 2004, at 76:5 – 82:7.

Modell also testified that he retained the Nevermore interest because "[w]ell, that's the least amount an owner can have, a stockholder can have in the NFL and then you get certain rights with it.  I mean, you're not – not dealing in half shares or three-quarter shares, it's either one – either one percent or more."[76]  However, no NFL bylaw, rule, policy or procedure precludes a minority owner from owning fractional shares of less than one percent in an NFL franchise.[77]

When asked what rights he retained by continuing to own an indirect interest in 1% of the team, Modell testified, "Go to league meetings, I'm allowed to sit in on a league meeting, allowed to join committees, serve on committees.  Ownership is very – is an important thing for the league, has been for decades."[78]  Yet, no NFL bylaw, rule, policy or procedure requires an individual to own a minority interest in an NFL franchise in order to attend league meetings.[79]

Finally, when asked if it was his testimony that his indirect interest in 1% of the team allowed him to attend NFL owners' meetings, Modell testified that "[m]y interest in the Baltimore Ravens, whatever form it takes, allows me to attend league meetings . . . as a recognized part owner of a football team."[80]  But Jacksonville Jaguars' minority owner and former CEO David Seldin has testified that because Modell is universally viewed as one of the architects of the modern NFL as a consequence of his many years of participation at the

---

[76]  *See* Exhibit 2 at 108:19 – 109:4.

[77]  *See* Exhibit 44, the declaration of David Seldin, at ¶¶ 11-12.

[78]  *See* Exhibit 2 at 109:5 – 109:10.

[79]  *See* Exhibit 44 at ¶¶ 11-12.

[80]  *See* Exhibit 2 at 147:7 – 147:18.

organization's highest levels, it is not credible that he believed he stood to gain any advantage he

did not already possess within the league by being a "recognized part owner of a football team"

as opposed to Chairman Emeritus – the title Bisciotti had already agreed to give him.[81]

Modell has moved for summary judgment on a number of grounds, including that his

indirect ownership interest in Nevermore precludes him from being obliged to pay any finder's

fee pursuant to the Letter Agreement.[82]   Indeed, Modell does not believe that he will ever have to

pay anything to Plaintiffs (or anyone else) under the Letter Agreement;[83] he has refused to make

any provisions to guarantee the availability of funds to pay any finder's fee,[84] and he even argues

that "the Letter Agreement contemplates the possibility that a triggering event might never

occur."[85]

---

[81]   *See* Exhibit 44 at ¶¶ 30-32.  As Mr. Seldin testified, it is the support of an NFL franchise's majority owner that assures recognition by the NFL, not equity ownership:

> If you own an interest and you show up at a League meeting and the majority owner or the person who's voting the team doesn't want you in the room, you have no right to attend a League meeting.  That is clearly – I mean, I couldn't – Mr. Modell had that own issue with his partner a number of years ago.  Just owning an equity interest does not give you a right to go to NFL meetings.

Exhibit 45, excerpts from transcript of deposition of David Seldin, January 14, 2005, at 78:24 – 79:11.  *See also* Exhibit 46, minutes of the special meeting of the Board of Directors of Cleveland Browns Football Company, Inc., on December 22, 1982, discussing the exclusion of Bob Gries from NFL activities and functions – despite his ownership of 43% of the Cleveland Browns – when Modell designated as team representatives only himself and James Bailey, a Cleveland Browns official with no ownership interest in the franchise.

[82]   *See generally* MSJM #1; MSJM #2; MSJM #3.

[83]   *See* Exhibit 2 at 5:1 – 7:7.

[84]   *See id.* at 121:7-18.

[85]   *See* MSJM #3 at 16.

## LEGAL STANDARDS

The standards prescribed for summary judgment under Federal Rule of Civil Procedure 56 are stringent. "Summary judgment should not be granted unless the evidence, viewed in the light most favorable to the party opposing the motion, shows there are no genuine issues of material fact and the moving party is due judgment as a matter of law." *Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 174 (4th Cir. 1998); *see* Fed. R. Civ. P. 56(c).

In determining if this showing has been made, "[t]he facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to plaintiff, as the party opposing the motion . . . . The nonmoving party is in a favorable posture, being entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.'" *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985) (quoting *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

## CHOICE OF LAW

The parties agree that the substantive law of New York governs Modell's motion for summary judgment on standing grounds. Subject to the caveat that Plaintiffs' third-party beneficiary claim under the PUPA and the OPA is governed by Maryland law,[86] Plaintiffs also

---

[86]   Both the PUPA and the OPA recite that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, without regard to any applicable principles of conflicts of law." *See* Exhibit 32 at 60; Exhibit 33 at 26. A plaintiff who makes a third-party beneficiary claim is bound by the choice of law provisions in the relevant contract. *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 890 (7th Cir. 2004); *see also Acciai Speciali Terni USA, Inc. v. M/V Berane*, 181 F. Supp. 2d 458, 464-65 (D. Md. 2002).

agree with Modell that to resolve Modell's other motions, the Court need not decide whether

Ohio or New York substantive law applies, because "the outcome is the same under either

State's substantive law," putting aside one New York exception to the law of consideration in

contracts (MSJM #2 at 10), and "analysis of the controlling principles of contract interpretation .

. . under both New York and Ohio law result in the same conclusion" (MSJM #3 at 11).

Nevertheless, for the reasons cited by District Judge Gaughan in explaining her ruling that venue

in this case was proper in Ohio and that Ohio courts had personal jurisdiction over Modell, *see*

Memorandum of Opinion and Order, entered December 2, 2003, at 9-10, Plaintiffs believe that if

the Court were to consider the issue fully, it would conclude that Ohio law governs all of the

substantive legal issues (except standing) that are raised by Modell's motions.  Accordingly, this

memorandum relies primarily on Ohio case law.

## ARGUMENT

I.     **MODELL'S STANDING ARGUMENTS ARE INAPPOSITE,
       MISCONSTRUE NEW YORK PROBATE LAW, AND IN ANY EVENT
       CANNOT PRECLUDE PLAINTIFFS' CLAIMS.**

In his motion for summary judgment on standing grounds, Modell does *not* claim that the

transfer of the Letter Agreement to the Plaintiffs from Mrs. Phyllis Andrews, the widow of

Vincent Andrews, was itself improper.  Instead, Modell argues that Plaintiffs lack standing to

pursue their claims because "[t]here is . . . no evidence that Mrs. Andrews ever properly took

title to the Letter Agreement, and thus no evidence that she ever had anything to sell, transfer or

assign" to the Plaintiffs.  MSJM #1 at 18.

Modell's argument rests on multiple misunderstandings of New York probate law.  The

gist of Modell's claim is that "because Mr. Andrews Sr.'s Estate never satisfied the claims filed

against it, Mrs. Andrews's status as residuary legatee does not, without specific proof that the Letter Agreement was transferred properly to her, vest title in her by operation of law." *Id.* Even assuming that Modell has standing to challenge Mrs. Andrews' administration of her deceased husband's estate – which, as a matter or New York law, he clearly does not – this argument is without merit, for several reasons.

### A.     Modell Has No Standing to Challenge Mrs. Andrews' Administration of Mr. Andrews' Estate.

In New York, only individuals or entities with a financial interest in the decedent's estate have standing to object to the voluntary accounting of an executor or executrix. *Estate of Vaughn*, 267 A.D.2d 763 (N.Y. App. Div. 1999); *see* HON. EVE PREMINGER ET AL., NEW YORK PRACTICE SERIES – TRUSTS AND ESTATES PRACTICE IN NEW YORK § 12.49 (2004).  Because Modell had (and has) no financial interest in Vincent Andrews, Sr.'s estate, it follows that he has no standing to object to the way in which Mrs. Andrews has administered that estate.[87]

### B.     Mrs. Andrews Had the Power to Distribute the Letter Agreement to Herself, and She Exercised that Power.

In New York, an executrix has the power to distribute the assets of an estate to the decedent's legatees.  N.Y. EST. POWERS & TRUSTS LAW § 11-1.1(b)(20).  Mrs. Andrews was both the executrix and the sole beneficiary of her husband's estate.[88]  As such, she was empowered to distribute the Letter Agreement from the estate to herself at any time after she

---

[87]   In New York, the Surrogate is the only party with no financial interest in an estate who has the power to initiate an inquiry into the propriety and accuracy of a fiduciary's account. *Stortecky v. Mazzone*, 650 N.E.2d 391 (N.Y. 1995) (Surrogate can review reasonableness of attorneys' fees and fiduciaries' accountings under general jurisdiction conferred by N.Y. SURR. CT. PROC. ACT § 201(3) and the New York State Constitution despite the absence of such authority under N.Y. SURR. CT. PROC. ACT § 2211.03).

[88]   *See* Exhibit 20 at ¶¶ Third, Sixth.

obtained letters of administration, subject only to the statutory right of estate creditors to recover

from her (in her capacities as executrix and distributee, respectively) any claims that the estate

would have been required to pay – using the market value of the Letter Agreement at the time it

was distributed.

Mrs. Andrews was *not* required to distribute estate assets within any required period of

time:

> Though distribution of an estate normally takes place upon the expiration of seven
> months, or after publication of notice to creditors, it isn't required.  The personal
> representative of an estate in his fiduciary capacity may very well have reasons
> for delaying distribution.  This delay may then be reviewed by the Court and a
> determination made as to whether it is reasonable or not.

*In re Estate of LaFave*, 456 N.Y.S.2d 964, 966 (N.Y. Surr. Ct. 1982).

Modell argues that because some creditor of Vincent Andrews' estate might choose to

challenge Mrs. Andrews' transfer of the Letter Agreement to herself, and seek an accounting

from Mrs. Andrews, Modell himself should be allowed to ignore the transfer.  But the possibility

that Mrs. Andrews might have to defend herself in the future against the claims of estate

creditors does not begin to void the transfer itself.

In fact, what matters for *this* action is not *when* Mrs. Andrews distributed the Letter

Agreement to herself, or for what consideration, but simply *whether* she ever did so.  Plainly, she

did – as even Modell acknowledges.  Specifically, on January 27, 2000, Mrs. Andrews

represented and warranted in a written Purchase Agreement that she had taken "all necessary

action required to have been taken by or on [her] behalf . . . by applicable law" to authorize her

as an individual to sell the Letter Agreement to the Phyllis Andrews Family Trust.[89]  In giving

---

[89]   *See* Exhibit 35 at P50157, §§ 4.1, 4.4.

this representation, Mrs. Andrews confirmed that she had (in her capacity as executrix) previously distributed the Letter Agreement to herself (in her capacity as beneficiary).[90]  When that distribution occurred is not material to *this* litigation, because the Purchase Agreement leaves *no* question that the distribution occurred before Mrs. Andrews transferred the Letter Agreement to the Trust.[91]

### C.  Mrs. Andrews Was Not Required to Obtain a Formal Accounting or an Order Closing Mr. Andrews' Estate, or Even to Pay the Estate's Creditors Before Distributing the Letter Agreement to Herself.

Modell argues that "under New York law, [Mrs. Andrews] does not take title to the Estate's assets by operation of law unless and until the Estate resolved all of the outstanding claims against it," and adds that "[t]his makes good sense:  if there are any questions about an estate's ability to satisfy claims, an executor or executrix should not be able to transfer property to him or herself or others without supervision of and approval by the Surrogate's Court."[92]

---

[90]  It matters little that four and one-half years later, at the age of eighty-eight, Mrs. Andrews testified that she did not remember ever being told that the Letter Agreement was an asset of her husband's estate and that she did not know if there came a time after her husband's death when the Letter Agreement became her property.  *See* Exhibit 47, excerpts from transcript of deposition of Phyllis Andrews, June 21, 2004, at 27:12-23.

[91]  Even though Mrs. Andrews did not literally represent in the Purchase Agreement that "I have distributed the Letter Agreement from my husband's estate to myself, and therefore I can legally transfer it to the Trust," such a representation is in substance well within the scope of the representations and warranties that she did literally make.  And at the summary judgment stage, "[t]he facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to plaintiff, as the party opposing the motion . . . .  The nonmoving party is in a favorable posture, being entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.'"  *Ross*, 759 F.2d at 364 (quoting *Charbonnages*, 597 F.2d at 414).

[92]  *See* MSJM #1 at 19.  The cases cited by Modell merely support the non-controversial proposition that when all of an estate's obligations are paid, title to the estate's remaining assets

Whether Mrs. Andrews properly took title to the Letter Agreement by operation of law is irrelevant because, as explained, *supra*, at Part I.B, she was empowered to, and did, distribute the Letter Agreement from the estate to herself as the estate's sole beneficiary.[93]  Under New York probate law, that distribution was *not* precluded by the fact that the estate was not first closed and may not have resolved any or all of the claims against it.[94]  And contrary to Modell's gloss on New York law, Mrs. Andrews was allowed to transfer the Letter Agreement (or any other estate property) to herself (or to others) *without* supervision of and approval by the Surrogate's Court, *even if* there were questions about the estate's ability to pay claims.

In New York, an executrix distributes estate property subject to the risk, which she assumes by distributing the property, that she may be surcharged with an amount up to the market value of that property at distribution necessary to pay the estate's debts if it is determined (after the objection of an interested party) that the distribution was not made in good faith

---

vests in the residuary legatee by operation of law.  *See* MSJM #1 at 19, n.61; *In re Mullon's Estate*, 39 N.E. 821 (N.Y. 1895); *In re Zahoudanis*, 612 N.Y.S.2d 667 (N.Y. App. Div. 1994); *In re Covanagh's Will*, 218 N.Y.S. 2d 241 (N.Y. App. Div. 1961).  Importantly, the most recent of Modell's cases also demonstrates that the executrix may, by her actions, distribute estate assets before all claims against the estate are settled.  *See In re Zahoudanis*, 612 N.Y.S.2d at 668 ("*We conclude that, because the decedent's personal assets were insufficient to pay all the claims of the estate, title to real property did not vest in the appellant by operation of law but had to be accomplished through the actions of the executor*.") (emphasis added).

[93]  Any dispute over whether Mrs. Andrews obtained title to the Letter Agreement by her affirmative actions as executrix rather than by operation of law necessarily involves a genuine issue of material fact precluding summary judgment for Modell.

[94]  In New York, an executrix is not required to submit to a formal judicial accounting.  "If a fiduciary does not want to do a formal judicial accounting under N.Y. SURR. CT. PROC. ACT § 2308, she can account informally to the interested parties and obtain receipts and releases from them."  N.Y. SURR. CT. PROC. ACT § 2203 "permits her to take the further step of filing those releases and obtaining a court decree releasing and discharging her [but the] section does not require that the accounting be filed . . . ."  *Id.*

without knowledge of creditors.  *See In re Estate of Seife*, 235 N.Y.S.2d 514 (N.Y. Surr. Ct. 1962).[95]  New York law also provides that "distributees and testamentary beneficiaries are liable, in an action, to the extent of the value of any property received by them as such," for the debts, funeral and administration expenses, and taxes that are not recovered from the executrix.  N.Y. EST. POWERS & TRUSTS LAW § 12-1.1; *see* HON. EVE PREMINGER ET AL., NEW YORK PRACTICE SERIES – TRUSTS AND ESTATES PRACTICE IN NEW YORK § 8.25.

Thus, even if Modell had standing to challenge Mrs. Andrews' administration of the estate (and he does not), and even if he had some basis to question Mrs. Andrews' conduct in distributing the Letter Agreement (which he does not), his motion must still fail because, as a matter of law, he cannot void the transfer from the estate to Mrs. Andrews.  It is settled law that if the distribution of an estate asset is challenged by a creditor of the estate, that distribution does *not* become void or voidable.  If the creditor can demonstrate that the distribution was not made "in good faith without knowledge of creditors," and there are insufficient assets remaining in the estate to pay the creditor's claim, the creditor can recover damages in *the amount of its claim*, first from the executrix to the extent possible and then from the distributee to the extent possible – but the distribution itself (here, the transfer of ownership of the Letter Agreement from the estate to Mrs. Andrews) would still not be undone.[96]

---

[95]   In New York, creditors' claims remain actionable until an estate is settled.  "For the purposes of estate administration, a debt barred by the statute of limitations is not a debt," but "the presentation of a verified claim to a fiduciary [here, the executrix] is . . . viewed as the commencement of a special proceeding which tolls the statute of limitations."  41 N.Y. JUR. 2D, *Decedents' Estates* § 1967 (2004).

[96]   The creditor's total recovery cannot exceed the market value of the distributed asset as of the date of distribution.  *See* N.Y. SURR. CT. PROC. ACT § 1802; N.Y. EST. POWERS & TRUSTS LAW §§ 11-1.1, 11-1.5, 11-4.5, 12-1.1.

Accordingly, if a creditor of Vincent Andrews, Sr.'s estate were to challenge successfully the appropriateness of Mrs. Andrews' distribution of the Letter Agreement to herself, it would be entitled to damages from Mrs. Andrews, and then from the Trust, up to the extent of the market value of the Letter Agreement at the time it was distributed – but it still could not rescind the transfer itself.[97]   Because Mrs. Andrews' property interest in the Letter Agreement as a distributee is thus indefeasible, and because Modell does not dispute that she transferred that interest to the Trust in January 2000, the Plaintiffs have standing to bring their claims in this litigation as a matter of law, and Modell's standing motion must be denied.

## II.    MODELL'S MOTION FOR SUMMARY JUDGMENT ON CONFLICT OF INTEREST AND CONSIDERATION GROUNDS MUST BE DENIED.

### A.    Modell's Conflict of Interest Claims Do Not Provide Any Basis for Summary Judgment.

The "voidability" prong of Modell's second motion for summary judgment asks this Court to find as a matter of law that John Wells and Robert Frisch of the Rogers & Wells firm (i) failed to advise Modell that they were also representing Vincent Andrews, Sr.; (ii) unduly pressured Modell to give Andrews an extraordinarily lucrative finder's free agreement to which he had no right, and secretly drafted that agreement for Andrews; and (iii) concealed their conflict until last summer, when documents produced by Rogers & Wells' successor purportedly divulged their "secret."   Based on these purportedly "undisputed facts", Modell claims the right to void the Letter Agreement entirely.

---

[97]   As with the date of distribution, the market value of the Letter Agreement on that date is an issue of fact, but not one that is material to *this* litigation.  *See* discussion, *supra*, at Part I.B.

Modell's motion for summary judgment on conflict of interest grounds must be denied

for the following independently sufficient reasons:

First, Modell's conflict of interest defenses are untimely raised, and for that
reason cannot form a basis for summary judgment in this litigation.

Second, even if there was an undisclosed conflict regarding the Letter Agreement
itself, Modell's remedy is not to void the agreement but to sue his former counsel
– which of course he has not done.

Third, even if the Court were to reach the facts, genuine issues of material fact
exist as to (i) whether Modell's former counsel actually represented Andrews in
connection with the Letter Agreement, and (ii) even if so, whether Modell
consented to or waived any conflict of interest.

Fourth, a host of credibility issues and disputed facts also preclude summary
judgment for Modell.  In particular:

- Modell's motion is based on inferences from his own recollection of
  events, even though Modell testified candidly that his recall was very
  poor.

- What Modell did recall is contradicted by contemporaneous documents,
  which at least create disputed facts regarding whether Rogers & Wells
  represented Andrews, Modell, or both (with their knowledge) in
  connection with the Letter Agreement.

- The documents, and the affidavit of a former Rogers & Wells partner, also
  create a dispute of fact regarding whether John Wells disclosed and
  obtained a waiver for any potential conflicts of interest, and when and why
  Modell parted ways with Rogers & Wells.

   **1.     Because They Should Be Stricken as Untimely Raised,
           Modell's Conflict of Interest Defenses Cannot Form a Basis for
           Summary Judgment in This Litigation.**

As Plaintiffs have previously explained, Modell's conflict of interest defenses should be

stricken because they were not timely raised and their consideration at this late stage would be

29

severely prejudicial. [98]   Accordingly, those defenses cannot form a basis for Modell's motion for

summary judgment.  *See S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367

(4th Cir. 2003);[99] *Williams v. The Gradall Co.*, 990 F. Supp. 442 (E.D. Va. 1998).[100]

---

[98]   More than four months after the close of discovery in this litigation and more than *thirty years* after he claims to have learned for the first time that his former lawyers represented both himself and Vincent Andrews, Modell added the conflict of interest defenses, which (if they had any merit) he should have pleaded affirmatively in response to Plaintiffs' original Complaint. Plaintiffs have had no opportunity to take any discovery on the merits of these defenses, information about which may well be hidden in documents Modell has withheld from production as privileged.  Because Modell has no credible excuse for his late pleading and Plaintiffs will be severely prejudiced by these new defenses, to which they cannot respond at trial without additional discovery, the Court should deem the new defenses waived and strike them from Modell's Amended Answer.  *See generally* Memorandum in Support of Plaintiffs' Motion to Strike Defendant's New Conflict of Interest Defenses to Plaintiffs' Amended Complaint, which Plaintiffs hereby incorporate by reference as if fully set forth herein.

[99]   In *Edwards*, the Fourth Circuit held that a two-year contractual limitations period should have been pleaded by the defendant as an affirmative defense.  Because the plaintiff "was taken by unfair surprise and prejudiced by the delayed assertion of the two-year limitation as a defense" for the first time in defendant's motion for summary judgment, *id.* at 373-74, the appellate court upheld the trial court's denial of summary judgment on limitations grounds, agreeing that the defendant had waived the limitations defense by its conduct.

[100]   In *Williams*, an equipment manufacturer raised for the first time in its motion for partial summary judgment a disclaimer defense to an injured employee's claim for breach of warranty. The trial court denied defendant's motion, holding that the defense was waived entirely for failure to raise it as an affirmative defense, given that (i) the defense had accrued, if at all, well before responsive pleadings in the case were filed, and (ii) the time for discovery pertaining to issues surrounding the alleged disclaimer of warranties had lapsed:

> Raising the defense at this late hour results in unfair surprise and inadequate opportunity to prepare to rebut the defense.  The Court finds that Gradall has waived the defense, and plaintiff would be prejudiced to permit the defense to be asserted at this time.

*Id.* at 446.  Trial courts in this circuit have also held that affirmative defenses that are not pleaded until after the close of discovery may not be used as a basis to defeat summary judgment.  *See Resolution Trust Corp. v. Southwest Dev. Co.*, 807 F. Supp. 375 (E.D.N.C. 1992), *order amended*, 837 F. Supp. 122, *aff'd in part and rev'd in part on other grounds sub nom.*, *Resolution Trust Corp. v. Cunningham*, 14 F.3d 596 (4th Cir. 1993).  If untimely affirmative

For reasons identical to those at issue in *Edwards* and *Williams*, use of Modell's new conflict of interest defenses at this late date would result in unfair surprise and prejudice to Plaintiffs.  Accordingly, those defenses cannot form a basis for Modell's motion for summary judgment.[101]

### 2. Summary Judgment for Modell in this Litigation Is Not an Appropriate Legal Remedy for Any Alleged Conflict of Interest on the Part of Modell's Former Attorneys.

Modell cites *no* case, and we are aware of none, in which a litigant was able to void a contract with a third party because of a lawyer's alleged conflict of interest.  That is because Modell's argument that the Letter Agreement is voidable fundamentally misreads agency law.  "[T]he concept of agency posits a consensual relationship in which one person, to one degree or another or respect or another, acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person."  RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. c (Tentative Draft No. 2, 2001) (Agency Defined).

There is absolutely no evidence that Rogers & Wells ever acted as a representative of either Modell or Andrews with power to affect either's legal rights and duties in connection with the Letter Agreement.  Indeed, all the evidence is to the contrary:  the contemporaneous evidence

---

defenses may not be used as a basis to defeat summary judgment, it follows *a fortiori* that they may not be used as grounds for summary judgment.

[101]   *See Morgan Guar. Trust Co. of N.Y. v. Blum*, 649 F.2d 342 (5th Cir. 1981) (district court did not abuse its discretion in denying defendant's motion, made after discovery was concluded and more than two years after complaint was filed, to amend answer to assert defense); *Toth v. Glazer*, 163 F.R.D. 549 (E.D. Wis. 1995) (amendment of answer to add affirmative defense denied as prejudicial to plaintiff after the close of discovery); *Ritz-Craft Corp. v. Stanford Mgmt. Group*, 800 F. Supp. 1312 (D. Md. 1992) (by failing to raise affirmative defense of accord and satisfaction in its responsive pleading, defendant waived defense, and was barred from presenting any evidence thereon except with plaintiff's consent).

includes a memorandum referring to an oral agreement that Modell and Andrews had reached between themselves in 1961,[102] which Rogers & Wells was asked to reduce to writing, and the resultant Letter Agreement, which was later signed by Modell and Andrews, each on his own behalf.

The Restatement provides that while the elements of common-law agency may be present in certain circumstances during the relationship between client and lawyer, RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. c., there is no agency relationship where, as here, the lawyer is merely advising the client: "*[I]f a service provider simply furnishes advice and does not interact with third parties as the representative of the recipient of the advice, the service provider is not acting as an agent.*" *Id.* (emphasis added). Because Rogers & Wells was simply furnishing advice to Modell, it was not his agent, and agency law does not determine what remedies Modell may obtain against a third party for the alleged conflict of interest.

In short, Modell's only remedy for Rogers & Wells' allegedly undisclosed conflict of interest is to seek recovery against its successor firm Clifford Chance US LLP ("Clifford Chance") for malpractice.[103] Modell's claim here that the Restatement of Agency permits him to void a contract his lawyers drafted fails as a matter of law.

---

[102]  *See* Exhibit 14.

[103]  Perhaps Modell could have sued Andrews or his estate to void the Letter Agreement when he claims to have discovered that Wells was "serving two masters" – but that was around the time Andrews died in 1969. Modell did not do so then, has not done so here, and of course it is too late for him to do so now.

      **3.**      **Genuine Issues of Material Fact Exist as to Whether Modell's Former Counsel Actually Represented Andrews in Connection with the Letter Agreement.**

            **a.**      **The "Admission" of a Present-Day Associate at Clifford Chance concerning Events about which She Concededly Has Personal Knowledge Is Irrelevant to Whether Rogers & Wells Represented Andrews in Connection with the Letter Agreement.**

The only evidence Modell proffers for his claim that Rogers & Wells represented Andrews in connection with the Letter Agreement is the purported "admission" of Rita McCloy Stephanz, a current associate at Clifford Chance, that Clifford Chance's predecessor firm, Rogers & Wells, represented both Modell and Andrews in connection with the Letter Agreement. *See* MSJM #2 at 6. As Ms. Stephanz's declaration submitted herewith makes clear, however, neither she nor anyone else currently at Clifford Chance has any personal knowledge of whether Rogers & Wells ever represented either Modell or Andrews, in connection with the Letter Agreement or otherwise, and her prior statements to that effect were based solely on her review of documents in the files of Clifford Chance, which speak for themselves – and are inconclusive at best.[104] Modell cannot seize upon a purported "admission" by Ms. Stephanz in this regard to resolve ambiguities in the documents – among other things, her statement lacks the requisite evidentiary foundation, and is inadmissible.[105]

---

[104]   *See* Exhibit 48, the declaration of Rita McCloy Stephanz.

[105]   In any event, the location of documents in Andrews' files at Clifford Chance is not dispositive of the question whether Rogers & Wells represented Andrews in connection with the Letter Agreement any more than the location of similar documents in Modell's files at Clifford Chance is dispositive of the question of whether Modell had notice of that representation.

      **b.**      **Modell Has Himself Insisted that the Documentary Evidence Does Not by Itself Demonstrate that Rogers & Wells Represented Andrews in Connection with the Letter Agreement.**

Modell now claims that the January 29, 1963 letter from Robert Frisch of Rogers & Wells to Andrews proves that Rogers & Wells represented Andrews in connection with the Letter Agreement.  MSJM #2 at 7.  But Modell took precisely the opposite position two months ago, when explaining why he had not promptly raised the "conflict" defense after receiving this letter and other similar documents from Clifford Chance in July 2003 and Plaintiffs in January 2004:  "neither he [Modell] nor we [Modell's counsel] knew that Mr. Wells represented Mr. Andrews Sr. in connection with [the] Letter Agreement *until (a) your firm* [*i.e.*, Plaintiffs' counsel] *waived Mr. Andrews Sr.'s attorney-client privilege and (b) Clifford Chance produced the documents attached to Ms. Stephanz's letter of September 15, 2004 . . . . [U]ntil we received these Clifford Chance documents . . . we had no direct evidence of that conflict*."[106]

Modell cannot have it both ways:  If the 1963 Frisch letter was not sufficient even to put Modell on notice of a potential defense, it cannot now possibly form the basis for summary judgment in his favor on precisely that basis.  The same holds true for the other documents on which Modell's motion relies – all but one of which were produced in this litigation well in advance of September 15, 2004.[107]

---

[106]  *See* Exhibit 49, a letter from Douglas R. M. Nazarian to Christopher M. Green, dated January 3, 2005 (emphasis added).

[107]  *See* Exhibit 50, the Clifford Chance documents and their counterparts which have been produced in this litigation.  An exact copy of CC00470, a transmittal letter from Frisch to Andrews, was produced by Plaintiffs on January 1, 2004.  *See* P00088.  An exact copy of CC00471, a transmittal letter from Frisch to Modell, was also previously produced by both Plaintiffs (on January 1, 2004) and Modell (on February 19, 2004).  *See* P00089; ABM05642. An exact copy of CC00472-73, a transmittal letter from Frisch to Andrews, was also previously

c.      **The 1961 Frisch Memo Does Not Demonstrate that
Rogers & Wells Represented Andrews in Connection
with the Letter Agreement.**

The only document relied on by Modell that he has not labeled inconclusive – a memo

from Frisch to Wells dated April 11, 1961 (the "1961 Frisch Memo")[108] – actually tends to

*disprove* Modell's claim.  The 1961 Frisch Memo describes a call from Andrews advising Frisch

of Modell's agreement to make the payments later codified in the Letter Agreement, and asking

Frisch to "draw up the necessary documents."[109]  As noted above, Wells wrote on the memo that

he had no objection to doing so "[p]rovided we first check with Artie."

Wells' note refutes Modell's theory that Andrews induced Modell's counsel to secretly

betray him in favor of Andrews in drafting the agreement.  The most reasonable interpretation of

this note is that Wells looked to Modell, and not Andrews, for direction (and a waiver) in

connection with the Letter Agreement's drafting.[110]

---

produced by both Plaintiffs (on January 1, 2004) and Modell (on March 5, 2004).  *See* P00084-85; ABM00131-32.

[108]    *See* Exhibit 14.

[109]    Notably, the 1961 Frisch memo indicates that the finder's fee and quarterly retainer fee were Modell's ideas, and thus appears to contradict Modell's self-serving testimony that he was "persuaded" by John Wells to enter into the Letter Agreement.

[110]    The fact that Andrews asked Wells' colleague Frisch in 1961 to draft the Letter Agreement (which then was apparently not drafted for almost two years) is also far from "direct evidence" that Rogers & Wells represented Andrews in connection with the Letter Agreement – much less that it did so without Modell's knowledge.

**4.      The Documentary Evidence Does Not Compel the Conclusion that Rogers & Wells Represented Andrews in Connection with the Letter Agreement.**

None of the documents discussed by Modell (or any other documents in the record) proves that Rogers & Wells represented Andrews *without Modell's consent* in connection with the Letter Agreement.  In fact, the documentary evidence is entirely consistent with a finding that Rogers & Wells either did not represent Andrews in connection with the Letter Agreement, or did so with Modell's consent.[111]

First, the 1963 letters from Frisch to Andrews – which Modell attempts to portray as duplicitous,[112] are completely consistent with the manner in which an attorney could appropriately represent his client (*i.e.*, Modell) by working out the details of a contract with another unrepresented party (*i.e.*, Andrews) and obtain that party's signature on the contract before presenting the contract to his client for review and execution.

Second, as explained above, the fact that the Letter Agreement was not drafted for almost two years after Andrews first asked Frisch to draft it in 1961, and Wells' handwritten note on the 1961 Frisch Memo instructing Frisch to "first check with Artie," suggests that Rogers & Wells either represented Modell, not Andrews, in connection with the Letter Agreement, or acted with Modell's informed consent.

---

[111]   *See Ross*, 759 F.2d at 364 (quoting *Charbonnages*, 597 F.2d at 414) ("The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to plaintiff, as the party opposing the motion . . . .  The nonmoving party is . . . entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.'").

[112]   *See* MSJM #2 at 7-8; Exhibit 50 at CC00472 – CC00473, P00084 – P00085; ABM 00131 – ABM00132; *id.* at CC00470, P00088.

<u>Third</u>, a letter written by Andrews on November 4, 1964 provides direct evidence that Rogers & Wells represented only Modell in connection with the Letter Agreement.[113]  In this letter, apparently written to satisfy the Bank of Commerce (a lender to which Andrews was indebted), Andrews wrote Frisch as follows:

> *As attorneys for the Cleveland Browns*, you are aware of a certain contract
> between myself and Arthur Modell wherein I am to receive certain payments in
> the event of a sale of the Cleveland Browns stock.  This is to advise you that in
> the event any proceeds are due me by virtue of the sale of this stock, such
> payment should be made directly to the Bank of Commerce, 56 East 42nd Street,
> New York, N.Y., attention of Mr. Malcolm Angus.

*Id.* (emphasis added).  Given that Andrews was obviously writing this letter to assure his banker Malcolm Angus (who received a copy) that Bank of Commerce would receive any finder's fee proceeds first, Andrews had every incentive to demonstrate to Angus that Frisch would be a cooperative intermediary in the event a finder's fee was paid by Modell.  Accordingly, if Frisch (and Rogers & Wells) were also (or only) Andrews' attorneys in connection with the Letter Agreement, Andrews had reason to say so in this letter.  The fact that he did not – and instead referred to Rogers & Wells as counsel to the Browns – indicates that Rogers & Wells did not represent him in connection with the Letter Agreement, and instead represented Modell's interests.  At a minimum, it raises a genuine issue of material fact in that regard which precludes summary judgment for Modell on his conflict of interest defenses.

---

[113]   *See* Exhibit 51, a letter from Vincent S. Andrews to Robert Frisch, dated November 4, 1964.

### 5.   Even if Rogers & Wells Represented Andrews in Connection with the Letter Agreement, Modell Waived Any Conflict of Interest.

Rogers & Wells represented Andrews in 1957, long before 1961.[114]  Because John Wells "first represented Mr. Modell during his acquisition of the Browns" in 1961, MSJM #2 at 5, it is reasonable to infer that Vincent Andrews brought Modell to Rogers & Wells as a prospective client at or about the same time as he introduced Modell to the possibility of purchasing the Cleveland Browns.

In any event, even if Modell did not know that Rogers & Wells represented Andrews before representing him, documents produced by Modell in this litigation show that Modell knew in 1960, *before* he signed the 1963 Letter Agreement, that Rogers & Wells represented both him and Andrews in connection with the acquisition of the Browns.  For example, a Rogers & Wells memorandum from R. E. Frisch to John Wells dated December 14, 1960 (the "1960 Frisch Memo") confirms (i) that Wells' colleague Frisch gave identical legal advice to both Andrews and Modell prior to the initial purchase of the Cleveland Browns, and (ii) that each man knew that the other had received that advice.[115]  Excerpts from that memorandum are set forth below:

> I have spoken to both Arthur Modell and Vinnie Andrews, and they have confirmed to me their decision to make the following verbal offer [to purchase the Cleveland Browns].

> Assuming this offer mis [sic] accepted, Modell and Andrews will proceed to form a Delaware Corporation, also called "Cleveland Browns, Inc." . . . .

> I have previously told Modell and Andrews (and obtained Jones's and Haber's consent) that any purchase of the Browns should be a purchase of assets.

---

[114]   *See* Exhibit 6 at entries 48 and 49, listing letters from December 1957 concerning "Employment Contract" and "Retainer Agreement."

[115]   *See* Exhibit 4.

In speaking to both Modell and Andrews, I pointed out the severity of forfeiture [for failure to close the transaction] of $500,000.  (I told each of them that sum of money could buy "a river of gin.")

Each of them told me, however, that they were so confident that they could raise the necessary money in their new corporation that they saw no reason why they should not and every reason why they should pay $500,000 down and forfeitable.

Each of them said that he had enough confidence in the principals with whom they were dealing to go ahead on a handshake basis and "leave it to the lawyers" to draw the necessary documents reflecting their formal agreement.

As a matter of law, Modell's knowledge that Rogers & Wells represented Andrews in connection with the Browns purchase at the same time it represented him (and possibly before it represented him), constituted a waiver of any right to object to Rogers & Wells' continued representation of Andrews.  *See Cleveland v. Cleveland Elec. Illuminating Co.,* 440 F. Supp. 193 (D. Ohio 1976), *aff'd*, 573 F.2d 1310 (6th Cir. 1977) (City waived any objection to law firm's continued representation of electric company in antitrust action brought by city against electric company where city voluntarily sought law firm's representation as bond counsel, notwithstanding city's knowledge of law firm's long-standing representation of electric company.).

### 6. Genuine Issues of Material Fact, and Credibility, Exist Regarding Whether Modell Consented to Any Dual Representation.

Modell's summary judgment memorandum argues that "Mr. Modell neither knew about nor consented to his [prior] attorneys' simultaneous representation of Mr. Andrews in connection with the Letter Agreement."  MSJM #2 at 4.  But Modell himself has provided no testimony in

support of this contention.[116]   Moreover, Mr. Modell testified candidly that his recollection is not

reliable about recent events, much less events of forty years ago:

> Q   Okay.  Through the '60s, you were represented by Rogers & Wells; is that
> fair to say?
> MR. BARLEY:  If you remember.
> A   I don't remember.
> Q   Okay.
> A   I don't even know what I had for breakfast this morning.[117]
>
> Q   Was there something that was unclear about the agreement in your mind when
> you signed it?
> A   Mr. Hayes, I've had two heart attacks and a stroke, I can't remember things of
> last week, let alone going back 40 years if I had a feeling or an interpretation or I
> had reason to ask somebody about this, no, I can't answer that.  I would be telling
> an untruth if I did say I could.[118]

Given the contemporaneous documentary evidence (discussed above and below),

Modell's testimony cannot possibly support summary judgment in his favor, contrary to the

reasonable inferences that must be drawn from the documents.  For example, documentary

evidence currently in the record (such as the 1961 Frisch memo, discussed above)[119] indicates

---

[116]   Instead, Modell's summary judgment memorandum states, *on the same page*, that at his deposition, "Mr. Modell testified that he later learned that his [prior] attorneys represented Andrews *in other matters*."  *Id.* (emphasis added).  Since Modell takes the position that he did not testify at his deposition that he had learned about the alleged conflict *in connection with the Letter Agreement* prior to his breakup with Rogers & Wells, but only learned about it during discovery in this litigation, and since Modell has provided no further testimony on this point by affidavit, it is clear that Modell has submitted no admissible evidence that he neither knew about nor consented to his prior attorneys' simultaneous representation of Andrews in connection with the Letter Agreement.  Accordingly, Modell's motion for summary judgment on this ground must also be denied for lack of evidentiary support.

[117]   *See* Exhibit 2 at 18:13-19.

[118]   *Id.* at 37:12-19.

[119]   As noted above, the 1961 Frisch Memo describes a call from Andrews advising Rogers & Wells attorney Robert Frisch of Modell's agreement to make the payments later codified in the Letter Agreement, and asking Frisch to "draw up the necessary documents."  *See* Exhibit 14.  In

that any conflict – if one existed – was disclosed to Modell, who nevertheless executed the Letter Agreement.

Assuming (as is reasonable) that Frisch or Wells did, as Wells requested in a notation on the 1961 Frisch memo, "check with Artie," they would have told him at a minimum about Andrews' statement that Modell had agreed to pay him, and Andrews' request that they draft the necessary documents. In other words, Modell would have learned that Andrews had communicated with Rogers & Wells concerning the Letter Agreement without Modell's prior or concurrent knowledge. If such communications are tantamount to proof of Rogers & Wells representing Andrews – as Modell argues they are, *see* MSJM #2 at 7-8 – then the evidence strongly suggests that Modell consented to any such representation by signing the Letter Agreement in 1963, after Frisch and Wells "check[ed] with" him.[120]

Finally, credibility concerns prevent summary judgment for Modell based on his own, uncorroborated recollections.[121] Even if Modell were to submit an affidavit specifically stating

---

a handwritten notation on this memo, John Wells instructed Frisch to act on Andrews' request only "[p]rovided we first check with Artie." *Id.* Notably, the 1961 Frisch memo indicates that the finder's fee and quarterly retainer fee were Modell's ideas, and thus appears to contradict Modell's self-serving testimony that he was "persuaded" by John Wells to enter into the Letter Agreement. MSJM #2 at 6.

[120] *See Ross*, 759 F.2d at 364 (quoting *Charbonnages*, 597 F.2d at 414) ("The nonmoving party is . . . entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.'").

[121] *See Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 575 (7th Cir. 1987) ("'Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial . . . .'" (quoting 10A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2726, at 115-16 (2d ed. 1983)).

that John Wells represented Andrews in connection with the Letter Agreement without his

knowledge or consent, the affidavit of Wells' colleague and Modell's acquaintance Eugene T.

Rossides, submitted herewith, would call the credibility of any such testimony into question.

Mr. Rossides, a law partner of Wells for fourteen years and a former Assistant Secretary

of the U.S. Treasury Department who knew both Modell and Andrews, has testified that

Modell's conflict of interest claim is not credible:

> John Wells was a very careful and highly ethical attorney.  It was his practice at
> all times to make the disclosures and obtain the approvals necessary to avoid any
> conflicts of interest.  Based upon my personal knowledge of John Wells, which
> was developed during my approximately 14-year association with him, I do not
> believe he would have represented Mr. Andrews in connection with the
> negotiation and execution of the February 1963 Letter Agreement without the
> knowledge and/or consent of Mr. Modell.[122]

Because issues of credibility are particularly acute in cases like this one, "when the

knowledge of the events or occurrences on which the [defense] is based lies exclusively within

the control of the party moving for summary judgment," courts are "reluctant to deprive the

nonmoving party of the opportunity of testing the credibility of the movant or the movant's

witnesses in open court in this context."  10A WRIGHT & MILLER, FEDERAL PRACTICE AND

PROCEDURE § 2726, at 453 (1998).  Here, Modell is the only person still alive who could

possibly know whether Rogers & Wells disclosed any possible conflict and whether he

consented.  Yet Modell's testimony cannot even be reconciled with his own privilege log:

Modell testified that he fired Rogers & Wells after discovering their representation of Andrews,

around the time Andrews died – but that was in 1969, but his privilege log shows that Rogers &

---

[122]   *See* Exhibit 52, the declaration of Eugene T. Rossides, at ¶¶ 6-7.

Wells continued to advise him and the Browns until 1987.[123]   That discrepancy, and the

testimony Mr. Rossides has provided the Court, both cast doubt on Modell's credibility and

render summary judgment for Modell on this issue improper.[124]

### B.      Modell's "No Consideration" Argument Does Not Mandate Summary Judgment.

The "no consideration" prong of Modell's second motion insists that Rogers & Wells was

sufficiently incompetent in its covert work on Andrews' behalf that the agreement it drafted was

unenforceable because it lacked any consideration (this is in addition to Modell's motion for

summary judgment on the merits, which claims that the Letter Agreement was also drafted so as

to permit Modell to evade its terms permanently, *see* MSJM #3 at 16).

Modell's motion for summary judgment on consideration grounds should be denied for

the following independently sufficient reasons:

> First, a genuine issue of material fact exists as to whether Andrews' past acts were performed at Modell's request, which would make the finder's fee provision binding under Ohio law.

> Second, as a matter of law, Andrews' promise to render "such business advice" as Modell "may request" provided adequate consideration for the entire Letter Agreement.

> Third, as a matter of law, a contracting party may not employ the doctrine of contractual "severability" to defeat unwanted contractual obligations on the grounds that they are unsupported by consideration.

---

[123]   *See* Exhibit 7 at 31, 33 & 48, listing as privileged documents generated by Rogers & Wells in 1985 and 1987.

[124]   *See, e.g., Thomas v. Great Atl. & Pac. Tea Co., Inc.*, 233 F.3d 326, 331 (5th Cir. 2000) (upholding the denial of summary judgment that would have been based solely on self-serving testimony, noting that "when the circumstances are conducive to lying" by witnesses at the summary judgment stage, a "well-supported suspicion of mendacity may serve as a legitimate basis for a factfinder's reasonable inferences concerning the ultimate facts at issue.")

<u>Fourth</u>, even if the finder's fee provision of the Letter Agreement were severable from the business management provision, that provision is nevertheless enforceable as a charitable contribution.

> **1.    A Material Issue of Genuine Fact Exists as to Whether Andrews' Past Acts Were Performed at Modell's Request, Thus Making the Finder's Fee Provision Binding under Ohio Law and Foreclosing Summary Judgment for Modell.**

Under Ohio law, past consideration is generally insufficient to support a promise.  17 OHIO JUR. 3D, *Contracts* § 54 (2004).  However, a promise to pay for some act previously done at the request of the promisor *is* binding in Ohio, since an implied contract arises in such a case.[125]

For example, in *Owens v. Baker*, 193 N.E. 778, 781 (Ohio 1933), the Ohio Supreme Court held that defendants' written promise to pay a real estate commission was enforceable despite their claim that they signed the contract entitling the agent to a commission only after a verbal promise by the agent not to pursue the commission.  The defendants also argued that the agent's services 'were fully completed when the defendants signed the contract, and that therefore, being an executed or past consideration," those services did not "support their promise to pay the plaintiff his commission."  *Id.*  The court disagreed, noting that "[t]hat which is often called a past consideration may support a subsequent promise where there was a request, either actual or implied, under such circumstances as evidence an intention that there should be a recompense."[126]

---

[125]    *Id.; see also* 4 WILLISTON ON CONTRACTS § 8:11 (4th ed. 2004) ("[W]here services are rendered because requested as part of a business transaction, so that there is consequently a contemporaneous implied in fact promise to pay for them, the majority of courts hold valid the subsequent promise as defining the extent of the promisor's obligation.").

[126]    *Id.* (quoting ELLIOTT ON CONTRACTS, Vol. 1, §§ 205, 214).  Similarly, in *Morgan v. Rusk*, 174 N.E. 142, 143 (Ohio Ct. App. 1930), the court held that the city of Cleveland could legally

Thus if Modell asked Andrews to introduce him to "Curly" Morrison in 1960, the finder's fee provision of the Letter Agreement is enforceable despite the fact that Andrews' 1960 introduction was a "past act" in February 1963, and despite the fact that Andrews executed a release in Modell's favor in January 1963. *See Owens*, 193 N.E. at 778. But whether Modell asked Andrews to introduce him to Morrison is a genuine issue of material fact that cannot be resolved on the current record.[127] Accordingly, Modell's motion for summary judgment must be denied.[128]

---

compensate a citizen for his past performance of an heroic act, because that act was performed at the request of a city official. *See also Worner Agency, Inc. v. Doyle*, 479 N.E.2d 468. 473 (Ill. App. Ct. 1985) ("Performance may ameliorate an initial lack of consideration if the performance is clearly invited."); *Reece v. Reece*, 212 A.2d 468, 474 (Md. 1965) ("a present promise to pay in consideration of an act previously done at the request of the promisor will be enforceable as supported by sufficient consideration even though that consideration consists of an act previously done").

[127] Although Modell's current attorneys claim that "Andrews offered to introduce him to people who were authorized to sell the team," MSJM #2 at 2, **Plaintiffs dispute** this self-serving characterization of what happened. It is equally likely that *Modell asked Andrews* to be introduced to people who were authorized to sell the team. The record is uninformative on this point. Modell has testified that Andrews "called me and asked if I was interested in buying a professional team . . . . I quickly came over, and at that time met Curly Morrison, a former Brown's football player, who was authorized by the Brown's ownership, principally Dave Jones, President of the Browns, to seek a buyer for the franchise." *See* Exhibit 1 at 5:21 – 6:11. He has also testified that Vincent Andrews introduced him to Curly Morrison and Roger Struck in Andrews' office. *See* Exhibit 2 at 28:2-17. But Modell has not testified as to who asked for these introductions – him or Andrews.

[128] *See Ross*, 759 F.2d at 364 (quoting *Charbonnages*, 597 F.2d at 414) ("The nonmoving party is . . . entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.'").

### 2.     Andrews' Promise to Render Business Advice to Modell on Request Provided Adequate Consideration for the Entire Letter Agreement.

The Letter Agreement contains three numbered provisions.[129]  In the first of these, the "business management" provision, Modell agreed to pay Andrews $3,000 annually to retain him as his business manager.  Modell concedes (as he must) that this provision of the Letter Agreement is supported by bargained-for consideration – Andrews' promise "[i]n consideration of such retainer" to render "such business advice" as Modell "may request."[130]  As a matter of law, this bargained-for consideration is sufficient to support the entire Letter Agreement.

Although Modell characterizes the Letter Agreement as promising "an enormous windfall" to Andrews, it is nevertheless true that "ordinarily . . . courts do not inquire into the adequacy of consideration."  RESTATEMENT (SECOND) OF CONTRACTS § 79, cmt. c (1981).  "To the extent that the apportionment of productive energy and product in the economy are left to private action, the parties to transactions are free to fix their own valuations."  *Id.*  Accordingly, it is axiomatic that even a peppercorn is legally sufficient consideration to support a promise.[131]

---

[129]   In the first numbered provision, Modell agreed to retain Andrews as his business manager; in the second, Modell agreed to pay Andrews a finder's fee; and in the third, Andrews agreed not to delegate the business management services, payment for which was made contingent on Andrews' ability to perform them, and Modell agreed to pay the finder's fee to Andrews' estate in the event of the latter's death.  *See* Exhibit 15.

[130]   Modell concedes that "[t]he Employment Agreement makes clear that Mr. Andrews's services as business manager were exchanged . . . for the retainer."  MSJM #2 at 21 & n.75.

[131]   *See, e.g., King County v. Taxpayers of King County*, 949 P.2d 1260, 1278 (Wash. 1997) (Sanders, J., dissenting) ("The peppercorn is the classic example of 'consideration given' that does not match the value received and thus represents nominal payment. Under English law a peppercorn was the stated rent in many nominal lease contracts. BLACK'S LAW DICTIONARY 1135 (6th ed. 1990) (peppercorn is 'the reservation of a merely nominal rent, on a lease'); 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 440 (1766) (referring to the

Absent the application of some special exception to this general rule, Andrews' promise to

render business advice to Modell is adequate consideration for the entire Letter Agreement.

> **3.     The Doctrine of Contractual "Severability" Does Not Apply
> Here to Allow Modell to Defeat His Unwanted Finder's Fee
> Obligation on Consideration Grounds.**
>
> > **a.     Ohio Law Does Not Allow Parties to Sever a
> > Contractual Provision Merely Because It Is
> > Unsupported by Consideration.**

Modell argues that Andrews' promise in the "business management" provision of the

Letter Agreement to render "such business advice" as Modell "may request" cannot, as a matter

of law, constitute consideration for the Letter Agreement's "finder's fee" provision, because the

latter provision is "severable" and whether it is supported by adequate consideration must be

evaluated separately.[132]  As a matter of Ohio law, this argument has no merit.

In Ohio, the concept of severability does not apply to situations in which a contracting

party (here, Modell) singles out one of a number of contractual obligations in an otherwise valid

agreement and seeks judicial relief from the enforcement of that obligation on the grounds that it

is not supported by consideration *separate from* that which supports the remainder of the

contract.[133]  Instead, severability applies only in one of three very different situations: <u>first</u>, "in

---

practice of requiring payment of a peppercorn for a leasehold as nominal rent).").

[132]  Modell also argues that the "business management" provision of the Letter Agreement was
breached when Andrews died prior to December 31, 1970.  MSJM #2 at 22.  This argument is
wholly without merit because, as Modell notes, the Letter Agreement made Modell's "obligation
to make the payments specified in Section 1 . . . contingent upon [Andrews'] continued ability to
perform." *Id.* at 22, n.77.  When Andrews died, he could no longer perform, and Modell's
obligation to pay ended; Andrews' death did not "breach" the Letter Agreement.

[133]  None of the New York cases cited by Modell holds that a contractual obligation unsupported
by consideration should for that reason be severed from an otherwise valid contract and found
independently unenforceable. *See Ripley v. Int'l Railways of Central America*, 171 N.E.2d 443

the situation in which a party is allowed to enforce one part of an agreement even *though another part of the same agreement is unenforceable on grounds of public policy*, for the reason that the first part does not materially advance the improper purpose";[134] second, to "*mitigate the harshness of a rule that bars a party from enforcing an agreement* by apportioning the performances into corresponding pairs of part performances and then enforcing the agreement as to only one part";[135] or third, *when a party is allowed to insist on his right to a return performance under one part of an agreement* even though he has committed a material breach

---

(N.Y. 1960) (approving severance of unfair rate terms from cartage contracts because the rate terms were agreed to separately, and reforming those terms to allow plaintiffs to recover "fair and reasonable valuation of the services rendered"); *Spaulding v. Benenati*, 442 N.E.2d 1244 (N.Y. 1982) (*reversing* the intermediate appellate court's severance from a purchase contract of a sale of good will provision alleged to be unsupported by consideration); *Lai v. Lau*, 670 N.Y.S.2d 724 (N.Y. Sup. Ct. 1998) (severing and *enforcing* an indemnification provision agreement from a sale contract, enforcement of which was time-barred); *Noto v. Satloff*, 239 N.Y.S.2d 324 (N.Y. Civ. Ct. 1963) (*refusing* to sever a contractual provision alleged to be unsupported by consideration).

[134]   For example, in *Toledo Police Patrolmen's Ass'n v. City of Toledo*, 641 N.E.2d 799, 803 (Ohio Ct. App. 1994), the only Ohio case cited by Modell in support of his severability argument, the court declared the confidentiality provision in a police officers' collective bargaining agreement unenforceable because it was in direct conflict with an Ohio statute declaring that public records be made available for public inspection.  Instead of striking down the entire agreement, however, the court severed the confidentiality provision and enforced the remainder of the contract, relying in part on a savings clause stating that "[i]f any article or section of this contract or any rider thereto should be held invalid, illegal or unenforceable by operation of the law or by any tribunal of competent jurisdiction . . . the remainder of this contract or any rider thereto . . . shall not be affected thereby."

[135]   In *Frantz v. Maher*, 155 N.E.2d 471 (Ohio Ct. App. 1957), after it determined that an oral contract to make a will violated Ohio's statute of frauds, the court nevertheless severed and enforced a provision concerning the transfer of personal property that did not violate the statute.

under another part of the same agreement."[136]  RESTATEMENT (SECOND) OF CONTRACTS § 183,

cmt. a (1981) (emphasis added).

 None of the Restatement's three severability requirements exists here.  Moreover, Modell

has cited no Ohio authority authorizing this Court to sever the finder's fee provision of the Letter

Agreement for want of consideration.  Indeed, the only Ohio court to address such a request has

refused to sever a contractual provision on grounds of no consideration.  *See Sannes v. Jeff Wyler*

*Chevrolet, Inc.*, 736 N.E.2d 112 (Ohio Ct. Com. Pl. 1999).  In *Sannes*, the defendant argued that

its promise to assist plaintiffs in obtaining credit was unenforceable because it was unsupported

by any consideration separate from the $1,346.62 ($446.62 in cash and $900 in trade-in equity)

that defendant argued was given solely in exchange for a truck purchased by plaintiffs.  *Id.* at

115.  The court refused to sever the promise of credit assistance from the purchase agreement.

 In sum, to the extent that Modell's summary judgment relies upon his "severability"

argument, it must be denied as a matter of law.

> **b.** **Far from Requiring Severance, Ohio Law Endorses the**
> **Enforcement of Contracts Governing Transactions that**
> **Are in Part a Bargain and in Part a Gift.**

 It is hornbook law in Ohio (and elsewhere) that when a transaction is in part a bargain

and in part a gift, the element of bargain may furnish consideration for the entire transaction:

> In most commercial bargains there is a rough equivalence between the value
> promised and the value received as consideration.  But the social functions of
> bargains include the provision of opportunity for free individual action and
> exercise of judgment and the fixing of values by private action, either generally or
> for purposes of the particular transaction.  Those functions would be impaired by

---

[136]   In *Gilbert-Varker Corp. v. Carrig*, 50 N.E.2d 59 (Mass. 1943), the court held that a contract
to build thirty-five houses was a "divisible" one, and the contractor's breach of that contract by
refusing to construct the final fifteen houses did not bar the contractor from recovering the
unpaid balance for work done and materials furnished in constructing the first twenty houses.

judicial review of the values so fixed.  Ordinarily, therefore, courts do not inquire into the adequacy of consideration, particularly where one or both of the values exchanged are difficult to measure.  *Even where both parties know that a transaction is in part a bargain and in part a gift, the element of bargain may nevertheless furnish consideration for the entire transaction.*[137]

Modell's summary judgment motion repeatedly describes the Letter Agreement as "gratuitous."  *See* MSJM #2 at 8, 15, 22.  At his deposition, Modell even testified that the Letter Agreement was an "act of charity":  "[I]f I can characterize this, this is an act of charity for Vincent Andrews, a charitable move on my part to ease some of the pain that he inflicted upon himself with not coming up with the money at the 11th hour, causing me to scrounge around and find Rudy Schaefer who came in."[138]

Far from precluding enforcement of the Letter Agreement, as Modell incorrectly argues, *see, e.g.*, MSJM #2 at 22, the "gratuitous" nature of the Letter Agreement requires its enforcement because even Modell concedes that the "business manager" provision of the Letter Agreement is supported by bargained-for consideration.  Under Restatement Section 71, which governs in Ohio,[139] that consideration is sufficient to support the entire Letter Agreement, even though (and perhaps because) Modell has admitted that the finder's fee provision was a gift.

---

[137]   RESTATEMENT (SECOND) OF CONTRACTS § 71, cmt. c (1981) (emphasis added); *see, e.g., Pasant v. Jackson Nat'l Life Ins. Co.*, 52 F.3d 94 (5th Cir. 1995) (even if "part of [defendant's agent's] motivations was a reward for [plaintiff] for past services, a promise that is supported by a mixture of gift and bargain is supported by adequate consideration" (citing CALAMARI AND PERILLO, CONTRACTS § 4-7 at 200 (3d ed. 1987)).

[138]   *See* Exhibit 2 at 22:17 – 23:1.

[139]   *See Dantz v. Am. Apple Group, LLC*, 2005 WL 465253, at *5 (6th Cir. Mar. 1, 2005) (applying Section 71 under Ohio law); *See, e.g., Brantley Venture Partners, II. L.P. v. Dauphin Deposit Bank and Trust Co.*, 7 F. Supp. 2d 936, 945-46 (N.D. Ohio 1998) (same); *Women's Fed. Sav. & Loan Ass'n v. Potz*, 1983 WL 2790, at *3 (Ohio Ct. App. Nov. 17, 1983) (same).

Indeed, Restatement Section 71 directly refutes Modell's contention that the finder's fee

provision is unenforceable and can appropriately be severed from the Letter Agreement.

> ### 4.      Alternatively, the Finder's Fee Provision of the Letter Agreement Is Enforceable as a Charitable Subscription.

Finally, even if this Court finds that the finder's fee provision is both severable from the

remainder of the Letter Agreement and unsupported by consideration, it should enforce the

provision as a charitable subscription.  As Modell put it, the Letter Agreement was "an act of

charity for Vincent Andrews."[140]  Under Restatement (Second) of Contracts § 90, which has

been adopted by the Ohio Supreme Court, *see Shampton v. City of Springboro*, 786 N.E.2d 883,

887 (Ohio 2003), a charitable subscription is enforceable *without* consideration.[141]

Although no Ohio court has yet been asked to apply Section 90 to determine the

enforceability of a charitable subscription unsupported by consideration, the courts of other

states that have adopted Section 90 of the Restatement have consistently found such a

subscription to be enforceable.  *See, e.g.*, *Friends of Lubavitch/Landow Yeshiva v. Northern*

*Trust Bank of Fla.*, 685 S.O.2d 951 (Fla. Dist. Ct. App. 1996); *Jewish Fed'n of Cent. N.J. v.*

*Baroness*, 560 A.2d 1353 (N.J. Super. Ct. Law Div. 1989); *Salsbury v. Northwestern Bell Tel.*

---

[140]   *See* Exhibit 2 at 22:17 – 23:1.

[141]   RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981) ("(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise . . . (2) A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance."); *see also* R. Posner, *Gratuitous Promises in Economics and Law*, 6 JOURNAL OF LEGAL STUDIES 411, 420 (1977) (discussing efficiency rationales for judicial enforcement of charitable subscriptions in the absence of consideration and/or reliance).

*Co.*, 221 N.W.2d 609 (Iowa 1974).  Because an Ohio court would likely follow these decisions

and the Restatement, Modell's motion for summary judgment must be denied.[142]

### III.   MULTIPLE GENUINE ISSUES OF MATERIAL FACT PRECLUDE MODELL'S MOTION FOR SUMMARY JUDGMENT #3 ("NO TRIGGERING EVENT").

Modell's third motion for summary judgment is precluded on each of the following

independently sufficient grounds:

First, a genuine issue of material fact exists as to whether Modell acted in bad faith when, after having been sued, he engineered the Nevermore arrangement to deny Andrews' heirs the finder's fee they were otherwise due.

Second, genuine issues of material fact exist as to whether Nevermore's 1 Common Unit has in substance already been sold to BFC for $6 million (plus simple annual interest of 3%), which if true would result in the divestment of Modell's "stock interest" in the team.

Third, a genuine issue of material fact exists as to whether the character of Nevermore's indirect interest in the team is so materially different from the "stock interest" referred to in the Letter Agreement that Modell can be said to have sold his entire "stock interest" in the team.

Fourth, a genuine issue of material fact exists as to whether a reasonable person in the position of Vincent Andrews Sr. would have been justified in understanding that the Letter Agreement included a promise by Modell that he would not undertake to avoid indefinitely paying Andrews a finder's fee of at least $21.5 million by reconfiguring existing contractual arrangements to defer the final $6 million installment of sales proceeds after having already received $579 million in proceeds.

Fifth, a genuine issue of material fact exists as to whether the Trust represented by Plaintiffs is a third party beneficiary of the PUPA and OPA.

---

[142]   *See Ross*, 759 F.2d at 364 (quoting *Charbonnages*, 597 F.2d at 414) ("The nonmoving party is . . . entitled 'to . . . be given the benefit of all favorable legal theories invoked by the evidence as considered.'").

### A.      Under the Doctrine of Prevention, Whether Modell Acted in Bad Faith when He Engineered the April 8, 2004 Nevermore Arrangement Is a Genuine Issue of Material Fact that Precludes Summary Judgment for Modell.

The common law doctrine of prevention mandates that "where the obligations arising under a contract have attached and thereafter one party without the consent of the other does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms, that party cannot avail itself of that [conduct] to avoid its liability to the other party." *Benatty Corp. v. Transatlantic Energy Corp.*, 1994 WL 668103 (Ohio Ct. App. Nov. 8, 1994) (citing and paraphrasing *Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304 (Ohio 1919)).  Under the doctrine of prevention, it is well settled that "[o]ne who *unjustly* prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as a condition.  He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised."  3A CORBIN ON CONTRACTS § 767 (1960) (emphasis added).[143]

### 1.      The Doctrine of Prevention Applies Precisely when the Defendant Prevents the Condition Precedent from Occurring.

Modell argues that he is entitled to summary judgment because "an expressly stated contractual condition precedent to payment," *i.e.*, the divestment of all of his "stock interest" in

---

[143]   Modell argues incorrectly that because Plaintiffs have specifically pleaded the Ohio common law doctrine of prevention, a finding that New York law governs this dispute would bar Plaintiffs' prevention claim outright.  But Modell concedes that the Ohio doctrine and the New York doctrine are identical:  "[A]nalysis of the controlling principles of contract interpretation involved in this motion under both New York and Ohio law result in the same conclusion."  MSJM #3 at 11.  Because Plaintiffs are entitled to recover under one state's version of the doctrine, they are also entitled to recover under the other state's version.

the Ravens, has not literally occurred.  MSJM #3 at 11-14.  This misreads the cases, including

authority cited by Modell himself which hold that a condition precedent may be excused in

certain circumstances.[144]  Indeed, as defined above, the doctrine of prevention only comes into

play when a condition precedent has not occurred – *i.e.*, when a party has an obligation that is

conditioned on the occurrence of a future event, *and then takes steps that prevent the future event*

*from occurring:*  "If a promisor prevents or hinders the occurrence or fulfillment of a condition

to his or her duty of performance, the condition is excused; in other words, 'the nonoccurrence or

nonperformance of a condition is excused where the failure of the condition is caused by the

party against whom the condition operates to impose a duty.'"  13 WILLISTON ON CONTRACTS §

39:4 (4th ed. 2004) (Nonperformance of Condition).  Modell's first argument – that he cannot be

liable because the condition has not occurred (for whatever reason) would read the doctrine

entirely out of the law, and must be rejected.

### 2.	Modell's Obligation to Pay the Finder's Fee Attached on March 18, 2004.

Modell's obligation to pay the finder's fee attached no later than March 18, 2004, when

BFC delivered the Option Exercise Notice which required the Modell companies to divest their

entire remaining interests in BRLP to BFC for a sum certain on the "Option Closing Date",

which was a defined term in the parties' agreements.[145]  That required divestment gave rise to

---

[144]   *See, e.g.*, MSJM #3 at 12, n.40 (citing RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981), Condition Defined ("A condition is an event, not certain to occur, which must occur, *unless its non-occurrence is excused*, before performance under a contract becomes due); § 225 Effects of the Non-Occurrence of a Condition ("Performance of a duty subject to a condition cannot become due *unless the condition occurs or its non-occurrence is excused*.")) (emphasis added).

[145]   Modell makes much of Plaintiffs' assertion in an earlier motion that his obligation attached in 2000, and argues that no obligation could have attached at that point.  *See* MSJM #3 at 23-25.

Modell's obligation to pay the finder's fee to the Plaintiffs in the amount and by the date prescribed in the Letter Agreement.

On April 8, 2004, at Modell's request, Bisciotti agreed to amend the OPA to allow Nevermore to retain what was referred to as a 1% interest in BRLP. The only question is whether Modell's action to prevent the occurrence was "unjust" or, put another way, "wrongful."[146]

### 3.	Modell Ignores Controlling Precedent that an Act of Prevention Motivated by Bad Faith Is Necessarily Wrongful.

Modell correctly recognizes that "the prevention doctrine precludes a party only from benefiting from *wrongful* acts." MSJM #3 at 26. But he mistakenly asserts that if an act is permitted by the express language of the parties' contract, it can never be wrongful: "Mr. Modell cannot be guilty of prevention by doing something the allegedly prevented contract allows him to do." *Id.* And he compounds that mistake by claiming that even if he decided to engineer the Nevermore arrangement in bad faith, solely (or substantially) in response to this

---

That claim was based upon an incomplete record, caused by Modell's failure to produce the Option Exercise Notice, which Plaintiffs had to obtain instead from the NFL. The delivery of that notice on March 18, 2004 clearly caused Modell's obligation to attach.

[146]   Under the doctrine of prevention, a party cannot take steps specifically designed to render a contractual right valueless. *Benatty Corp. v. Transatlantic Energy Corp.*, 1994 WL 668103 (Ohio Ct. App. Nov. 8, 1994). *Benatty Corp.* involved a gas resale agreement at a fixed price that allowed the reseller, Transatlantic, to cancel the contract or reduce its purchase price if it could not resell Benatty's gas to a third party "at a price that allowed Transatlantic to realize a reasonable profit". *Id.* at *1. Transatlantic voluntarily terminated its relationship with the third party and then sought to reduce the price it was paying Benatty. Benatty sued to enforce the contract. A jury found that by taking steps to render Benatty's contractual right valueless, Transatlantic had violated the doctrine of prevention and thus had to pay what it owed to Benatty under the original terms of the contract. *Id.* at *3. This verdict was affirmed by the Ohio Court of Appeals, which specifically rejected Transatlantic's argument that because the contract was executory the doctrine of prevention did not apply. *Id.*

lawsuit and to defeat his obligation to Andrews' heirs, he still would not be in violation of the

doctrine of prevention: "There was nothing remotely wrongful about Mr. Modell's decision to

retain an interest in the team, *whatever his motives* . . . ." *Id.* (emphasis added).  Ohio law is

clearly otherwise.[147]

    The cases discussing the doctrine hold that if an act of prevention is motivated by bad

faith it is *necessarily* wrongful, *even if* it is allowed under the strict terms of the parties'

agreement.  *See, e.g., Rohde v. Mass. Mut. Life Ins. Co.*, 632 F.2d 667 (6th Cir. 1980) (applying

Ohio law); *Gridiron Steel Co. v. Jones & Laughlin Steel Corp.*, 361 F.2d 791, 793 (6th Cir.

1966) (same).[148]  Moreover, "*the issue of defendant's good or bad faith is primarily a question of*

---

[147]   The principle that a party cannot create its own escape hatch to a contract through the
intentional non-fulfillment of a condition predates the Letter Agreement.  *See Guardian Trust
Co. v. Rapid Transit Land Co.*, 1932 WL 2305, at *1 (Ohio Ct. App. Jan. 25, 1932).  The
plaintiff in *Guardian Trust* was owed a debt to be paid "before any dividends are paid on the
common stock."  After the defendant accumulated sufficient assets to pay the debt, it contended
that as long as it refrained from paying *any* dividends, it never had to repay the plaintiff.  *Id.* at
*2.  The court rejected this argument, holding that common sense and the presumed expectations
of the parties required that when the defendant had sufficient surplus funds on hand so that it
could theoretically pay dividends, it could also liquidate its debt to the plaintiff, and was
obligated to do so.  *Id.*

[148]   Under Ohio law, a defendant cannot avoid liability under the doctrine of prevention by
adhering to the strict terms of the contract while also acting in bad faith.  For example, in
*Gridiron Steel*, the plaintiff had the right, upon termination of a licensing agreement, to purchase
all dies, patterns, and special tools "*at that time in current use*" by the defendant "in connection
with the manufacture of ironing tables under this contract."  *Id.* at 793 (emphasis added).
Defendant sought to avoid this clause by selling all of the tools and dies it had been using prior
to the termination of the agreement.  *Id.*  When the plaintiff sought to exercise its purchase
option, defendant claimed that "it had no dies and tools 'in current use' on the date of the
termination of the license agreement since it had previously sold them to [a third party], and that
it therefore was under no obligation to perform the option provisions of that agreement."  *Id.* at
794.  The court squarely rejected this strategy.  "A statement of this proposition is its refutation.
Even where liability under a contract depends upon a condition precedent, one cannot avoid his
liability by making the performance of the condition precedent impossible, or by preventing it."
*Id.*

*fact requiring an examination of defendant's intent or state of mind.*"  *Rohde*, 632 F.2d at 670 (emphasis added).  It is that question of fact, among others, that requires a trial in this matter.

*Rohde* is particularly significant:  the plaintiff in that case was the widow of a man who applied for life insurance, arranged for the payment of the initial premium, took the required physical examination, and died of an apparent heart attack, all on the same day.  *Id.* at 668. Exercising its contractual right to determine whether the applicant met its "limits, rules and standards" as a pre-condition to coverage, the defendant insurer determined that the plaintiff's husband was uninsurable for the policy he had sought.  *Id.*  The trial court found that the defendant acted in bad faith and was without reasonable grounds in determining that the dead man failed to meet the policy requirements.  *Id.* at 670.  However, the trial court concluded that the defendant was not liable because it would have reached the same conclusion if it had acted in good faith.  The Sixth Circuit reversed, holding that when one party to a contract acts in bad faith to prevent the occurrence of a condition precedent, the other party is entitled under Ohio law to recover the full value of the contract *even though* the occurrence of the condition precedent could have been precluded by the good faith conduct of the party who prevented it.  *Id.*

The *Rohde* holding, which governs the case before this Court, precludes summary judgment for Modell.  Whether Modell violated the doctrine of prevention turns on whether he was acting in bad faith when he engineered the Nevermore arrangement, *even though* Modell could have lawfully prevented the triggering of the Letter Agreement if he had acted in good faith, and for reasons unrelated to the Letter Agreement, to retain a genuine stock interest in the team (which, *see* discussion, *infra*, at Part III.B.2, the Nevermore interest is not).  And since "the issue of defendant's good or bad faith is primarily a question of fact requiring an examination of defendant's intent or state of mind," *id.,* summary judgment is plainly inappropriate.

4.    Modell's Nevermore Arrangement Need Not "Prevent the
      Completion of the Letter Agreement" to Violate the Doctrine
      of Prevention.

Modell argues that the Nevermore arrangement did not violate the doctrine of prevention

because nothing about the arrangement "'prevent[s] the carrying out of the [Letter Agreement]

according to its terms.'"  MSJM #3 at 25.  According to Modell, there is no violation because

"the Letter Agreement can, by its very terms, be performed as written when as and if a triggering

event occurs . . . ."  *Id.*  Accordingly, "[f]or purposes of the doctrine of prevention, Mr. Modell's

decision to retain an interest does not 'prevent' completion of the Letter Agreement any more

than every other day since 1961 when Mr. Modell retained an interest in the team."  *Id.* at 25-26.

Modell's own cases contradict his reading of the doctrine:  *Shear v. Nat'l Rifle Ass'n*, 606 F.2d

1251, 1255 (D.C. Cir. 1979), a case cited by Modell, see MSJM #3 at 26, n.85, demonstrates that

the doctrine of prevention does not require the permanent prevention of contractual

"completion."

In *Shear,* a real estate agent sued the National Rifle Association for a commission due

him for arranging the sale of its Washington, D.C., headquarters.  Under the parties' contract,

payment of the commission was subject to the single condition that the sale be approved by the

NRA board.  When a bylaw was enacted by the NRA membership removing the board's

authority to approve the sale, the agent alleged that the NRA "frustrated the sale in a way not

contemplated or authorized by the contract."  *Id.* at 1256.  The D.C. Circuit reversed the district

court's dismissal of the agent's claim, holding that "the facts alleged here constitute a classic

case of prevention."  *Id.*

Notably, the NRA's conduct in preventing the commission payment was, like Modell's

conduct, far from final or irrevocable.  The NRA could have revisited its decision and approved

the sale at any time, thereby allowing the commission agreement to be "completed," just as Modell could divest the Nevermore interest at any time, thereby allowing the Letter Agreement to be "completed."   This possibility did not rule out a claim for prevention in *Shear*, and it cannot rule out such a claim in this case.[149]

Similarly, the Ohio case *Wm. P. Zinn & Co. v. Shawnee Pottery Co.*, 148 F. Supp. 322 (S.D. Ohio 1955), *aff'd*, 240 F.2d 958 (6th Cir. 1956), found that the defendant had not prevented the completion of a commission agreement by canceling leases with renewal periods that formed the basis for commissions owed, and then negotiating new leases with longer terms. Instead, the court found that the new leases were merely "renewals" of the previous leases, and that the commission agreement continued to operate.   Nevertheless, the court held that under the doctrine of prevention, the defendant owed commissions for the entire term of the new leases, relying explicitly on the seminal Ohio prevention case, *Suter v. Farmer's Fertilizer Co.*, 126 N.E. 304, 306 (Ohio 1919), which held that "where the liability depends upon a condition precedent, one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it."

---

[149]   The *Shear* court wrote in *dicta* that "prevention is a breach of contract" and "[a] corollary of this definition is that there is no prevention when a contract authorizes a party to prevent a condition from occurring."   *Id.* at 1256.   These propositions are incorrect.   Prevention is not a breach, but allows for recovery when there has been bad faith conduct preventing a condition precedent, even though that conduct is allowed by the strict terms of the contract.   *See* discussion, *supra*, at Parts III.A.1 – III.A.3.   Even taking the *Shear dicta* at face value, however, there is still a difference between what a contract expressly "authorizes" and what it fails to bar a party from doing.   The Letter Agreement did not authorize Modell to redefine the number of units in BRLP he was obligated to sell Bisciotti *after* his obligation to sell all of those units attached.

**5.      A Genuine Issue of Material Fact Exists as to Whether Modell
Acted in Bad Faith when He Engineered the April 8, 2004
Nevermore Arrangement.**

Despite his claims that "none of this really matters," MSJM #3 at 21, and that "[t]here

was nothing remotely wrongful about Mr. Modell's decision to retain an interest in the team,

*whatever his motives . . .*," *id.* at 26 (emphasis added), Modell offers four reasons why the Court

should find that he engineered the Nevermore arrangement in good faith:  <u>First</u>, his accountant

testified "only that this litigation was a factor in Mr. Modell's decision to retain an interest, and

that the 'primary reason' was because 'this is something Art wants to own.'" MSJM #3 at 21.

<u>Second</u>, "Modell himself testified that he 'wanted continued ownership in the NFL which [he]

had for 43 years.'" *Id.*  <u>Third</u>, "since the first negotiations with Mr. Bisciotti in 1999 and 2000 –

long before this lawsuit was filed, Mr. Modell had expressed his interest in remaining a minority

owner." *Id.*  And <u>fourth</u>, "Mr. Bisciotti . . . approached Mr. Modell and asked him to retain an

ownership interest." *Id.*  None of these arguments is persuasive – and certainly none suffices to

support summary judgment for Modell.

**a.      Modell's Explanations for Why He Retained an Indirect
Interest in 1% of the Team Are Contradicted by Other
Witnesses, NFL Rules and Practices, and Common
Sense.**

Modell's first two explanations for his conduct are insufficient to dispose of the genuine

issue of material fact that exists as to whether Modell acted in bad faith when he engineered the

Nevermore arrangement.

Modell's accountant may have testified that avoiding his payment obligation under the

Letter Agreement was not the "primary reason" why Modell decided to retain an indirect interest

in 1% of the team, but he also testified that Modell's advisors Michael Colglazier and Luis Perez

told him that one of the two reasons why Modell retained that interest was that doing so "would have the salutary effect of avoiding a finder's fee" under the Letter Agreement.[150]  This testimony flatly contradicts Modell's own answer ("No. . . .  Not at all") when asked "[d]id your agreement with Mr. Andrews enter into your mind at all when you were thinking about keeping some equity interest in the team?"[151]

Modell's other explanations for retaining an indirect interest in 1% of the team are also contradicted and self-contradictory:

- Modell testified that he retained that interest because "[w]ell, that's the least amount an owner can have, a stockholder can have in the NFL and then you get certain rights with it.  I mean, you're not – not dealing in half shares or three-quarter shares, it's either one – either one percent or more."[152]  *But*, as Jacksonville Jaguars' minority owner and former CEO David Seldin has testified, no NFL bylaw, rule, policy or procedure precludes a minority owner from owning fractional shares of less than one percent in an NFL franchise.[153]

- Asked what rights he retained by continuing to own an indirect interest in 1% of the team, Modell testified, "Go to league meetings, I'm allowed to sit in on a league meeting, allowed to join committees, serve on committees.  Ownership is very – is an important thing for the league, has been for decades."[154]  *But*, as Mr. Seldin has also explained, no NFL bylaw, rule, policy or procedure requires an individual to own a minority interest in an NFL franchise in order to attend league meetings.[155]  "It is inconceivable to me that if Mr. Modell were presented at a meeting to represent the Baltimore Ravens as Chairman Emeritus with a designation

---

[150]  *See* Exhibit 43 at 76:5 – 82:7.

[151]  *See* Exhibit 2 at 120:3-10.

[152]  *Id.* at 108:19 – 109:4.

[153]  *See* Exhibit 44 at ¶¶ 11-12.

[154]  *See* Exhibit 2 at 109:5 – 109:10.

[155]  *See* Exhibit 44 at ¶¶ 11-12.

from Mr. Bisciotti that that would not be fully acceptable as credentials for him to serve in any capacity, including representing the team in [a] one per club meeting."[156]

- Asked if it was his testimony that his indirect interest in 1% of the team allowed him to attend NFL owners' meetings, Modell testified that "[m]y interest in the Baltimore Ravens, whatever form it takes, allows me to attend league meetings . . . as a recognized part owner of a football team."[157]  *But* Modell knows from personal experience that ownership is neither a necessary nor sufficient criterion for attendance.[158]  And since Modell is universally viewed as one of the architects of the modern NFL as a consequence of his many years of participation at the organization's highest levels, it is not credible that he believed he stood to gain any advantage he did not already possess within the league by being a "recognized part owner of a football team" as opposed to Chairman Emeritus – the title Bisciotti had already agreed to give him.[159]

---

[156]  *See* Exhibit 45 at 72:23 – 73:5.

[157]  *See* Exhibit 2 at 147:7 – 147:18.

[158]  *See* Exhibit 46, minutes of the special meeting of the Board of Directors of Cleveland Browns Football Company, Inc., on December 22, 1982, discussing the exclusion of Bob Gries from NFL activities and functions – despite his ownership of 43% of the Cleveland Browns – when Modell designated as team representatives only himself and James Bailey, a Cleveland Browns official with no ownership interest in the franchise.

[159]  *See* Exhibit 44 at ¶¶ 30-32.  As Mr. Seldin testified, it is the support of an NFL franchise's majority owner that assures recognition by the NFL, not equity ownership:

> If you own an interest and you show up at a League meeting and the majority owner or the person who's voting the team doesn't want you in the room, you have no right to attend a League meeting.  That is clearly – I mean, I couldn't – Mr. Modell had that own issue with his partner a number of years ago.  Just owning an equity interest does not give you a right to go to NFL meetings.

*See* Exhibit 45 at 78:24 – 79:11.

**b.**     **Modell's Pre-2000 Desire to Maintain Minority Ownership and Bisciotti's Desire to Have Modell Keep 20% of the Team Do Not Explain Why Modell Changed His Mind and Decided to Retain an Indirect 1% Interest in the Ravens After Being Sued.**

Modell's interest in remaining a minority owner in the Ravens at the time of the first negotiations with Mr. Bisciotti in 1999 and 2000 has absolutely no bearing on what motivated him to engineer the Nevermore arrangement in April 2004.  Modell didn't want to sell at all, but mounting debt forced him to look for a minority investor.  Bisciotti, however, refused to purchase an interest in the Ravens without a guarantee that he could buy the entire team.  It is undisputed that in 2000, Modell agreed to Bisciotti's demand, thereby foregoing any possibility of retaining a minority interest.[160]  Moreover, Mr. Bisciotti testified that when he first reconsidered his position in the spring of 2003 and asked Modell to retain a minority interest in the team, Modell declined.[161]

Modell's testimony on this point agrees with Bisciotti's.[162]  Accordingly, the record is absolutely clear that Modell had abandoned any intention he may have once had to retain an interest in the team at a point prior to the filing of this lawsuit on May 23, 2003.

Nor does the fact that it was Bisciotti who initially approached Modell in 2003 about retaining a minority interest in the team have any bearing on the reasons for Modell's ultimate decision to retain an indirect interest in 1% of the Ravens.  As Mr. Bisciotti made clear, he

---

[160]   *See* Exhibit 25 at 15:16 – 16:15; 29:4 – 30:12.

[161]   *Id.* at 36:21 – 37:15.

[162]   *See* Exhibit 2 at 68:18 – 70:2 ("All I know is at the time of this transaction, he said that he would like me to keep up to 30 percent . . . .  Thirty at first, and then it dropped to 20 and I said I can't do it.").

wanted Modell to retain *20%* of the team.[163]   Retaining an indirect interest in 1% of the team was Modell's idea, not Bisciotti's.  Indeed, Bisciotti testified that Modell's retention of such a small percentage was of no practical help to him.[164]   Bisciotti's offer in the spring of 2003, for his own business reasons, to allow Modell to retain 20% and his subsequent decision for personal reasons to consider allowing Modell to retain 1% do not obviate the need to determine whether Modell acted in bad faith when he changed his mind, after he was sued, and decided he wanted to retain that indirect 1% interest.

> **c.      Undisputed Evidence in the Record Raises a Genuine Issue of Material Fact as to Whether Modell Acted in Bad Faith when He Engineered the April 8, 2004 Nevermore Arrangement.**

As shown above, Modell's explanations for his change of mind are contradicted by other witnesses, NFL rules and practices, and common sense.  Indeed, there are numerous undisputed facts from which a jury could conclude that Modell engineered the Nevermore arrangement in bad faith to avoid his payment obligation to the heirs of Vincent Andrews:

- The Ravens' accountant Art Yonowitz testified that Modell retained the indirect interest in 1% of the Ravens in part to avoid his payment obligation under the Letter Agreement.

---

[163]   *See* Exhibit 25 at 30:13 – 32:1:

> My business partner, Jim Davis, was recommending . . . you should try and get them to hold 20 percent of the team, because as long as they own a minority stake, their voting power doesn't matter, I would still really control the team, just like Art was controlling the team with 51 percent.  And again, for financial reasons, it was that I could do that and not have to go to the banks and borrow the money, so long as I was willing to . . . it would be worthwhile to do, because it would save me a lot of problems with the dog and pony shows with the bankers trying to get the liquidity to buy.

[164]   *Id.* at 40:1-6.

- Modell had decided not to retain an interest in the Ravens prior to the filing of this lawsuit and only changed his mind after this lawsuit was filed.

- The indirect interest in 1% retained by Modell serves no legitimate economic purpose except allowing Modell to argue that he is not obligated to pay the finder's fee.

- It only costs Modell $6 million in foregone income to retain an indirect interest in 1% of the Ravens, yet it enables him to argue that he can avoid paying a finder's fee of at least $21.5 million.

- Modell himself has testified that he doubts he will ever have to pay a finder's fee to the heirs of Vincent Andrews.

Each of the foregoing undisputed facts is sufficient to raise a genuine issue of material fact as to whether Modell acted in bad faith when he engineered the April 8, 2004 Nevermore arrangement. Collectively, these facts require that summary judgment for Modell be denied.

**B.**   **Genuine Issues of Material Fact Exist as to Both the Character of the Nevermore Arrangement Itself and the 1% Interest Retained by Nevermore, Precluding Summary Judgment for Modell.**

**1.**   **Genuine Issues of Material Fact Exist as to Whether Nevermore's 1% Interest in BRLP Has in Substance Been Sold to BFC, Resulting in the Divestment of Modell's "Stock Interest" in the Team.**

Genuine issues of material fact exist as to whether Nevermore's 1% interest in BRLP has in substance been sold to BFC for $6 million (plus simple annual interest of 3%), resulting in the divestment of Modell's "stock interest" in the team. Modell's expert Alfred R. Berkeley, III, and Plaintiffs' expert William Chandler disagree sharply on this key point. Because the resolution of this point – determination of the "substance" of a particular transaction – is necessarily a question of fact for the jury, Modell's motion for summary judgment must be denied.

Modell's expert Mr. Berkeley concluded that Nevermore's 1% interest in BRLP is a continuing equity interest, based on the following "facts":

65

- The existence of Bisciotti's call option "bolsters the conclusion" that Nevermore's 1% interest in BRLP is equity, because "[c]all options (and their corollary put options) are devices used to hedge the fluctuation inherent in equities."[165]

- Modell's "principal investment, although now smaller, remains at risk and can fluctuate in value depending on the market value of BRLP."[166]

- Modell "is not presently obliged to divest" Nevermore's interest in BRLP "at any time certain or upon the occurrence of any particular event, and he might never be obliged to divest it."[167]

- "BFC's interest in BRLP, which includes both preferred and common units, is superior to Nevermore's.  If BRLP were now to liquidate, BFC's preferred units would be paid before any common units, including Nevermore's.  If Nevermore's interest in BRLP were a debt interest, which it is not, Nevermore would be paid first – even before BFC's preferred units."[168]

- Nevermore's 1% interest "retains other characteristics of equity," including (i) being subject to capital calls, (ii) voting rights, (iii) protection against dilution, and (iv) "tag along" rights.[169]

In contrast, Plaintiffs' expert Mr. Chandler has concluded that, because of the provisions of the "Investors' Rights Agreement" and the "Irrevocable Proxy" agreement, the Nevermore arrangement is nothing more or less than a present sale to BFC of Nevermore's 1% interest in BRLP for $6 million plus simple annual interest of 3%, to be paid on demand.  In Chandler's opinion, Nevermore's 1% interest is essentially a debt obligation – not a continuing equity

---

[165] *See* Exhibit 53, the Rule 26(a)(2) Report of Alfred R. Berkeley, III, at 8.

[166] *Id.* at 9.

[167] *Id.*

[168] *Id.* at 11.

[169] *Id.* at 11-12.

investment in BRLP.  The following facts (and disputes concerning Berkeley's "facts") support

Mr. Chandler's conclusion:

- Even Modell concedes that because of the "put" provision of the Investors' Rights Agreement, Modell's principal investment does not remain at risk.  *See, e.g.,* MSJM #3 at 22, n.72 ("Because of the 'put' option, Mr. Modell's interest is immune" to the risk of any decline in value.).

- Modell *is* presently obliged to divest Nevermore's interest in BRLP "upon the occurrence of [a] particular event."  For example, as Mr. Berkeley himself notes, Modell is obliged to divest "if (a) BFC exercise[s] its 'drag along' rights . . . ; (b) Nevermore exercise[s] its 'tag along' rights . . .; (c) BFC exercise[s] its call option . . . ; or (d) Nevermore exercise[s] its put option . . . ."[170]

- Contrary to Mr. Berkeley's assessment, the "put" provision of the Investors' Rights Agreement allows Nevermore to be paid first in the event of any BRLP liquidation.  Nevermore can simply exercise its "put" and require Biscotti to purchase its 1% interest in BRLP for $6 million plus simple annual interest at 3%.[171]

- The "other characteristics of equity" retained by Nevermore's 1% interest are not meaningful when considered in context: (i) Nevermore has no significant assets with which to make a capital call and the BRLP Partnership Agreement does not obligate Nevermore to participate in any future capital calls; (ii) Nevermore's retained voting rights are of no real significance, given its assignment of those rights to BFC in the Irrevocable Proxy agreement; (iii) Nevermore's retained preemptive rights are inconsequential, given Modell's desire not to increase his participation in BRLP,[172] and (iv) Nevermore's participation rights (tag along and drag along rights and obligations) were only made necessary in order to give BFC full freedom to enter into transactions as it would have if it had acquired all of BRLP, as it originally intended to do.[173]

---

[170]   *See id.* at 9-10.

[171]   *See* Exhibit 54, the Rebuttal Expert Report of William F. Chandler, at 7.

[172]   *See* Exhibit 2 at 68:18 – 70:2.

[173]   *See* Exhibit 54 at 10.

Summary judgment for Modell is precluded by the foregoing multiple issues of material fact which must be resolved before it can be determined whether Nevermore's 1% interest in BRLP has in substance been sold to BFC, resulting in the divestment of Modell's "stock interest" in the team.

> **2.     A Genuine Issue of Material Fact Exists as to Whether the Character of Nevermore's 1% Interest Is So Materially Different from the "Stock Interest" that Was the Subject of the Letter Agreement that It Is Appropriate to Conclude that Modell Has Divested All of His "Stock Interest" in the Team.**

A genuine issue of material fact also exists as to whether the character of Modell's indirect interest in Nevermore is so materially different from the character of the "stock interest" that was the subject of the Letter Agreement that it is appropriate to conclude that Modell has divested all of that original "stock interest" even if he is not found to have actually sold Nevermore's 1% interest.

The "stock interest" that was the subject of the Letter Agreement was a transferable direct interest (subject only to a right of first refusal in favor of the other major shareholder) of voting common stock in a corporation that operated an NFL franchise.  The stock was subject to market fluctuation, possible capital gain or loss, and had a claim on the franchise's residual profits (it was also held by the controlling stockholder and principal executive officer of that corporation). The interest in BRLP that Mr. Modell now owns has none of those characteristics:  it is a non-voting minority interest of highly limited transferability, held through a complex set of intermediate entities[174] which in turn hold a 1% non-voting interest in BRLP, the limited

---

[174]   Modell owns 100% of the stock in Baltimore Ravens, Inc. ("BRI"), which in turn owns a 99% membership interest in Nevermore.  *See* MSJM #3 at 7.  Modell also owns 65% of the stock in MSLP, Inc., a corporation which owns the remaining 1% membership interest in Nevermore

partnership that operates the Baltimore Ravens.  This indirect 1% interest has no claim on the residual profits of the franchise.  It has no real risk of capital gain or loss (precisely because it is hedged with "puts" and "calls"); it is subject to near-total restraints on transferability; and it has no vote in the team's management (because Modell gave Bisciotti an irrevocable proxy).

As Plaintiffs' expert Chandler has opined, the nature of Modell's indirect interest in BRLP has so many of the characteristics of debt, and so few of the characteristics of the "stock interest" that was the subject of the Letter Agreement, that it is appropriate to conclude that Modell has actually divested all of his "stock interest" in the Browns, as that term is used in the Letter Agreement.  Modell's expert Berkeley disagrees, on the grounds that each one of these non-equity characteristics of the retained interest does not, in itself, change the nature of that interest[175] – but he has declined to give any opinion regarding whether the sum total of the restrictions made the retained interest a synthetic debt instrument.[176]  At the least, there are sufficient questions of fact regarding the taxonomy of Modell's retained interest that the issue cannot be resolved on summary judgment.

### 3. The Substance of the Nevermore Arrangement and the Character of the 1% Interest Retained by Nevermore Are Questions of Fact.

When, as here, a court must determine the substance of a particular economic arrangement or the character of an economic interest, that determination has generally been

---

and acts as the "Manager" of Nevermore.  *See* Exhibit 42 at ABM06108.  Modell's wife owns the remaining stock in MSLP, Inc.  *Id.*

[175]  *See* Exhibit 53 at 6 ("Mr. Modell's "stock interest" in the football team took and takes the form of his continued 100% ownership of BRI, which . . . continues to own an equity interest in BRLP to the present day.").

[176]  *See* Exhibit 55, excerpts from transcript of deposition of Alfred R. Berkeley, July 12, 2004, at 98:9 – 99:11.

treated as a question of fact. *Fla. Progress Corp. and Subsidiaries v. C.I.R.*, 348 F.3d 954, 961 (11th Cir. 2003); *see Crowley v. Commissioner,* 962 F.2d 1077, 1080 (1st Cir.1992) ("The determination whether the parties to the transaction intended a loan or a dividend presents an issue of fact"); *Rice's Toyota World, Inc. v. C.I.R.*, 752 F.2d 89, 91-92 (4th Cir. 1985) (whether a particular transaction is a sham is an issue of fact); *Busch v. Commissioner,* 728 F.2d 945 (7th Cir.1984) (whether shareholder's withdrawals from corporation constituted loans or dividends is purely a question of fact); *Dolese v. United States,* 605 F.2d 1146 (10th Cir.1979) (question of debt or dividend normally a question of fact); *Weisbart v. Commissioner,* 564 F.2d 34, 37 (10th Cir. 1977) (recognizing that in addressing the "character" of a particular transaction, "[f]indings as to what is substance in a transaction are to be treated as questions of fact.")

Even apart from tax litigation, numerous courts have treated the substance of a particular economic arrangement or the character of an economic interest as a question of fact. *See, e.g., ECE Technologies Inc. v. Cherrington Corp.*, 168 F.3d 201, 204-05 (5th Cir. 1999) ("Question of fact existed as to whether set of commercial agreements between the parties was in substance a loan, or whether the agreements created a contractor-subcontractor relationship that included a loan, thus precluding summary judgment on manufacturer's claim that Texas usury laws were violated by the agreements."); *In re Rex Group, Inc.,* 80 B.R. 774, 780 (Bankr. E.D.Va. 1987) ("The real nature of a transaction, lease or security agreement, is a question of fact to be resolved by the trier."); *Tishman Equip. Leasing, Inc. v. Levin,* 202 A.2d 504, 507 (Conn. 1964) ("In the determination of the actual intent and purpose of the transaction, the negotiations surrounding it

may properly be considered and its real nature is a question of fact to be resolved by the trier.").[177]

Modell's summary judgment motion must therefore be denied because genuine issues of material fact exist as to whether Nevermore's 1% interest in BRLP has in substance been sold to BFC and whether that interest, even if not sold, is so materially different from the "stock interest" that is the subject of the Letter Agreement as to no longer be considered such a "stock interest."  Resolution of these factual issues in Plaintiffs' favor will necessarily result in a determination that Modell has divested all of his "stock interest" in the Ravens, and is liable for the finder's fee.

     **C.**    **Whether the Nevermore Arrangement Breached the Implied Covenant of Good Faith and Fair Dealing Is a Genuine Issue of Material Fact that Precludes Summary Judgment for Modell.**

          **1.**    **Technical Compliance with Contractual Provisions Does Not Preclude Liability for Violation of the Implied Covenant of Good Faith and Fair Dealing.**

Modell concedes that "[t]he implied covenant provides that a party cannot act 'in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  MSJM #3 at 15 (citing *Just-Irv Sales, Inc. v. Air-Tite Bus. Ctr., LLC.*, 237 A.D.2d 793, 794 (N.Y. App. Div. 1997)). Yet Modell argues that there can be no breach of the implied covenant by a party who is in

---

[177]  *See also Walter v. Atha*, 262 F. 75, 77 (3d Cir. 1919) ("The argument on the law of this case has taken a wide range, involving questions of rights and liabilities of endorsers, co-sureties, and contribution, arising out of the finding of the learned trial judge that the mother's loans of her shares were to the Brick Company and not to her sons personally. Before we are called upon to consider these questions of law, we must first ascertain the precise character of the transactions between the mother and her sons, and determine, as a matter of fact, whether she loaned her shares to her sons to enable them to finance the Brick Company, or whether she loaned her shares to the Brick Company, and thereby financed it herself.")

compliance with the literal terms of the contract at issue.  MSJM #3 at 15-20.  Contrary to Modell's argument, both Ohio and New York courts have allowed juries to find breaches of the implied covenant by parties – like Modell – who were in technical compliance with the contract at issue.

For example, in *Galmish v. Cicchini*, 734 N.E.2d 782 (Ohio 2000), a seller of property was entitled under the terms of the sale agreement to receive one-half of the profits realized by the purchaser if the purchaser resold the property within one year to a specified developer.  *Id.* at 785.  When the purchaser delayed the resale of the property until after the expiration of the year-long profit-sharing period, *id.* at 788, the seller brought numerous claims against the purchaser, including breach of the duty of good faith and fair dealing.  The jury found that the purchaser could not intentionally drag his feet and thereby purposefully deny the seller her share of the profits.  *Id.* at 791.  The verdict was set aside by an Ohio Court of Appeals, but the Ohio Supreme Court reversed the intermediate appellate court and reinstated the jury verdict, *id.* at 795, leaving no doubt that in Ohio a good faith claim may be successfully maintained even when the implied duty (to share any profits realized from a sale that reasonably could have been completed within one year) contradicts the express terms of a written agreement (to share the profits only on a resale occurring within one year).[178]

_____

[178]   Similarly, in *Chase Manhattan Bank v. Keystone Distribs., Inc.*, 873 F. Supp. 808 (S.D.N.Y. 1994), Chase paid Keystone $58.5 million to receive the income stream generated by reimbursement payments made to Keystone by nine mutual funds to which Keystone had advanced money.  *Id.* at 810.  Chase alleged that Keystone "systematically manipulate[ed] the sales of the funds . . . [and] dried up the stream of 12b-1 income that it is obligated to pay Chase and has taken steps to keep the income for itself."  *Id.* at 815.  The court held that "if Chase can prove that [Keystone] manipulated cash flows and fund sales and misrepresented the machinations to Chase, a trier of fact could conclude that [Keystone] breached its duty to act in good faith *even though there was no technical breach of the Contract*."  *Id.* at 816 (emphasis added).

*Galmish* also squarely refutes Modell's argument "that the implied covenant does not, as the [Plaintiffs] seem to claim, arise in connection with Mr. Modell's dealings with third parties . . . ." MSJM #3 at 15. In *Galmish*, the Ohio Supreme Court held that the defendant could not wrongfully manipulate the timing of a transaction with a third party in order to defeat a contractual obligation to the plaintiff that was conditioned solely on the completion of the transaction between the defendant and the third party. The *Galmish* fact pattern is for all practical purposes identical to the one before this Court, in which Modell has sought to "reconfigure" a third party transaction to avoid a contractual obligation to Plaintiffs that is conditioned solely on the completion of that transaction.

*Galmish* also refutes the rule that Modell attempts to extract from *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 961-62 (Ohio Ct. App. 2004), *i.e.*, that the implied covenant cannot impose any duty in addition to the duties imposed by the literal words of the parties' contract. As the "gap-filling" default rule Modell concedes it to be, *see* MSJM #3 at 15, the implied covenant necessarily imposes a duty of good faith and fair dealing for those instances of conduct as to which a contract is silent. To the extent that the *Wauseon* court holds otherwise, it is simply mistaken.

> **2.     The Implied Covenant of Good Faith and Fair Dealing Applies Precisely Because the Letter Agreement Does Not Explicitly Address the Challenged Conduct.**

Modell argues that the implied covenant of good faith and fair dealing "applies only when the contract fails to address the conduct at issue" and that "[w]hen the express terms of a contract address a matter, courts do not imply a covenant, but instead interpret and apply the contract according to its terms." MSJM #3 at 15-16. These non-controversial legal principles do

not preclude Plaintiffs' implied covenant claim for the simple reason that the Letter Agreement *does not* explicitly address Modell's conduct.

In short, the Letter Agreement does not reserve for Modell the right to amend existing contractual relationships giving rise to Modell's obligation to pay the finder's fee in order to defeat that obligation (of at least $21.5 million) at the relatively small cost of deferring $6 million in sales proceeds after having already received $579 million in such proceeds.

Because Modell's conduct is not explicitly addressed by the Letter Agreement, the cases that Modell principally relies upon in arguing that Plaintiffs cannot prevail on their implied covenant claim are inapt.   For example, in *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 790 (S.D.N.Y. 1969), the court allowed Goodyear to "purposefully [run VTR's] business into the ground," *see* MSJM #3 at 17, without finding a breach of the implied covenant because the Goodyear-VTR contract allowed Goodyear to make the relevant decisions "solely in its own interest and without any liability or obligation to VTR."   Similarly, in *Unicredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003), "the operative contracts specifically absolve[d] the Defendant banks from any duty to disclose financial information regarding Enron and contain[ed] Plaintiffs' undertakings to rely on their own credit analysis in making the relevant decisions."   Accordingly, the court found that plaintiffs' claim for breach of the implied covenant was precluded.[179]

---

[179]   *See Bennco Liquidating Co. v. Ameritrust Co. Nat'l Ass'n*, 621 N.E.2d 760, 762 (Ohio Ct. App. 1993) (agreement that specifically provided that the "Bank shall at all times be under no duty to make any loan to the borrower" precluded implied covenant claim arising out of bank's refusal to advance funds); *see also Montgomery County Cmty. Coll. Dist. v. Donnell, Inc.,* 752 N.E.2d 342, 346 (Ohio Ct. App. 2001) (matters from which court concluded defendant had acted in bad faith "could have been contemplated by [plaintiff] when it signed the contract" unlike this case, in which there is a question of fact whether Andrews could have foreseen Modell's conduct, *see infra*, Part III.C.3).

The application of the implied covenant "ordinarily arises (1) when the contract is silent or ambiguous about the permissibility of the [challenged] conduct, or (2) when the conduct is undertaken pursuant to a grant of discretion and the scope of that discretion has not been designated."[180]   In this case, the Letter Agreement's understandable failure to anticipate or address Modell's conduct requires the implied covenant's application.

> **3.      Whether Modell Violated the Implied Covenant of Good Faith and Fair Dealing is a Question of Fact for the Jury.**

The covenant of good faith and fair dealing reflects "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc., v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1082-83 (Ohio 1996).

As a law review article cited by Modell notes:

> "[P]arties do not anticipate all future contingencies. This is particularly so in long-term contracting, because there are inevitable cognitive limitations on the human mind's information processing capacity." John C. Coffee Jr., *Unstable Coalitions: Corporate Governance as a Multi-Player Game*, 78 GEO. L.J. 1495, 1505 (1990). The inability to anticipate contingencies is the reason that default terms [like the implied covenant of good faith and fair dealing] are necessary. "[A] key purpose of state-supplied terms is to save parties from the necessity of formulating a complete set of express conditions for contingencies that may be difficult to anticipate, or are at least easily overlooked." Charles J. Goetz & Robert E. Scott, *The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms,* 73 CAL. L. REV. 261, 270 (1985).[181]

---

[180]   Thomas A. Diamond & Howard Foss, *Proposed Standards for Evaluating When the Covenant of Good Faith and Fair Dealing Has Been Violated: A Framework for Resolving the Mystery* (hereinafter "*Proposed Standards*"), 47 HASTINGS L.J. 585, 587 (1996).

[181]   *Proposed Standards*, 47 HASTINGS L.J. at 607, n.99.

It follows that "[e]ncompassed within the implied obligation of each promisor to exercise good faith are 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'"  *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (internal citations omitted).[182]

In this case, a genuine issue of material fact exists as to whether a reasonable person in the position of Vincent Andrews, Sr. would have been justified in understanding that the Letter Agreement included a promise by Modell that he would not undertake to avoid indefinitely paying Andrews or his heirs a finder's fee of at least $21.5 million by reconfiguring existing contractual arrangements to defer the final $6 million installment of sales proceeds after having already received $579 million in such proceeds.

Courts have traditionally reserved such "reasonableness of expectations" determinations for the jury.  For example, *Scheck v. Burger King Corp.*, 798 F. Supp. 692, 694 (S.D. Fla. 1991), concerned the question whether a franchise agreement with an "express denial of an exclusive territorial interest" gave Burger King "the right to open other proximate franchises at will regardless of their effect on Plaintiff's operations."  The court denied Burger King's motion for summary judgment, stating that "[i]t is axiomatic that a contract includes not only its written provisions but also the terms and matter which, though not actually expressed, are implied by law," and holding that the question of whether good faith forbade the opening of additional Burger King franchises near the franchisee was one of fact for the jury.

---

[182]   The covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Evans v. Famous Music Corp.*, 807 N.E. 2d 869, 875 (N.Y. 2004) (quoting *511 W. 232nd Owners Corp v. Jennifer Realty Co.*, 773 N.E. 2d 496, 500 (N.Y. 2002)).

Similarly, in *Chase Manhattan Bank v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 816 (S.D.N.Y. 1994), the court denied Keystone's summary judgment motion and held that "if Chase can prove that Keystone manipulated cash flows and fund sales and misrepresented the machinations to Chase, a trier of fact could conclude that Keystone breached its duty to act in good faith even though there was no technical breach of the Contract."

Finally, in *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food and Drug Ctrs., Inc.*, 889 P.2d 445, 452 (Utah Ct. App. 1995), the appellate court held that "viewing the facts most favorably to Olympus Hills, reasonable minds could differ as to whether Smith's acted in bad faith in changing the use of the leased space to the warehouse box store, in violation of Olympus Hills's justified expectations. Thus, the trial court properly submitted the issue to the jury." In so holding, the appellate court cited numerous authorities, including 3A CORBIN ON CONTRACTS § 654B (2d ed. 1993) (if dispute exists concerning duty of good faith as to why contractual parties did what they did, there is question of fact for the jury).

**D.     A Genuine Issue of Material Fact Exists as to Whether the Trust Represented by Plaintiffs Is a Third Party Beneficiary of the Option Purchase Agreement.**

Plaintiffs contend that the Trust is a third party beneficiary of the agreement announced in December 1999, in which companies owned and controlled by Modell and his wife agreed to sell 100% of the Ravens to BFC for approximately $600 million (*i.e.*, the agreement set forth in the PUPA and the OPA). Moreover, Plaintiffs contend that the Trust acted in reliance on that agreement by hiring counsel to collect the finder's fee from Modell, and thus materially changed its position. Under this theory, Modell and Bisciotti could not legally modify the express terms of the PUPA and the OPA (*i.e.*, agree to Amendment No. 2 to Option Purchase Agreement and the other April 2004 modifications) without the consent of the Trust. *See* RESTATEMENT

(SECOND) OF CONTRACTS § 311 (1981); *Auer v. Kawasaki Motors Corp.*, USA, 830 F.2d 535,

539 (4th Cir. 1987); *Burns v. Gen. Motors Corp.*, 950 F. Supp. 137, 139 (D. Md. 1996).

Accordingly, the April 2004 modifications are ineffective and void.  *See, e.g., Spates v. Spates*,

296 A.2d 581 (Md. 1972).

Modell asserts that Plaintiffs' third party beneficiary claim is "untenable – if not frivolous

– because the Trust is not (nor does it allege itself to be) an *intended* beneficiary" of the PUPA.

MSJM #3 at 27.  Surprisingly, Modell's motion for summary judgment fails to squarely address

Plaintiffs' third party beneficiary theory, even though that theory has been previously explained

in Plaintiffs' motion for leave to amend their Complaint.

In short, Plaintiffs' evidence demonstrates that Modell entered into the PUPA and the

OPA for the express purposes of paying his creditors.[183]  Because Plaintiffs are creditors of

Modell, it follows that they are creditor beneficiaries and thus intended beneficiaries of the

PUPA and the OPA.  According to the Restatement (Second) of Contracts § 133(1)(b) (1981), as

adopted by the Maryland courts in numerous decisions, including *Dist. Moving & Storage Co.,*

*Inc. v. Gardiner & Gardiner, Inc.*, 492 A.2d 319, 322 (Md. Ct. Spec. App. 1985), a creditor

---

[183]    *See* Exhibit 26, selected press reports:  Jon Morgan, *Modell to Sell Part of Ravens; Non-Controlling Partner Would Ease Debt, Estate Planning; Cash-Flow Problems Denied; Sources: NFL May Need to Help Make Payments*, Baltimore Sun, June 17, 1999 ("Modell acknowledges that taking on a new investor would help finances. It would also aid his estate planning, he said. 'It would reduce our debt. It puts the company in a more solid position,' Modell said."); Ed Bouchette, *Out on a Limb; Modell Thinks the Rewards Were Worth the Risks*, Pittsburgh Post-Gazette, January 28, 2001 ("Modell was running out of time . . . .  Last year, he sold 49 percent of his franchise for $275 million to Stephen Bisciotti with an option for Bisciotti to purchase the remaining 51 percent for $325 million within three to five years. Modell was forced to sell because of mounting debt."); Thomas Heath, *Modell to Sell Share of Ravens, Debt of 180 Million-Plus Forces Owner to Pursue Buyer*, The Washington Post, June 18, 1999 ("Baltimore Ravens owner Art Modell said yesterday he will try to sell a minority share of the franchise to erase some of the team's large debt and to facilitate estate planning.").

beneficiary is an intended beneficiary and thus has standing as a third party beneficiary.  "One is a creditor beneficiary when 'performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary.'"  *Id.*

The "performance of the promise" made by Modell in the PUPA and OPA to sell all of the Ravens to BFC at its option would undoubtedly "satisfy an actual or supposed or asserted duty" to the Trust, because as a result of that performance, Modell would have both the means and the obligation to pay the finder's fee owed to the Trust, and he would at that time be obligated to make such payment.

"In determining whether a party is a third party beneficiary to a contract, the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form."  *Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 752 A.2d 265, 276 (Md. Ct. Spec. App. 2000).  "For a third party beneficiary claim to succeed, the plaintiff must be a part of the class of persons specifically intended to be beneficiaries."  *Shofer v. Stuart Hack Co.,* 723 A.2d 481, 529 (Md. Ct. Spec. App. 1999).

Plaintiffs have presented sufficient evidence that they are part of a specific class of individuals and entities for whose benefit the PUPA and OPA were executed – *i.e.*, creditors of

Modell – to create a genuine issue of material fact on that issue.  *See* footnote 183, *supra*.[184]

Accordingly, Plaintiffs' third party beneficiary claim must be resolved by a jury.[185]

## CONCLUSION

For the foregoing reasons, this Court should deny each and every one of Defendant

Modell's Motions for Summary Judgment, and allow this case to proceed to trial.

Respectfully submitted,

_____/s/_____
Andrew Jay Graham (Fed. Bar No.: 00080)
George E. Brown (Fed. Bar No.: 14681)
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland  21202
(410) 752-6030 (telephone)
(410) 539-1269 (facsimile)
agraham@kg-law.com
gbrown@kg-law.com

*Attorneys for Plaintiffs*
*Thomas E. Minogue and*
*Thomas O. Callaghan, Co-Trustees of the*
*Phyllis Andrews Family Trust*

---

[184]   *See Wong v. Aragona*, 815 F. Supp. 889, (D. Md. 1993) (summary judgment precluded by fact issues, including whether plaintiffs had standing to sue as third-party beneficiaries of contract); *Butler v. Sun Refining and Mktg. Co.*, 658 F. Supp. 858, 861 (D. Md. 1987) (material issue of fact as to former franchisees' third party beneficiary status precluded summary judgment for franchisor).

[185]   Because the Court could grant Plaintiffs' Equitable Lien and Constructive Trust claims without necessarily finding that Modell is presently liable for the finder's fee, this memorandum does not address Modell's arguments that Plaintiffs have no right to prevail on those claims.  *See* MSJM #3 at 28-32.  Nevertheless, Plaintiffs do not waive those claims.

OF COUNSEL:

Andrew W. Hayes, Esq.
Christopher M. Green, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Armonk, NY  10504
(914) 749-8200 (telephone)
(914) 749-8300 (facsimile)

Neil McGinness, Esq.
McGinness, Painter & McGinness
Tower Press Building
1900 Superior Avenue
Suite 230
Cleveland, OH  44114
(216) 696-8440 (telephone)
(216) 696-0910 (facsimile)