IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. MINOGUE, CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. CCB 03-3391 |
| v. | ) ) | |
| ARTHUR B. MODELL, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S REPLY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

Michael D. Colglazier, # 05074
Steven F. Barley, # 10049
Douglas R. M. Nazarian, # 23402
Michael J. O'Connor, # 27604
HOGAN & HARTSON L.L.P.
111 South Calvert Street, Suite 1600
Baltimore, Maryland  21202
Telephone:   (410) 659-2700
Facsimile:   (410) 539-6981

Counsel for Defendant
Arthur B. Modell

April 11, 2005

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 3

The Opposition Applies A Seriously Mistaken Summary
Judgment Standard ................................................................................. 3

I.  Reply In Support Of Motion For Summary Judgment #1:
    The Trust Has Not Proffered *Prima Facie* Proof of
    Standing...... .......................................................................... 6

    A.  The Facts Material To The Trust's (Lack Of) Standing
        Are Not In Dispute ..................................................... 7

    B.  Without Proof Of An Actual Transfer, The Trust
        Cannot Prove Standing. ............................................... 9

II. Reply In Support Of Motion For Summary Judgment #2:
    The Letter Agreement Is Voidable And The Finder's Fee
    Contract Fails For Lack of Consideration ............................ 13

    A.  Mr. Wells's Conflict Of Interest Rendered The Letter
        Agreement Voidable ................................................... 14

    B.  The Trust's Opposition Does Not Demonstrate Any
        Issues of Material Fact ............................................... 17

        1.  Mr. Wells Represented Mr. Modell In
            Connection With The Letter Agreement......................... 18

        2.  Mr. Wells Also Represented Mr. Andrews In
            Connection With The Letter Agreement......................... 18

        3.  Mr. Modell Neither Knew Of, Nor Consented To
            The Dual Representation................................................. 20

            a.  Mr. Modell Did Not Waive His Objection
                To The Undisclosed Dual Representation............. 20

\\\BA - 66910/0005 - 189475 v1

b.    Mr. Modell Did Not Know Of The Dual Representation And Eugene Rossides's Affidavit Does Not Change That ........................... 23

C.    The Letter Agreement Fails For Lack of Consideration ............ 26

1.    The Trust Offers Nothing To Support Its Implied-Contract Theory .............................................................. 26

2.    The Finder's Fee Contract Is Separate From The Employment Contract And Fails For Lack of Consideration .................................................................. 28

3.    Neither Vincent Andrews Nor The Trust Qualifies As A Charity ..................................................................... 30

III.    Reply In Support of Motion for Summary Judgment #3:  The Letter Agreement Has Not Been Triggered, Nor Has Any Duty To Avoid Prevention Or Of Good Faith And Fair Dealing .................. 31

A.    There Has Been No Triggering Event Because Mr. Modell Retains A Stock Interest ............................................................ 32

B.    Mr. Modell's Retention Of A Stock Interest Does Not Violate The Ohio Doctrine Of Prevention ................................... 35

1.    The Trust's Prevention Claim Rests On An Imaginary Duty To Sell The Team ................................... 36

2.    The Court Should Hold The Trust To The Prevention Claim It Actually Pled ................................... 38

3.    No Obligation Attached When Mr. Bisciotti Delivered The Option Exercise Notice On March 18, 2004 ................................................................ 40

C.    Mr. Modell Has Not Breached The Implied Covenant of Good Faith And Fair Dealing ........................................................ 43

D.    The Trust Is Not A Third-Party Beneficiary Of Mr. Modell's Agreements With Mr. Bisciotti ..................................... 46

CONCLUSION ............................................................................................. 48

# TABLE OF AUTHORITIES

Page

## CASES:

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................................... 3, 4

*Benatty Corp. v. Transatlantic Energy Corp.*, No. 94-CA-12, 1994 WL 668103
    (Ohio Ct. App. Nov. 8, 1994).................................................................................... 35

*Board of Trustees of Union Twnshp. v. Planned Dev. Co. of Ohio*, 2000 WL 1818540
    (Ohio Ct. App. 2000) ....................................................................................... 44, 45

*Brooks v. Eschwege*, 162 N.E.2d 897 (Ohio Ct. App. 1957)................................................. 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................3, 4, 11, 27

*Charbonnages De France v. Smith*, 597 F.2d 406 (4ᵗʰ Cir. 1979)........................................... 4

*Citicasters Co. v. Bricker & Ecker, L.L.P.*, 778 N.E.2d 663 (Ohio Ct. App. 2002) ............... 45

*Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (D. Ohio 1976)... 20, 21, 22

*Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390
    (4ᵗʰ Cir. 1994)............................................................................................................ 11

*Dowdell v. Chapman*, 930 F.Supp. 533 (M.D.Ala 1996)........................................................ 47

*Dynes Corp. v. Seikel, Koly & Co., Inc.*, 654 N.E.2d 991 (Ohio App. 1994)......................... 35

*Galmish v. Ciccini*, 734 N.E.2d 782 (Ohio 2000)..................................................... 43, 44, 45

*Gilbane Building Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895 (4th Cir. 1996) ...... 40

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444 (6th Cir. 2005)................................................. 44

*Jordan v. Western Distributing Co.*, No. CCB 03-950, 2004 WL 1465804
    June 25, 2004) ........................................................................................................... 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................................................... 8

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................ 11

*Machovec v. Prudential Ins. Co.*, 2004 WL 1505523 (D. Md. June 28, 2004) ........................ 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........................... 3, 4

\\\BA - 66910/0005 - 189475 v1

*Miller v. Bristol-Myers Squibb Co.*, 121 F. Supp. 2d 831 (D. Md. 2000) .............................. 12

*Orsi v. Kirkwood*, 999 F.2d 86 (4th Cir. 1993) ..................................................................... 12

*Palmer v. Gould*, 144 N.Y. 671 (1895) ............................................................................... 15

*R/S Associates v. New York Job Dev. Auth.*, 771 N.E.2d 240 (2002) .................................. 32

*Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985) .......................... 3, 4, 5

*Sannes v. Jeff Wyler Chevrolet, Inc.*, 736 N.E.2d 112 (Ohio Ct. App. 1999) ........................ 29

*Shear v. Nat'l Rifle Assoc.*, 606 F.2d 1251 (D.C. Cir. 1979) ........................................... 36, 38

*Shofer v. Stuart Hack Co.*, 723 A.2d 481 (Md. Ct. Spec. App. 1999) ................................... 46

*Spaulding v. Benanati*, 442 N.E.2d 1244 (N.Y. 1982) ......................................................... 30

*Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304 (Ohio 1919) ................................................. 35

*Toledo Police Patrolmen's Assoc. v. City of Toledo*, 641 N.E.2d 799 (Ohio Ct.
    App. 1994) ...................................................................................................................... 30

*United States v. Bethlehem Steel Corp.*, 315 U.S. 289 (1942) .............................................. 30

*Wauseon Plaza Ltd. Partnership v. Wauseon Hardware Co.*, 807 N.E.2d 953
    (Ohio App. 2004) (cited at Motion #3 at 18-19) ............................................................. 45

*Weems v. Nanticoke Homes, Inc.*, 37 Md.App. 544 (Md. 1977) ............................................ 47

*Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494 (4th Cir.1977) ......................................... 25

*Winningham v. N. Am. Res. Corp.*, 42 F.3d 981 (6th Cir. 1994) ........................................... 32

*Wm. P. Zinn & Co. v Shawnee Pottery Co.*, 148 F.Supp. 322 (S.D. Ohio 1955) .................. 38

## OTHER AUTHORITIES:

RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:44 (4th ed.) ............................................ 15

5 RICHARD A. LORD, WILLISTON ON CONTRACTS § 377A at 235 ............................................ 37

WEINSTEIN'S FEDERAL EVIDENCE § 406.02[2] ...................................................................... 25

MOORE'S FEDERAL PRACTICE § 5614[1][c] at 56-158 (3d ed.) ............................................... 24

5 CHARLES A. WRIGHT *ET AL.*, *FEDERAL PRACTICE AND PROCEDURE* § 1215
 (3d ed. 2004) ................................................................................................ 40

10A CHARLES A. WRIGHT *ET AL.*, *FEDERAL PRACTICE AND PROCEDURE* § 2720
 (2d ed. Supp 1994) ....................................................................................... 11

10A CHARLES A. WRIGHT *ET AL.*, *FEDERAL PRACTICE AND PROCEDURE* § 2726
 at 445 (2d ed. Supp 1994) ........................................................................... 25

10A CHARLES A. WRIGHT *ET AL.*, *FEDERAL PRACTICE AND PROCEDURE* § 2727 at 474
 (2d ed. Supp 1994) ....................................................................................... 27

Federal Rule of Civil Procedure 56(e) ......................................................... 5, 10

Federal Rule of Evidence 404 ......................................................................... 24

Federal Rule of Evidence 801 ......................................................................... 19

Restatement (First) of Contracts ................................................................... 46

Restatement (Second) of Contracts § 133 ..................................................... 46

Restatement (Second) of Contracts § 90 ....................................................... 30

Restatement (Second) of Contracts § 183 .................................................. 28, 29

Restatement (Second) of Contracts § 202(3)(a) ............................................ 32

Restatement (Second) of Contracts § 302 .................................................. 47, 48

Restatement (Third) of Agency § 1.01 .................................................. 14, 15, 17

Restatement (Third) of the Law Governing Lawyers § 6 (1998) ..................... 16

Restatement (Third) of the Law Governing Lawyers § 130 ............................ 18

\\\BA - 66910/0005 - 189475 v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. MINOGUE, **CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST**, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. CCB 03-3391 |
| ARTHUR B. MODELL, | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S REPLY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

## INTRODUCTION

The Phyllis Andrews Family Trust's[1] Consolidated Opposition[2] to defendant Arthur B. Modell's three motions for summary judgment reveals the fundamental lack of merit to this case. After two years of opportunities to plead, discover and articulate every conceivable theory of recovery under the February 4, 1963 Letter Agreement (the "Letter Agreement")—including a post-discovery amendment to the complaint to add the prevention and good-faith-and-fair-dealing claims that dominate the Opposition—the Trust cannot overcome any of four independently fatal problems:

---

[1] As in all three motions for summary judgment, this Reply will refer collectively to Messrs. Minogue and Callaghan, appearing here in their capacities as trustees of the Phyllis Andrews Family Trust, as the "Trust."

[2] *See* Plaintiffs' Consolidated Opposition to Defendant's Motions For Summary Judgment (the "Opposition").

1.     The Trust cannot produce any admissible evidence that satisfies its burden of proving its rightful ownership of the Letter Agreement, the first prerequisite to proving its standing to bring these claims.

2.     The Trust cannot overcome the admission by the successor to Mr. Modell's former law firm that Mr. Wells, Mr. Modell's lawyer for the Letter Agreement, served simultaneously as counsel to Vincent Andrews Sr., the other signatory, in connection with the very same agreement.

3.     The Trust cannot avoid the undisputed fact that Mr. Andrews Sr. specifically and for consideration released his claim to any finder's fee relating to Mr. Modell's 1961 purchase of the Cleveland Browns.

4.     The Trust cannot avoid the undisputed and unambiguous language of the Letter Agreement, which specifically contemplates that Mr. Modell might never divest his interest in the football team and precludes a finder's fee from being triggered by the 2000 and 2004 transactions in which Mr. Modell sold 99% of the football team and retained 1%.

The Trust approaches this case and these motions with a misplaced sense of entitlement. It professes great offense that Mr. Modell would question the Trust's right to bring these claims, examine the dubious history and circumstances surrounding the drafting and execution of the Letter Agreement, and conduct his personal and business affairs in a manner consistent with his own personal and business interests. But as to each of Mr. Modell's three motions,[3] the Trust has

---

[3] Motion #1 seeks summary judgment based on the Trust's lack of standing.  Motion #2 seeks summary judgment on the grounds that the Letter Agreement is voidable and is not

failed to confront and refute the straightforward facts and legal principles that entitle Mr. Modell to summary judgment.  Instead, the Trust asks the Court to ignore or assume away the operative facts, to treat speculative inferences as evidence, to interpolate legal duties that do not exist, and to ignore the actual terms of transactions in favor of hypothetical alternatives.

The common defects in the Trust's Opposition, beginning with the incorrect summary judgment standard on which it relies, counsel in favor of a single consolidated reply.  For the reasons that follow, the Court should grant each of Mr. Modell's motions for summary judgment.

## ARGUMENT

### The Opposition Applies A Seriously Mistaken Summary Judgment Standard.

The Opposition suffers throughout from a serious and misleading analytical mistake:  the Trust cites and applies the wrong summary judgment standard when describing and carrying out its burden of production in opposing Mr. Modell's motions.  The Trust draws its standard from the Fourth Circuit's decision in *Ross v. Communications Satellite Corp.*,[4] a case predating the Supreme Court's fundamental reorientation of summary judgment analysis in 1986.[5] *Ross* was good law when it was decided in 1985 and has not specifically been overruled.

---

supported by consideration.  Motion #3 seeks summary judgment on the ground that the finder's fee obligation contained in the Letter Agreement has not ripened.  Mr. Modell's Reply will cite his Motions for Summary Judgment as "Motion #1" (standing), "Motion #2" (voidability and consideration), and "Motion #3" (triggering event and merits).

[4] *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

3

But the portion of *Ross* the Trust cites for its summary judgment standard conflicts

directly with *Anderson, Celotex,* and *Matsushita*, particularly with respect to a non-

movant's burden of production and persuasion.  This misstatement of the law

manifests itself most visibly and most pervasively in the way the Trust attempts to

manufacture issues of fact from speculation, conjecture and interpretation

whenever it lacks concrete, admissible evidence.

The portion of *Ross* the Trust cites describes an analysis more akin to

that governing motions to dismiss, *i.e.*, one in which the Court is obliged to credit

every allegation as true and presumptively draw all inferences against the movant:

> [T]he facts themselves, and the inferences to be
> drawn from the underlying facts must be viewed in
> the light most favorable to plaintiff, as the party
> opposing the motion . . . .  The nonmoving party is
> in a favorable posture, being entitled 'to have the
> credibility of his evidence as forecast assumed, his
> version of all that is in dispute accepted, all
> internal conflicts in it resolved favorably to him,
> the most favorable of possible alternative
> inferences from it drawn in his behalf; and finally,
> to be given the benefit of all favorable legal theories
> invoked by the evidence as considered.[6]

After *Anderson v. Liberty Lobby, Inc.*,[7] however, the *Ross* standard no longer

correctly states the law:

> By its very terms, [the summary judgment]
> standard provides that the mere existence of some
> alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for

---

[6] Opposition at 21 (quoting *Ross*, 759 F.2d 355, 364 (4th Cir. 1985) (quoting *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979))).

[7] 477 U.S. 242, 247-48 (1986).

4

> summary judgment; the requirement is that there
> be no genuine issue of *material* fact.

*Ross*, at least as applied by the Trust, also flies in the face of Rule 56's proscription that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."[8]

The Trust's effort to lower the bar for itself bespeaks its distinct inability to oppose Mr. Modell's motions for summary judgment with applicable law and admissible evidence. The Trust repeatedly posits self-interested views of documents or testimony, then drops a footnote arguing that the Court is obliged by *Ross* to treat its characterization as a material issue of fact that defeats summary judgment.[9] But that is not how summary judgment works, and the Trust's misplaced reliance on *Ross* requires the Court to look skeptically at the nature and quality of the evidence on which the Trust relies when arguing that disputes of fact preclude summary judgment.

All three of Mr. Modell's motions for summary judgment relied on a standard adopted by this Court that accounts for the post-*Ross* evolution of summary judgment law and properly allocates the burdens of proof.[10] Although the Trust obviously resists these motions, it does not and cannot argue that Mr. Modell

---

[8] *See* Fed. R. Civ. P. 56(e).

[9] *See, e.g.*, Opposition at 25 n.91, 36 n.111, 41 n.120, 45 n.128 and 52 n.142.

[10] *See Machovec v. Prudential Ins. Co.*, 2004 WL 1505523, at **2-3 (D. Md. June 28, 2004).

\\BA - 66910/0005 - 188558 v5

has failed to meet his *prima facie* burden under Rule 56 for any of them.[11]   Once

Mr. Modell met his burden, as he did, it fell to the Trust to counter the motions with

superseding authority or admissible evidence creating genuine issues of material

fact.  As the Court will see, the Trust has failed thrice to do so.

## I.   REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT #1: THE TRUST HAS NOT PROFFERED *PRIMA FACIE* PROOF OF STANDING.

Summary Judgment Motion #1 demonstrated that the record in this case—

including the Surrogate's Court file for Mr. Andrews Sr.'s estate (the "Estate") and

materials produced by the Trust in discovery—does not support the Trust's

standing to enforce the Letter Agreement against Mr. Modell.[12]   The motion never

questioned that Mrs. Andrews served as her husband's executrix or the possibility

that Mrs. Andrews, in her capacity as executrix, may have had the authority under

certain circumstances to convey the Letter Agreement from the Estate to herself (in

her individual capacity).  Instead, the Trust's lack of standing flows entirely from

the total void of evidence that this transfer occurred at all.  As a result, and as

Motion #1 demonstrated, Mrs. Andrews lacked title to the Letter Agreement when

she "sold" it to the Trust.

---

[11] The Trust argues at one point that Mr. Modell's voidability argument in Motion #2 must be denied for lack of evidentiary support because, in its view, Mr. Modell offered no admissible evidence of Mr. Wells's dual representation.  Opposition at 39-40 & n.116.  But although the Trust obviously disagrees about the weight and sufficiency of the other evidence Mr. Modell offers in support of Motion #2, it cannot and does not claim that the motion is unsupported.

[12] *See generally* Motion for Summary Judgment #1.

\\\BA - 66910/0005 - 188558 v5

Nothing in the Trust's Opposition addresses, let alone solves, this fundamental problem. The Trust states baldly that Mrs. Andrews transferred the Letter Agreement to herself from the Estate, but offers literally no contemporaneous or admissible evidence memorializing that transaction. The only "evidence" it does cite—Mrs. Andrews's representation and warranty in the Purchase Agreement with the Trust—is worthless from a legal and evidentiary standpoint. And because Mrs. Andrews could not, under New York law, have taken title to the Letter Agreement by operation of law, the Trust cannot satisfy its burden to prove that it had standing to bring these claims at the time it filed suit in May 2003. The Court should grant summary judgment to Mr. Modell on all counts in the Amended Complaint.

A.   **The Facts Material To The Trust's (Lack Of) Standing Are Not In Dispute.**

Before addressing the Trust's response, it is worth noting the important points the Trust has not disputed:

1.   <u>The Trust does not dispute that Mr. Andrews Sr.'s Estate was insolvent and never closed.</u>  The Trust's entire factual discussion relating to Motion #1 consumes a paragraph and a footnote on page 10 of the Opposition and a paragraph and four footnotes on pages 13-14, none of which challenge Mr. Modell's fully supported, nine-page presentation detailing the administration of Mr. Andrews Sr.'s Estate.[13] The Trust does not dispute that the Estate had numerous creditors whose claims were never satisfied, nor does it dispute that

---

[13] *See* Motion #1 at 2-11.

7

objections to Mrs. Andrews's intermediate accounting were never resolved, nor does

it dispute that a final accounting was never filed or approved, nor does it dispute

that the Estate was never closed.  Nor does the Trust dispute that in 1980, an

"attorney for the Estate of Vincent S. Andrews," Mr. Blumenthal, cited the Letter

Agreement and requested information regarding Mr. Modell's ownership of the

Browns "[i]n connection with the administration of the estate."[14]  Throughout the

entire administration of the Estate and for years thereafter, the Estate claimed the

Letter Agreement as an asset.

      2.   <u>The Trust has not produced any document or other admissible</u>

<u>evidence memorializing the transfer of the Letter Agreement from the Estate to</u>

<u>Mrs. Andrews</u>.  The Trust is correct that the central question is whether

Mrs. Andrews the executrix in fact transferred the Letter Agreement from the

Estate to Mrs. Andrews the individual.  But the Trust cannot just say that the

transfer happened—as the party seeking redress in this Court, <u>it</u> bears the burden

of proving its standing with actual evidence,[15] a legal proposition the Trust also has

not challenged.  And save for the self-fulfilling representation and warranty

contained in the Purchase Agreement her sons gave her to sign—a document of no

legal or evidentiary consequence whatsoever, as demonstrated below—the Trust

has offered nothing memorializing a transfer.

---

[14] *See id.* at 10 & n.34 (citing Nazarian Dec. Ex. 30).

[15] *See* Motion #1 at 16-18 (citing, among other cases, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to establish standing)).  The Trust has not challenged its obligation to prove its standing as of the time this suit was filed. *Id.* at 16 & nn.53-55.

3.     <u>The Trust does not dispute the facts surrounding the formation</u>
<u>of the Trust or the Trust's "purchase" of the Letter Agreement from Mrs. Andrews.</u>
The Trust purports to dispute Motion #1's description of the circumstances
motivating Mrs. Andrews's sons to form the Trust by way of a categorical statement
in a footnote, not countervailing facts.[16]  But the Trust does not dispute that
Vincent Jr. and Robert Andrews formed the Trust in December 1999, one week after
press accounts announcing an agreement between Messrs. Modell and Bisciotti.
The Trust does not dispute that the Trust "purchased" the Letter Agreement a
month later from Mrs. Andrews for $200,000.  The Trust does not dispute that
Mr. Andrews's sons, the Trust's initial trustees, commissioned the documents
memorializing that transaction and that she executed them at their direction.  And
the Trust does not dispute that Mrs. Andrews herself contributed the $200,000 the
Trust used to "purchase" the Letter Agreement from her—leaving unchallenged the
strangely circular nature of the "purchase" transaction.[17]

The underpinnings of Motion #1 thus stand unchallenged.  The Trust
has not mended the broken chain of title between the Estate and the Trust with
evidence, and its arguments fail to bridge the gap in any other way.

**B.     Without Proof Of An Actual Transfer, The Trust Cannot Prove
Standing.**

The Trust does not dispute that its standing depends on whether it can
prove it is the lawful successor to Mr. Andrews Sr.'s rights (if any) under the Letter

---

[16] *See* Opposition at 14 n.51.

[17] *See* Motion #1 at 11-14.

\\\BA - 66910/0005 - 188558 v5

Agreement. All eight of the claims in the Trust's Amended Complaint flow wholly and directly from the Letter Agreement[18] and the Trust cannot establish an injury-in-fact—the first prerequisite to standing[19]—without first proving ownership of the Letter Agreement. It may well be that as executrix, Mrs. Andrews <u>could have</u> transferred the Letter Agreement from the Estate to herself in the course of administering the Estate. And it may also be true, but the Court need not resolve, that Mrs. Andrews <u>might not</u> have been required to obtain a final accounting, an order closing the Estate, or satisfaction of outstanding claims before effecting such a transfer, [20] although New York law seems clearly to require approval of the Surrogate for a transfer under those circumstances.[21]

<u>None of these "could haves" or "might haves" matters, however, because the Trust has produced no evidence that such a transfer in fact occurred.</u> Ever. No documents, no Surrogate's Court filings, not even an affidavit from Mrs. Andrews. This failure alone compels summary judgment for Mr. Modell once Motion #1 established, as it did,[22] the absence of evidence in the record of this case

---

[18] *See id.* at 17 & nn.57-58.

[19] *Lujan*, 504 U.S. at 560.

[20] The Trust devotes much of its standing section to discussing whether a transfer by Mrs. Andrews as executrix to herself would have been proper, *i.e.*, whether she would have had to resolve certain aspects of the Estate at the time of such a transfer. *See* Opposition at 25-28. None of this matters, though, <u>because no such transfer ever happened</u>, or at least, the Trust cannot show that any such transfer happened.

[21] *See* Motion #1 at 8-9, 19.

[22] *See id.* at 2-14 and 18-21.

\\\BA - 66910/0005 - 188558 v5

capable of supporting the Trust's standing.[23]  In lieu of proof, the Trust relies

entirely on Mrs. Andrews's representation (in the Purchase Agreement she signed

with the Trust) that "[t]he seller is the record owner of the Letter Agreement

Interest and has good and marketable title thereto, free and clear of any liens,

claims, encumbrances, security interests, options, pledges, charges and restrictions

of any kind."[24]  The Trust claims that this representation somehow makes "plai[n

that] she did" distribute the Letter Agreement to herself at some point during the

last thirty years.[25]  But merely saying something does not make it so, plainly or

otherwise, and Mrs. Andrews's unsworn, tautological representation is not

---

[23] *See* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."); *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) ("As a leading treatise on federal procedure explains, under *Celotex*, 'the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case.'")(quoting 10A CHARLES A. WRIGHT *ET AL.*, *FEDERAL PRACTICE AND PROCEDURE* § 2720, at 10 (2d ed. Supp 1994)); *see also Lujan v. National Wildlife Fed'n*, 497 U.S., 871, 885 (1990) ("*Celotex* made clear that Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case; to the contrary, 'regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.'")(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (emphasis in original); *Jordan v. Western Distributing Co.*, No. CCB 03-950, 2004 WL 1465804, *4 (June 25, 2004) ("Jordan's bare allegation in the complaint . . . does not suffice at the summary judgment stage, where facts need to be supported by affidavit, deposition or other evidence.").

[24] *See* Motion #1, Nazarian Dec. Ex. 37, § 4.4. *See also id.* § 4.1 ("All necessary action required to have been taken by or on behalf of the Seller by applicable law has been taken to authorize (a) the execution and delivery by the Seller if this Agreement and (b) the performance by Seller of her obligations under this Agreement and the consummation of the transactions contemplated thereby.").

[25] Opposition at 24. The Trust also claims that Mr. Modell somehow acknowledged this (non-) transfer, but cites nothing memorializing this "acknowledgement;" the only citation is to the Purchase Agreement itself. *See id.* & n.89.

11

admissible evidence that the transfer in fact happened.[26]  To construe the representation as evidence would allow a plaintiff to confer federal jurisdiction on herself with, if the Trust is right, immunity from challenge.  The Trust's inability to explain its failure to produce tangible evidence of the transfer or an affidavit from Mrs. Andrews swearing that the transfer happened (and describing the circumstances) widens the evidentiary gap rather than narrowing it.

This leaves only the possibility that Mrs. Andrews took title to the Letter Agreement by operation of law—a theory the Trust dismisses as "irrelevant because . . . [Mrs. Andrews] was empowered to, and did, distribute the Letter Agreement from the estate to herself as the estate's sole beneficiary,"[27] and that Motion #1 rejected conclusively based on the now-undisputed fact that Estate's creditors remained (and remain) unsatisfied.[28]  The Trust does not refute this principle, focusing instead on non-issues such as whether Mr. Modell has standing to challenge Mrs. Andrews's administration of the Estate[29] and Mrs. Andrews's

---

[26] See, e.g., Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."); Miller v. Bristol-Myers Squibb Co., 121 F. Supp. 2d 831, 837 (D. Md. 2000) ("The unsworn, unauthenticated letter from Gloria Fusco is insufficient evidence to counter Defendant's motion for summary judgment. . . . Without legally competent evidence tending to prove that Plaintiff can distinguish which defendant's implants she received, there can be no genuine issue of material fact upon which a jury may support a verdict in favor of Plaintiff.").  Mr. Modell does not challenge the authenticity of the Purchase Agreement, as it is attached to both parties' papers, but the authenticity of the document does not mean that the unsworn representation it contains qualifies as competent evidence of the truth of that representation if it qualifies as evidence at all, the representation would thus be inadmissible as hearsay.

[27] Opposition at 26.

[28] See Motion #1 at 18-20 & n.61.

[29] See Opposition at 23.  Nothing about this motion in any way challenges Mrs. Andrews's administration of the Estate.  The now-undisputed facts regarding the administration of

hypothetical liability to Estate creditors if she had transferred the Letter Agreement as the Trust now claims.[30]  On this record, it makes no difference whatsoever to the outcome of this motion whether Mrs. Andrews could have transferred the Letter Agreement without first obtaining a formal accounting, satisfying creditors or otherwise closing the Estate or what her exposure might have been if she had.  The fact is that she did not transfer the Letter Agreement to herself, and without evidence of a transfer the Trust's discussion of Mrs. Andrews's powers and liabilities misses the point of—and fails altogether to oppose— Mr. Modell's motion.  The Court should grant summary judgment to Mr. Modell based on the Trust's lack of standing and need proceed no further.

## II.   REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT #2: THE LETTER AGREEMENT IS VOIDABLE AND THE FINDER'S FEE CONTRACT FAILS FOR LACK OF CONSIDERATION.

The Trust's response to Motion #2 leaves unchallenged the factual and legal underpinnings of Mr. Modell's voidability and lack-of-consideration arguments.  As to voidability, the Trust seeks to avoid confronting the impact of Mr. Wells's conceded conflict of interest on the formation of the Letter Agreement by mischaracterizing the conflict as a simple principal-agency dispute.[31]  It attempts to create issues of fact regarding the conflict through affidavits that are

---

the Estate matter here because they determine who had title to the Letter Agreement at different points in time.

[30] See Opposition at 25-28.

[31] The Trust also rehashes its claim that Mr. Modell failed to raise the conflict-of-interest defense in a timely manner, an argument that is the subject of a separate (and fully-briefed) motion to strike.  Mr. Modell relies upon, and incorporates here by reference, his Opposition to Motion to Strike Conflict-Of-Interest Defenses, filed March 21, 2005.

13

inadmissible and contain no relevant facts. Then, in response to Mr. Modell's lack-of-consideration argument, the Trust tries to introduce new theories neither pled in the Amended Complaint nor supported by any admissible fact. The Trust also seriously misreads the governing law. The Court should enter summary judgment for Mr. Modell on both grounds asserted in Motion #2.

### A. Mr. Wells's Conflict of Interest Rendered The Letter Agreement Voidable.

Mr. Modell demonstrated in Motion #2 that: (1) Mr. Wells was Mr. Modell's lawyer in connection with the Letter Agreement, (2) Mr. Wells also was Mr. Andrews Sr.'s lawyer in connection with the Letter Agreement (based on Clifford Chance's admission), and (3) Mr. Modell relied on Mr. Wells's advice but did not consent to the undisclosed dual representation.[32] The motion is thus a simple one: because Mr. Wells's adverse position to his client, Mr. Modell, rendered the Letter Agreement voidable as a matter of law, Mr. Modell is entitled to judgment.[33]

The Trust begins its response not by confronting these straightforward facts, but by arguing that the conflict begets a claim only against Clifford Chance or Mr. Andrews, not summary judgment against the Trust. In an effort to distinguish all of the cases cited in Mr. Modell's motion summarily, the Trust relies on a single sentence cherry-picked from a tentative draft of the Restatement (Third) of

---

[32] *See* Motion #2 at 2-9 and 11-12.

[33] *Id.* at 12-14.

Agency,[34] and claims that "[b]ecause Rogers & Wells was simply furnishing advice to Modell, it was not his agent. . . ."[35]   The Trust concludes that "Modell's claim here that the <u>Restatement of Agency</u> permits him to void a contract his lawyers drafted fails as a matter of law."[36]

Unfortunately for the Trust, Mr. Modell did not ground his argument on the generic agency principles articulated in the Restatement of Agency—Motion #2 did not even cite it.   Motion #2 relied instead on a broader and uncontroversial principle that a contract procured by a conflicted agent (or representative or fiduciary, as the term is often used outside of the Restatement) may be rescinded regardless of the agent's authority (or lack thereof) to sign the contract him- or herself:

> If one party enters into a contract through an agent who is also secretly acting for the other party, the contract is not only unenforceable specifically against the principal, but, unless ratified, is subject to a defense in any court on the ground of at least constructive fraud if the other party knew of the double employment. . . .[37]

*Williston* cites the New York case *Palmer v. Gould*,[38] a case Mr. Modell cited, in which the New York Court of Appeals refused to enforce a contract where

---

[34] *See* Opposition at 32 ("If a service provider simply furnishes advice and does not interact with third parties as the representatives of the recipient of the advice, the service provider is not acting as an agent.") (citing Restatement (Third) of Agency § 1.01, cmt. c).

[35] *Id.*

[36] *Id.* (emphasis added).

[37] *See* 27 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:44 (4th ed.) (cited in Defendant's Motion #2, at 13 & n.44).

[38] 144 N.Y. 671, 683-84 (1895).

\\\BA - 66910/0005 - 188558 v5

the lawyer represented and advised his client in the sale of her property without her knowledge that the lawyer also represented the other party. The lawyer did not sign the agreement on the client's behalf, as the Trust would seem to require. Instead, the client "relied on [the lawyer's] good faith and professional advice. The evidence, however, did not show that [the lawyer] conducted himself towards her as she was justified in assuming that he would, in view of their relations."[39] This is the concept of agency that governs here, and it compels the conclusion that the Letter Agreement is voidable.

The more relevant Restatement—the Restatement (Third) of the Law Governing Lawyers—states the case even more strongly. It provides that rescission or cancellation is an appropriate remedy where a lawyer represents both parties to a transaction without informed consent.[40] It goes on to say that "[c]ancellation of an instrument with otherwise legal effect would be appropriate when . . . the instrument was prepared by a lawyer representing clients with substantial conflicts of interest."[41] This too points directly to rescission, and thus summary judgment, as the appropriate remedy for agreements begotten of professional conflicts.

That all said, the Restatement of Agency section cited (out of context) by the Trust supports Mr. Modell's position. The very same comment provides in so many words that "[t]he elements of common-law agency are present in the

---

[39] *Id.* at 683.

[40] *See* Restatement (Third) of the Law Governing Lawyers § 6 (1998) ("For a lawyer's breach of a duty owed to the lawyer's client or to a nonclient . . . [j]udicial remedies include. . . (4) ordering cancellation or reformation of a contract, deed, or similar instrument").

[41] *Id.* cmt. e (citing § 130).

16

relationships between employer and employee, corporation and officer, <u>client and lawyer</u>, and partnership and general partner."[42]  And the sentence directly preceding that cited by the Trust says that "a principal might employ an agent who acquires information from third parties on the principal's behalf but does not 'deal' in the sense of entering into transactions on the principal's account."[43]  Put another way, Mr. Wells's obligation to act in Mr. Modell's interest is beyond dispute, whether Mr. Modell was his principal or his client.  Nothing in the Trust's Opposition excuses or diminishes Mr. Wells's violation of that duty in connection with the formation of the Letter Agreement.  Mr. Andrews, having known of the dual representation, should not (through his successors) be permitted to enforce it.

**B.    The Trust's Opposition Does Not Demonstrate Any Issues of Material Fact.**

From there, the Trust attempts to create issues of fact on the questions of dual representation and lack of consent by applying its incorrect summary judgment standard to inadmissible evidence.  The Opposition loudly defends Mr. Wells's character and draws favorable hypothetical inferences about what people might have done or thought in 1961 and 1963.  But none of this matters.  Mr. Modell's voidability argument rests on three, and only three, facts: (1) Mr. Wells represented Mr. Modell in connection with the Letter Agreement; (2) Mr. Wells represented Mr. Andrews in connection with the Letter Agreement; and (3) Mr. Modell did not know about the dual representation.  These are the only

---

[42] Restatement (Third) of Agency § 1.01, cmt. c. at 21.

[43] *Id.* at 22.

17

facts that matter for purposes of summary judgment.  The Trust cannot and does

not offer any facts refuting them.

> **1.     Mr. Wells Represented Mr. Modell in Connection with the Letter Agreement.**

There is, and can be, no dispute that Mr. Wells represented Mr. Modell

in connection with the Letter Agreement.  Although the Trust offers the misleading

suggestion that Mr. Wells and his colleagues merely reduced a prior agreement to

writing,[44] the scrivener characterization is "usually inappropriate.  A lawyer must

accept responsibility to give customary advice and customary range of legal

services, unless the clients have given their informed consent to a narrower range of

legal services."[45]  At any rate, the Trust cannot and does not dispute that

Mr. Modell relied on his lawyers for advice with respect to the Letter Agreement.[46]

> **2.     Mr. Wells Also Represented Mr. Andrews In Connection with the Letter Agreement.**

In light of two separate admissions by the designated representative of

Clifford Chance submitted in response to a valid Rule 45 subpoena—as to which the

---

[44] *See* Opposition at 7 ("In 1963, this oral agreement between Modell and Andrews was reduced to a written contract (the "Letter Agreement"), in which Modell agreed to compensate Andrews for making possible the 1961 transaction that enabled Modell to acquire control of the Browns.") (footnote omitted).  This statement is seriously misleading.  First, the "oral agreement" consists entirely of Mr. Frisch's memo transcribing the contents of a telephone call from Mr. Andrews.  *Id.*  At best this statement—Mr. Andrews's statement about what Mr. Modell agreed—is hearsay and inadmissible for the truth of the "agreement."  Second, this "agreement" cannot qualify as an enforceable agreement because (a) Mr. Wells's handwritten notation right below begins by saying "No!," *id.* (exclamation point in original); (b) Mr. Andrews had released his claim to a finder's fee, *see* Motion #2, Ex. 10; and (c) nearly two years passed between the time of this "oral agreement" and the execution of the Letter Agreement, time the Trust fails altogether to explain.

[45] Restatement (Third) of the Law Governing Lawyers § 130 cmt. b.

[46] *See* Motion #2 at 6-7 & n.28 (citing Mr. Modell's deposition testimony).

\\\BA - 66910/0005 - 188558 v5

Trust raised no evidentiary objections in the Opposition[47]—there can be no credible dispute that Mr. Wells represented Mr. Andrews in connection with the Letter Agreement.   Undaunted, the Trust attempts to create several tangential disputes of fact on this point,[48] principally through the declaration of Clifford Chance attorney Rita Stephanz.  These efforts do not and cannot succeed.

Ms. Stephanz's declaration purports to explain her law firm's prior conclusion that Clifford Chance's predecessor firm, Rogers & Wells, represented Mr. Andrews in connection with the Letter Agreement.  But the declaration does not in any way indicate that Ms. Stephanz was mistaken about her law firm's prior conclusion and admissions, and she does not retract or modify them.[49]  Although the declaration says that no one she spoke to has personal knowledge,[50] it does not identify to whom she spoke (or if she even spoke to anyone).  Since the Trust has not questioned (or offered evidence undermining) the truth of Clifford Chance's two

---

[47] The Trust attempts obliquely to question Ms. Stephanz's ability to bind Clifford Chance by characterizing her as a "present-day associate." Opposition at 33. This misses the point: Ms. Stephanz proffered Clifford Chance's positions in response to a valid Rule 45 subpoena. Her signature on letters and statements on behalf of Clifford Chance are no less effective than those of an associate signing pleadings or motion papers before this or any Court.

[48] Opposition at 33-37.

[49] If Clifford Chance had any doubt about whether Mr. Wells had represented Mr. Andrews in connection with the Letter Agreement, it presumably would have attempted to retract or explain its previous statements, especially since both parties suggest that Clifford Chance may be liable in some respect. Ms. Stephanz's declaration is just as revealing for what it does not say, as it is for what it says.

[50] Opposition, Exhibit 48. At any rate, paragraph 5 of the declaration is inadmissible hearsay. *See* Fed. R. Evid. 801 *et seq.*

previous admissions, the Trust's effort to draw competing inferences from documents fails.[51]

### 3. Mr. Modell Neither Knew Of Nor Consented To The Dual Representation.

The Trust tries in two different ways to argue that Mr. Modell knew about and consented to Mr. Wells's dual representation.[52] First, the Trust argues that even if Mr. Modell did not explicitly know of the dual representation in connection with the Letter Agreement, he somehow implicitly waived that objection because he knew that Mr. Wells and his colleagues represented Andrews in other contexts.[53] Second, the Trust infers that Mr. Modell must have known and argues that issues of credibility exist.[54] Both arguments are wrong as a matter of law.

#### a. *Mr. Modell Did Not Waive His Objection To The Undisclosed Dual Representation.*

The Trust offers no evidence whatsoever that Mr. Modell in fact knew about and explicitly waived his objection to Mr. Wells's dual role in the Letter Agreement. Instead, the Trust cites *Cleveland v. Cleveland Elec. Illuminating Co.*,[55] for the proposition that Mr. Modell's knowledge of Mr. Wells's past representation of Mr. Andrews in other matters implicitly waived his ability to

---

[51] Although the relevant documents provide context, Mr. Modell does not rely on them for purposes of summary judgment. Mr. Modell therefore need not respond to pages 34-37 of the Opposition.

[52] Though not necessarily precluded by the Rules at this point in the litigation, it is somewhat disingenuous for the Trust to argue on the one hand that Mr. Wells did not represent Mr. Andrews while arguing simultaneously that Mr. Modell knew of the dual representation.

[53] *See* Opposition at 38-39.

[54] *Id.* at 39-43.

[55] 440 F. Supp. 193 (D. Ohio 1976).

object to the firm's continued undisclosed representation of Mr. Andrews in connection with the Letter Agreement. *Cleveland Elec.* does not remotely support this proposition and there was no waiver, implicit or otherwise.

In *Cleveland Elec.*, the city of Cleveland (the "City") sued several electrical companies for antitrust violations.[56] One of the larger electric companies, Cleveland Electric ("CEI"), was represented in the antitrust litigation by the law firm Squire, Sanders & Dempsey ("SS&D"),[57] a large national firm with a presence in Cleveland. SS&D had openly represented CEI as outside counsel for over 65 years—several times in direct litigation against the City.[58] One of the firm's departments had also, on several limited occasions, represented the City as bond counsel to help it issue public bonds.

While the antitrust litigation (in which the City and CEI had adverse positions) was pending, the City requested that SS&D serve as its bond counsel in an unrelated issuance.[59] SS&D declined, citing the antitrust litigation (and the parties' adverse interests) as a possible conflict.[60] When the City later was unable to find qualified bond counsel, SS&D reluctantly agreed, <u>but not until all of the requisite disclosures were made and both CEI and the City agreed as well</u>.[61] And

---

[56] *Id.* at 195.

[57] *Id.*

[58] *Id.* at 197.

[59] *Id.* at 201.

[60] *Id.*

[61] *Id.* ("However, before reluctant acceptance of the retainer, SS&D insisted upon the written assent (in Hollington's request to SS&D) of [the City's Director of Utilities]. The concurrence was provided by the [City's Law Director's] letter of July 24, 1972.").

21

when the City subsequently moved to disqualify SS&D from representing CEI in the antitrust litigation, even though "SS&D's ad hoc legal representation of the City had no substantial relationship to the [antitrust litigation],"[62] the court refused to disqualify SS&D from representing CEI in the antitrust litigation. Among its reasons, the court held that the City waived its objection to SS&D's continued representation of CEI in the antitrust litigation when it assented, in writing and after the requisite disclosures were made, to representation by SS&D in the bond issuance.[63]

Cleveland Electric does not hold, as the Trust's misleading sound bite implies, that mere knowledge of a lawyer-client relationship in other matters effectively fulfills the informed-consent requirement—that would do away with the "consent" half of "informed consent" altogether. Instead, the case holds that where both clients consent to concurrent representation in unrelated matters—something that clearly did not happen among Messrs. Modell, Andrews Sr. and Wells—one client cannot subsequently move to disqualify counsel in unrelated litigation where the parties have adverse interests. As a matter of law and common sense, the fact that Mr. Modell might have known that Mr. Wells and his firm represented Andrews in other matters in the past sheds no light on whether he knew that they represented Mr. Andrews in connection with the Letter Agreement.

---

[62] Id. at 198.

[63] Id. at 205.

\\\BA - 66910/0005 - 188558 v5

>   b.   *Mr. Modell Did Not Know Of The Dual Representation*
>        *And Eugene Rossides's Affidavit Does Not Change That.*

Mr. Modell testified at his deposition that when he signed the Letter

Agreement in 1963 he "didn't know at the time [that Mr. Wells] was representing

Vincent Andrews and some of his business clients."[64]  Rather, he did not learn that

Mr. Wells represented Mr. Andrews until "later on," although he "had a suspicion

[Wells] was [representing Andrews] after the deal was made."[65]  And Mr. Modell

also testified that he <u>never</u> identified his other lawyer, Robert Frisch—the attorney

who actually wrote the Letter Agreement cover memoranda to Messrs. Andrews and

Modell—as serving two masters.[66]  The Trust's motion skirts the issue, but even if

Mr. Modell knew of the dual representation, there is literally no evidence that he

consented to it (or ever had the opportunity to do so).[67]

The Trust posits two theories of informed consent.  <u>First</u>, the Trust

cites a 1961 communication from Mr. Wells to Mr. Frisch directing the latter to

"check with Artie" before drafting an agreement between Mr. Modell and

Mr. Andrews.[68]  The Trust speculates from the mere existence of this memo

(without anything more) that Mr. Wells or a colleague in fact checked with

---

[64] *See* Motion #2 at 4 & n.17 (citing Modell Dep. at 21:19-23:2).

[65] *Id.*

[66] *Id.* at 12 & n.43 (citing Modell Dep. at 32:6-14).

[67] This conclusion holds whether the Court understands Mr. Modell's testimony to imply that (a) he had no knowledge of Clifford Chance's <u>general</u> representation of Andrews, or (b) he had no knowledge of Clifford Chance's <u>specific</u> representation of Mr. Andrews <u>in connection with the Letter Agreement</u>.  Either demonstrates that Mr. Modell did not give his informed consent to the dual representation.

[68] Opposition at 41.

23

Mr. Modell and Mr. Modell in fact consented to the dual representation. The inference is tenuous at best, but cannot in any case create a dispute vis-à-vis Mr. Modell's sworn testimony that he did not know of the dual representation. At most, the memo shows only that Mr. Andrews wanted the 5% deal and asked his lawyers (also Mr. Modell's lawyers) to procure it for him. The memo surely does not prove that Mr. Modell actually agreed in 1961 to pay the finder's fee Mr. Andrews had released three months earlier and two years before this Letter Agreement.

<u>Second</u>, the Trust attaches a thoroughly inadmissible declaration from Eugene T. Rossides, a former partner of Mr. Wells's, apparently to contradict or impeach Mr. Modell's testimony that he was never informed of the dual representation and to question Mr. Modell's credibility.[69]  Mr. Rossides's candidly admitted lack of personal knowledge[70] precludes his declaration from creating an issue of material fact.[71]  It also says nothing that actually contradicts Mr. Modell, opining only that Mr. Wells was a good guy and a good lawyer who never would have allowed himself to be conflicted.

The Court should not consider Mr. Rossides's declaration for a host of reasons. Character evidence is inadmissible except in very limited circumstances, none of which remotely apply here.[72]  Mr. Wells's character is not at issue anyway— the issue is his conflict of interest. And although Mr. Rossides's declaration

---

[69] *See* Opposition at 41-43.

[70] *See* Declaration of Eugene T. Rossides ¶ 4, attached as Opposition Exhibit 52.

[71] Affidavits proffered at the summary-judgment stage must be based on personal knowledge.  *See* MOORE'S FEDERAL PRACTICE § 5614[1][c] at 56-158 (3d ed.).

[72] *See* Fed. R. Evid. 404.

24

attempts to cast doubt on the conflict by speculating about Mr. Wells's usual practice, *i.e.*, by describing Mr. Wells's "practice at all times to make the disclosures and obtain the approvals necessary to avoid any conflicts of interest," the statement falls far shy of the habits and routine practices Rule 406 requires.[73] Mr. Rossides's bald conclusion that Mr. Wells took steps to avoid conflicts is of no evidentiary value.

And though the Trust cites WRIGHT & MILLER for the proposition that credibility questions are for a jury and not appropriate for summary judgment, "the general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice."[74] Because Mr. Rossides's declaration lacks any grounding in fact, but simply states his beliefs about how Mr. Wells conducted himself generally (and leaps to the conclusion the Trust wants), the Court should not consider it.

Ultimately, then, the Trust has not disputed or created a genuine dispute of fact to any of the three material facts relied upon by Mr. Modell: (1) Clifford Chance's representation of Mr. Modell in connection with the Letter

---

[73] *See Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 511 (4th Cir.1977) ("It has been repeatedly stated that habit or pattern of conduct is never to be lightly established, and evidence of examples, for purpose of establishing such habit, is to be carefully scrutinized before admission."); *see also* WEINSTEIN'S FEDERAL EVIDENCE § 406.02[2] ("Habit is a regular response to a repeated specific situation. To establish that a habit exists, the party must establish a degree of uniform response showing more than a mere tendency to act in a given manner. The evidence must show conduct that is semi-automatic in nature.").

[74] 10A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2726, at 445 ( 3d. ed. 1998).

\\\BA - 66910/0005 - 188558 v5

Agreement; (2) Clifford Chance's simultaneous representation of Mr. Andrews Sr. in connection with the Letter Agreement; and (3) Mr. Modell's lack of knowledge of, or consent to, dual representation. The Letter Agreement is therefore voidable and summary judgment the appropriate remedy.

### C.   The Letter Agreement Fails for Lack of Consideration.

The lack of consideration portion of Motion #2 made an even simpler point:  because Mr. Andrews released his right to a finder's fee in 1961, and because the consideration for the fee recited in the Letter Agreement tracks exactly the description of the fee he released, the Letter Agreement's finder's-fee contract is not supported by consideration and is not enforceable.[75]  The Trust responds again by failing to confront the simple (and fatal) problem.

#### 1.   The Trust Offers Nothing to Support Its Implied-Contract Theory.

The Trust begins by arguing a theory that appears nowhere in the Amended Complaint, *i.e.*, that the finder's fee contract is enforceable as an implied contract, and despite a lack of consideration, <u>if</u> Mr. Modell requested that Mr. Andrews introduce him to the sellers of the Browns in 1961.[76]  <u>The Trust's implied-contract theory fatally overlooks the undisputed fact that Mr. Andrews signed a release, supported by consideration, between the time he supposedly introduced Mr. Modell to the sellers' agents and the time Mr. Modell signed the</u>

---

[75] *See* Motion #2 at 14-22.

[76] *See* Opposition at 44-45.

<u>Letter Agreement</u>.[77]  Whatever expectation of payment the Trust now alleges that Mr. Andrews may have had at the time he made the introductions (if, in fact, Mr. Modell asked him to do so), he formally released the right to any such payment when he signed the Release and was paid consideration for it.  That fact ends the inquiry and this case.

Regardless of who asked for or offered the introduction, though, the Trust cannot defeat Mr. Modell's motion for summary judgment by offering unpled theories of recovery, particularly theories completely unsupported by fact. Mr. Modell bore his burden under Rule 56 by demonstrating the lack of consideration supporting the Letter Agreement.  As the party seeking to enforce the Letter Agreement (and collect millions of dollars), the Trust bears the ultimate burden of proving the existence of an enforceable contract.[78]  Even if the implied contract theory were before the Court—and it is not—the Trust cannot defeat summary judgment on this claim by arguing a <u>lack</u> of evidence about who introduced whom to whom.[79]  Instead, the Trust must come forth with actual admissible evidence that Mr. Modell affirmatively requested the introduction.

---

[77] *See* Motion #2 at 4 & nn.13-14 (citing attached copy of Release).

[78] Although lack of consideration is an affirmative defense, the implied-contract theory essentially concedes lack of formal consideration and asks the court to enforce a purported contract nonetheless.  Thus, implied contract is, roughly speaking, an affirmative defense to an affirmative defense.  The Trust would have the burden at trial on an implied-contract theory, and thus bears the corresponding burden of proof here.

[79] *See, e.g.*, WRIGHT & MILLER, *supra*, § 2727 at 474 ("Finally, as established in *Celotex*, it is not necessary for the movant to introduce any evidence in order to prevail on summary judgment.  Rather, at least in cases in which the nonmoving party will bear the burden of proof at trial, the movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law, thereby forcing the opposing party to come forward with some evidence or risk having judgment entered against him.").

\\\BA - 66910/0005 - 188558 v5

The best the Trust can do is to speculate that "[i]t is equally likely that Modell asked Andrews to be introduced to people who were authorized to sell the team," although it admits that "[t]he record is uninformative on this point."[80]  But an "uninformative" record does not discharge the Trust's burden to prove that Mr. Modell asked Mr. Andrews to do something and that Mr. Andrews changed his position in reliance on that request.

### 2.     The Finder's Fee Contract Is Separate From the Employment Contract And Fails for Lack of Consideration.

The Trust's next misdirection play seeks to stretch the consideration for the separate employment contract to encompass the previously released finder's fee agreement.  The Trust claims that Ohio law does not allow contract severability when one contract within a written instrument fails for lack of consideration, mis-citing a "list" of "severability requirements" from the Restatement (Second) of Contracts § 183 and a case not remotely on point.

First, the Trust asserts that "severability applies only in three very different situations. . . .,"citing the Restatement (Second) of Contracts § 183 cmt. a. At the outset, the Trust cites no authority for the proposition that Ohio has adopted that section of the Restatement of Contracts, and none exists.[81]  More importantly, however, the Restatement does not purport to set forth an exhaustive list of when a court may sever a writing or when a court may find separate contracts in the same

---

[80] Opposition at 45 n.127.

[81] The following Westlaw searches yielded no responsive hits:  (1) database: oh-cs; search terms: Restatement w/10 183; (2) database: dct; search terms: co (oh) & Restatement w/10 183.

28

instrument. Rather, the "list" cited by the Trust consists of three <u>examples</u> the Trust selected from the commentary. Section 183 does not address generally whether one writing can contain separate contracts, but instead addresses severability within the limited context of agreements offensive to public policy—an altogether different and inapposite context.[82]

The sole case cited by the Trust, *Sannes v. Jeff Wyler Chevrolet, Inc.*,[83] is simply inapposite, notwithstanding the Trust's contention that "the only Ohio court to address such a request has refused to sever a contractual provision on grounds of no consideration."[84] *Sannes* dealt with whether a car dealer was a "credit services organization" and whether the purchaser was a "buyer" under the Ohio Credit Services Organization Act.[85] The court had to determine whether the car purchaser bought credit services from the car dealer, which argued that the plaintiff paid for a car only, not for a car and credit services. The court stated that "it is difficult to separate the goods received from the services," and rejected the car dealer's argument.[86] But that holding simply interpreted the substantive scope of a contract for purposes of the Ohio statute and has no applicability here.

Mr. Modell's original argument therefore stands unchallenged: the Letter Agreement, although one writing, contains two entirely separate and distinct

---

[82] *See* Restatement (Second) of Contracts § 183.

[83] 736 N.E.2d 112 (Ohio Ct. App. 1999).

[84] Opposition at 49.

[85] *Sannes*, 736 N.E.2d at 115.

[86] *Id.*

\\\BA - 66910/0005 - 188558 v5

agreements predicated on separate and distinct consideration.[87]  Where one of those

agreements fails for lack of consideration, it is unenforceable, despite the

enforceability of the other.[88]  The Finder's Fee contract, therefore, fails for lack of

consideration and the Court should enter summary judgment for Mr. Modell.

### 3.   Neither Vincent Andrews Nor The Trust Qualifies As A Charity.

The Trust concludes with yet another unpled theory arguing that the

Court should enforce the finder's fee contract as a charitable subscription even if the

finder's fee contract is severable and unsupported by consideration.[89]  But despite

Mr. Modell's obvious hyperbole that the Letter Agreement was "an act of charity for

---

[87] Because the Trust's arguments at pages 46-47 and 49-51 of the Opposition depend entirely on a finding that the Letter Agreement is one cohesive agreement, no separate response to those arguments is necessary.  Though the Trust couches these arguments in different terms, they both adopt the basic proposition that consideration need not be equal to be binding.  The Trust's Part-Bargain-Part-Gift argument at pages 49-51 is premised on there being one contract instead of two.

[88] *See, e.g., Spaulding v. Benanati*, 442 N.E.2d 1244, 1245 n.1 (N.Y. 1982) ( "As the Appellate Division correctly found, a contract involving multiple promises, each of which is exchanged for a specifically identified portion of the entire consideration, is enforceable in part even though one of the bargained for promises is unenforceable for lack of consideration.") (citing WILLISTON).  Though the Trust correctly points out that the New York Court of Appeals reversed the lower court's severance, *see* Opposition n. 133, it unquestionably adopted the test set forth by the lower court.  S*ee also Toledo Police Patrolmen's Assoc. v. City of Toledo*, 641 N.E.2d 799, 803 (Ohio Ct. App. 1994) ("Courts will enforce a contract to the extent it conforms to the law if part of the consideration is legal and part unenforceable or illegal, and if the contract is severable.) (emphasis added); *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 298 (1942) ("Whether a number of promises constitute one contract or more than one contract is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out;'" finding agreement to be non-severable).  Furthermore, the Trust makes absolutely no attempt to get around the fact that Mr. Andrews had previously released any purported right to a finder's fee or other compensation in 1961.

[89] The Restatement (Second) of Contracts § 90 (the promissory estoppel provision) normally requires proof of reasonable reliance before recognizing implied contracts, but there is an exception for recognized charities:  "A charitable subscription or a marriage settlement is binding . . . without proof that the promise induced action or forbearance."

Vincent Andrews," Mr. Andrews was not a recognized charity at the time of the

Letter Agreement and did not enter into that Agreement for any charitable or

eleemosynary purpose.  The Trust's beneficiaries are Mr. Andrews Sr.'s sons and

grandchildren[90] and it too lacks any charitable or socially productive purpose.[91]  The

Court should reject this theory, which is not before it in any event, out of hand.

### III.   REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT #3: THE LETTER AGREEMENT HAS NOT BEEN TRIGGERED, NOR DID MR. MODELL OWE THE TRUST ANY DUTY TO SELL HIS STOCK INTEREST IN THE TEAM.

Motion for Summary Judgment #3 demonstrated that Mr. Modell is

entitled to summary judgment because his 2000 and 2004 sales of interests in

Baltimore Ravens Limited Partnership ("BRLP") to entities controlled by Stephen

Bisciotti did not qualify as a "triggering event" under the Letter Agreement.  This is

no technicality:  not only has the team not liquidated, Mr. Modell retains a 1%

interest in BRLP.[92]  Mr. Modell has not divested his entire stock interest in the

football team.  And try as it (and its experts) might, the Trust cannot defeat

summary judgment by hypothesizing that that Mr. Modell's remaining interest

could be considered be something other than what the documents define.[93]

---

[90] *See* Motion #1 at 12 & nn.41-42.

[91] *See* Motion #1 at 11-14.  The Opposition claims to dispute that the Trust was created for
the purpose of shielding any value of the Letter Agreement from the creditors of
Mr. Andrews's sons, *see* Opposition at 14 n.51, but the Trust offers literally no evidence to
the contrary.

[92] *See* Motion #3 at 6-7, 12-14.

[93] *See* Opposition at 65-71.

31

Rather than confronting the dispositive factual reality, the Trust focuses instead on claims—specifically, the Ohio prevention, bad-faith, and third-party-beneficiary claims—that place the analytical cart before the horse. As Motion #3 demonstrated, these claims all depend in the first instance on the existence of a duty on the part of Mr. Modell to pay the long-inchoate finder's fee or bring about that payment. But no such duty arises unless and until either of the "triggering events"—divestiture of Mr. Modell's entire stock interest or liquidation of the football team—has occurred. And absent an actual "triggering event," the Trust cannot survive summary judgment on any of the claims in the Amended Complaint.

## A. There Has Been No Triggering Event Because Mr. Modell Retains A Stock Interest.

The Court's analysis of Motion #3 necessarily begins with the question whether a "triggering event" has occurred. Both New York and Ohio courts follow the basic contract principle that unambiguous contract language is construed in accordance with its plain meaning. [94] The Letter Agreement defines the two potential "triggering events" plainly: Mr. Modell "agree[s] that <u>when, as and if</u> [he] ever <u>completely divest[s]</u> [him]self of <u>all</u> [his] <u>stock interest</u> in the Browns <u>or</u> the Browns completely liquidate, [he] shall pay [Mr. Andrews] an amount equivalent to

---

[94] *See R/S Associates v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (2002) (internal citations omitted) ("We have long adhered to the 'sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language'"); *Winningham v. N. Am. Res. Corp.*, 42 F.3d 981, 985 (6th Cir. 1994) ("Under Ohio law, courts are required to give unambiguous contract provisions their plain meaning."); *see also* Restatement (Second) of Contracts § 202(3)(a) (1981) ("where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). The principle is the bedrock of interpretation, whether contractual or statutory.

5% of [Mr. Modell's] net gain. . . ."[95] The Trust has not argued that this language (or any other aspect of the Letter Agreement) is ambiguous, nor is it. Nor can there be any ambiguity or dispute about the fact that Mr. Modell retains to this day a "stock interest" in the football team.

In the context of the Letter Agreement, the term "stock interest" refers unambiguously to Mr. Modell's ownership interest in the football team known then as the Cleveland Browns. The hard facts, which the Trust does not and cannot challenge, demonstrate that Mr. Modell still holds (though an entity he controls) an ownership interest in BRLP, the entity that owns and operates the football team.[96] That fact and the plain language of the Letter Agreement end the inquiry: because Mr. Modell has not completely divested his stock interest, no triggering event has occurred. Period.

The Trust attempts to create disputes of fact by asking the Court to ignore the plain meaning of the term "stock interest"[97] and to view the 2000 and 2004 transactions as something other than what the documents say.[98] The Trust cites ten cases for the proposition that "where a court must determine the substance of a particular economic arrangement or the character of an economic interest, that

---

[95] See Letter Agreement, attached as Exhibit 1 (emphasis added). The Trust does not make any claim in its Opposition that the football team has "completely liquidate[d]," in fact or in theory. As such, the only theory of triggering at issue in this motion is a divestiture of Mr. Modell's entire stock interest.

[96] See Motion #3 at 3-7.

[97] Cf., e.g., Brooks v. Eschwege, 162 N.E.2d 897, 899-900 (Ohio Ct. App. 1957) (distinguishing between stock and bonds and holding "in the absence of extrinsic evidence tending to show that at the time testatrix made her will she regarded the term, 'stocks,' as used therein to include bonds, the term must be construed in light of the word used").

[98] See Opposition III.B, at 65-71.

33

determination has generally been treated as a question of fact."[99]  Never mind what

Mr. Modell actually owns, an interest documented in black-and-white: the Trust

asks the Court to find that (1) the "economic substance" of Mr. Modell's 1% interest

in BRLP more closely resembles debt than equity,[100] and (2) the nature of

Mr. Modell's stock interest is "materially different" than in 1963.[101]

      The Court should decline the invitation.  The Letter Agreement does

not require (or permit) "the [C]ourt [to] determine the substance" of anything.  It

asks the Court only to determine whether Mr. Modell has completely divested a

particular and defined "stock interest."  The Trust's alternative constructions of

Mr. Modell's current holdings would require the Court to look beyond the plain

language of the Letter Agreement and to utilize irrelevant definitions of "stock

interest."[102]  But the Court cannot look beyond the Letter Agreement unless and the

Trust first establishes that the Letter Agreement's definition of the "triggering

---

[99] Opposition at 69-70.  Of those cases cited in support, six are tax cases where the general issues were how particular business transactions should be classified for purposes of the tax laws.  In all of those cases, however, the "economic substance" was explicitly made legally relevant.  The same is true for the non-tax cases.

[100] *Id.* at 65.

[101] *Id.* at 68.

[102] Indeed, the Trust asserts that "[a] genuine issue of material fact also exists as to whether the character of Modell's indirect interest . . . is <u>so materially different from the character of the "stock interest" that was the subject of the Letter Agreement</u> that it is appropriate to conclude that Modell has divested all of that original "stock interest" even though he is not found to have actually sold Nevermore's 1% interest."  The Trust's expert concludes that "it is appropriate to conclude that Modell has actually divested all of his "stock interest" in the Browns, <u>as that term is used in the Letter Agreement</u>."  Opposition at 69.  The expert's conclusion depends wholly on the meaning of 'stock interest' in the Letter Agreement, a meaning which he necessarily defines (at least implicitly) to reach his conclusions.  Interpretation of the Letter Agreement is a question of law for the Court, not a question of fact fit for an expert.

\\\BA - 66910/0005 - 188558 v5

events" is ambiguous.  And because the Trust has <u>not</u> claimed or proven that the Letter Agreement is ambiguous in any way, the Court need not and should not look anywhere else for "substance" that deviates from the plain language of that agreement.

**B.    Mr. Modell's Retention of a Stock Interest Does Not Violate the Ohio Doctrine of Prevention.**

Faced with the insurmountable fact of Mr. Modell's very real and continuing "stock interest," the Trust devotes the greater bulk of its Opposition to Motion #3 to an effort to create a <u>duty</u> on the part of Mr. Modell to sell the team *in toto*, and thus to pay the finder's fee, even though he has not divested.  The Trust tries this first through the Ohio[103] doctrine of prevention, which provides that "where the obligations arising under a contract have attached and thereafter one party without the consent of the other does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms," that party cannot rely on its subsequent contract (or conduct) to avoid its liability to the other party.[104]  Put another way, when a promisor *wrongfully* prevents a

---

[103] The Trust's amended Complaint specifically pleaded the <u>Ohio</u> doctrine of prevention. *See* amended Complaint ¶¶ 76-79 and Heading (several times referring to the "<u>Ohio</u> common law doctrine of prevention").  The Trust claims that "Modell concedes that the Ohio doctrine and the New York doctrine are identical," and directs the Court to consider the claim regardless of which law applies. *See* Opposition at n.143.  To the contrary, Mr. Modell specifically stated that choice of law matters with respect to the prevention claim. *See* Motion #3 n.73.  Mr. Modell reasserts his position that if New York law controls, the Ohio prevention claim is barred.

[104] *Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304 (Ohio 1919); *Benatty Corp. v. Transatlantic Energy Corp.*, No. 94-CA-12, 1994 WL 668103, at * 3 (Ohio Ct. App. Nov. 8, 1994) (citing *Suter*).

\\\BA - 66910/0005 - 188558 v5

condition from occurring, that condition is excused.[105]  The parties agree on this unremarkable statement of the law,[106] but the Trust's prevention claim fails at the threshold because Mr. Modell had (and has) no duty under the Letter Agreement to sell any or all of his stock interest in the football team.

### 1. The Trust's Prevention Claim Rests On A Non-Existent Duty To Sell The Team.

Whichever date the Trust defines as the operative date (a distinction discussed below), its Ohio prevention claim fails at the outset and as a matter of law because it depends in the first instance on the existence of a duty by Mr. Modell to sell the team at some time certain for Mr. Andrews's benefit.[107]  The Letter Agreement does not impose any such duty—it gives Mr. Modell the unfettered and unambiguous discretion to decide "when, as, and if" he wants to sell his interest in the team.  Indeed, the Letter Agreement explicitly contemplates that Mr. Modell need not sell his interest during his lifetime.[108]  And the duty on which the prevention claim depends cannot, on the face of the Letter Agreement itself, have ripened under these circumstances.

---

[105] *See also Dynes Corp. v. Seikel, Koly & Co., Inc.*, 654 N.E.2d 991, 1005 (Ohio App. 1994) ("Nonperformance of a condition is excused where performance thereof is prevented by the other party.").

[106] *See* Opposition at 53.

[107] *See* Motion #3 at 26.

[108] *See* Letter Agreement, attached as Exhibit 1 at 2 ("In the event of [Mr. Modell's] death . . . the amounts payable under this Section shall be payable by [Mr. Modell's] estate. . . .").

\\\BA - 66910/0005 - 188558 v5

*Shear v. Nat'l Rifle Assoc.,*[109] a case cited by both parties, held that "the prevention doctrine does not apply when the contract, in effect, authorizes prevention." As the D.C. Circuit recognized, "[a]n exception to [the prevention doctrine] must be made where the hindrance is due to some action of the promisor which under the terms of the contract was permitted."[110] Or as *Corbin* explains, "[t]he phrase 'unjustly preventing' was purposely used in (the definition of prevention) for the reason that there are some cases in which some sort of prevention or interference is contemplated by the parties as quite proper and within the privileges of the promisor."[111] Even if the Court were to assume that Mr. Modell somehow "prevented" a finder's fee when he decided not to sell his entire interest, which it absolutely should not, "there is no prevention when the contract authorizes a party to prevent a condition from occurring" or when one party assumes the risk of a condition's occurrence.[112]

The prevention inquiry turns, therefore, on whether the Letter Agreement imposed any duty on Mr. Modell to bring the condition precedent, *i.e.,* sale of his full interest, about affirmatively. The answer is no. By its plain terms, the Letter Agreement authorizes Mr. Modell intermittently to sell less than his entire interest in the team or not to sell at all[113] and recognizes that he might retain

---

[109] 606 F.2d 1251 (D.C. Cir. 1979).

[110] *Id.* at 1256 (citing 5 Williston on Contracts § 377A at 235) (internal ellipses omitted).

[111] *Id.* (citing 3A Corbin on Contracts § 767 at 545).

[112] *Id.*

[113] *See* Letter Agreement attached as Exhibit 1, at 1-2 ("when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate,

37

some or all of his interest after his death.[114]  Under the Trust's concept of

"prevention," Mr. Modell "prevented" the condition precedent to a finder's fee for

forty years by not selling; his more recent decision to retain an interest is no

different.[115]  If the finder's fee contract is enforceable at all, the condition precedent

to Mr. Andrews's payment could still be fulfilled when, as, and if Mr. Modell divests

his remaining ownership interest in BRLP.[116]  And because the Letter Agreement

allows Mr. Modell to retain an interest, the Trust's other arguments do not affect

Mr. Modell's right to summary judgment.[117]

---

you shall pay me an amount equivalent to 5% of your net gain from either of those transactions <u>and any intervening sales by you of your Browns stock</u>.") (emphasis added).

[114] The Agreement provides on the one hand that "[i]n the event of [Mr. Modell's] death . . . the amounts payable under this Section shall be payable by [Mr. Modell's] estate. . . ," and on the other that "[t]he payments specified . . . above shall be made in the event of [Mr. Andrews's] death to [his] estate."

[115] Although not in issue here, the Letter Agreement sets forth another triggering event: complete liquidation.  If the franchise was losing money or even heading toward bankruptcy, the Trust's theory of prevention would seem to compel Mr. Modell to liquidate rather than attempting to keep the team afloat, since an attempt to avoid liquidation would "prevent" the payment of a finder's fee (if perhaps, under those circumstances, a much smaller one).  The example illustrates the basic point that Mr. Modell has no affirmative duty to bring about the occurrence of a triggering event.

[116] The Trust mistakenly relies on *Shear* to contradict Mr. Modell's position that no prevention has occurred because the condition precedent may still be completed when as and if Mr. Modell sells his remaining interest.  *See* Opposition at 58-59.  In *Shear*, as the Trust correctly summarizes, a realtor and the NRA signed a contract providing for payment when the NRA board approved of the sale.  The NRA subsequently enacted a bylaw removing the board's authority to approve the sale.  The Trust erroneously concludes that "the NRA's conduct in preventing the commission payment was, like Modell's conduct, far from final or irrevocable.  The NRA could have revisited its decision and approved the sale. . . ." *Id.*  The situation here is entirely different.  Mr. Modell need not pass a bylaw or undo any past actions to fulfill the condition precedent.  He need only sell his remaining 1% interest.  Although the Trust also relies on the case of *Wm. P. Zinn & Co. v Shawnee Pottery Co.*, 148 F.Supp. 322 (S.D. Ohio 1955) to support its same argument, Mr. Modell's attorneys do not understand how *Zinn* relates to the issue for which it is cited.

[117] *See* Opposition at 60-65.

38

**2.     The Court Should Hold The Trust To The Prevention Claim It Actually Pled.**

The Trust's Amended Complaint alleges that "when Modell agreed <u>in February 2000</u> to sell the entire team to Mr. Bisciotti, his obligation to pay the Trust attached and he could not limit his liability to the Trust by making the new arrangement with Mr. Bisciotti. . . ."[118] The Trust's Motion for Modification of the Scheduling Order And For Leave to File An Amended Complaint and its Motion for a Preliminary Injunction also predicated the prevention claim explicitly on the February 2000 date.[119] Up until its Opposition, the Trust alleged and argued that Mr. Modell's obligation, and thus its prevention claim, <u>attached in 2000</u>, when Mr. Bisciotti acquired his option.

Motion #3 addressed these allegations directly and demonstrated that Mr. Bisciotti's purchase of a minority stake in BRLP and an option to acquire the remainder could not, as a matter of law, trigger a finder's fee under the Letter Agreement.[120] <u>The Trust's Opposition fails altogether to respond,</u>[121] <u>leaving Mr. Modell's motion for summary judgment unopposed as to prevention grounded in the 2000 transaction.</u>  The Opposition claims that "the Plaintiffs' assertion in an earlier motion that his obligation attached in 2000. . . . <u>was based on an incomplete</u>

---

[118] Amended Complaint ¶ 77 (emphasis added).

[119] Motion for Modification of the Scheduling Order And For Leave to File An Amended Complaint at 11 ("when Modell formally agreed <u>in February 2000</u> to sell the entire team to Bisciotti, his obligation to pay the Trust attached. . . .") (filed August 3, 2004); Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction at 10-11 (same).

[120] *See* Motion #3 at 22-25.

[121] *See* Opposition at 54-55 & n.145; *see also* Motion #3 at 22-25.

\\\BA - 66910/0005 - 188558 v5

<u>record</u>, caused by Modell's failure to produce the Option Exercise Notice, which Plaintiffs had to obtain instead from the NFL."[122]  But this simply is not true:  the Trust obtained the document from the NFL on or about June 4, 2004,[123] <u>two months</u> before it sought leave to amend its Complaint to include the Ohio prevention claim. Putting aside the Trust's failure to seek leave to revise its prevention theory, the record was as complete at the time of its Amended Complaint as it is now.

Mr. Modell's motion for summary judgment is, therefore, unopposed as to the Trust's claim under the doctrine of prevention and the Court should grant it for that reason alone.[124]

> ### 3.   No Obligation Attached When Mr. Bisciotti Delivered the Option Exercise Notice On March 18, 2004.

Although the Court should not even consider the newly articulated theory of prevention,[125] it fares no better than its predecessor.  The Trust now seeks to argue that "Modell's obligation to pay the finder's fee attached no later than

---

[122] *Id.* at 54-55 n.145.

[123] *See, e.g.,* Reply in Support of Plaintiffs' Motion for Modification of the Scheduling Order and For Leave to File an Amended Complaint at 5 ("On March 18, 2004, Mr. Bisciotti elected to exercise his option . . . by delivering Modell a notice that <u>Plaintiffs only obtained from the NFL on June 4, 2004</u> after serving it with a third-party subpoena."). Hogan & Hartson's records, kept in the ordinary course of business, confirm that the Option Exercise Notice was produced by the NFL on or about June 4, 2004.

[124] The prevention claim is Count Five of the Amended Complaint, ¶¶ 76-79.

[125] *See, e.g., Gilbane Building Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 900 (4th Cir. 1996) ("Courts now deem a claim sufficient if it contains a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is <u>and the grounds upon which it rests.</u>" (internal citations and quotation marks omitted) (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957) and Rule 8) (emphasis added); *see also id.* ("Nevertheless, despite the more forgiving pleading standards, the essence of a claim remains the factual elements."); 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215 at 194 (3d ed. 2004) ("the rules do contemplate a  statement of circumstances, occurrences, and events in support of the claim being presented").

40

March 18, 2004, when BFC delivered the Option Exercise Notice which required the

Modell companies to divest their entire remaining interests in BRLP to BFC for a

sum certain on the 'Option Closing Date.' . . ."[126]   But no obligation to pay the Trust

attached when Mr. Bisciotti delivered the Option Exercise Notice because, by the

terms of the Option Purchase Agreement and as a matter of law, Messrs. Bisciotti

and Modell were not then bound to carry out the transaction at all.

On March 18, 2004, a number of contingencies stood between

Mr. Bisciotti's notice and an actual transfer of Mr. Modell's units in BRLP.  Some

were simple representations and warranties, and some were in Mr. Modell's control

(and thus, the Trust no doubt would say, could not obviate a duty to close if one

existed on March 18).  But the Court need look no further than two portions of the

Option Purchase Agreement containing contingencies <u>not</u> in Mr. Modell's control to

dismiss any notion that the Option Exercise Notice represented a point of no return:

<u>First</u>, Article VII of the Option Purchase Agreement contained a list of

over ten conditions precedent to closing the transaction.[127]  Among these was

Mr. Bisciotti's obligation to pay the Estimated Option Purchase Price.[128]  It makes

no sense that Mr. Modell's obligation to pay a finder's fee could attach before

Mr. Bisciotti paid—and indeed, had Mr. Bisciotti failed to appear at the closing with

---

[126] *See* Opposition at 54; *Id.* at 54 III.A.2 ("Modell's Obligation to Pay the Finder's Fee Attached on March 18, 2004.").

[127] *See* Option Purchase Agreement, attached as Exhibit 2, § 7.1 *et seq.*  A complete copy of the Option Purchase Agreement is attached at Opposition Exhibit 33.

[128] *Id.* § 7.2

sufficient funds, the Trust's theory would, if correct, nonetheless require Mr. Modell to pay a finder's fee triggered by a transaction that never happened.

Second, section 8.1 of the Option Purchase Agreement gave the parties, either jointly or unilaterally under certain conditions, the right to terminate the Option Purchase Agreement completely prior to closing.[129]

Mr. Bisciotti's delivery of the Option Exercise Notice did not, therefore, launch the two men irreversibly down the path to closing.  But aside from these real impediments to any deal actually closing, the Trust's new theory overlooks Mr. Bisciotti's testimony that he and Mr. Modell had, since summer 2003, understood between them that Mr. Modell would retain an interest in the team.[130] Although Mr. Bisciotti testified that he did not believe that he had any legal obligation to let Mr. Modell to retain an interest in the team until the final terms were worked out in March 2004,[131] the terms of the 2000 agreements obviously allowed them to discuss how, to what extent, and precisely on what terms Mr. Bisciotti would exercise his option.  Practically (if not legally), any arrangement that Mr. Modell made to sell less than his full interest occurred well before March 18, 2004, even if the papers were not formally signed until the deal closed on April 8.  Thus, when Mr. Bisciotti submitted the Option Exercise Notice on

---

[129] See Option Purchase Agreement, attached as Exhibit 2, § 8.1.

[130] See Bisciotti Dep. attached as Exhibit 3, at 40:1-11. (And that's when Ned, that day, talked to me about owning—would you let [Mr. Modell] keep one percent?  And I said, sure I would. . . .").

[131] See Bisciotti Dep. attached as Exhibit 3, at 74:20-75:16.  Mr. Bisciotti is not a lawyer and was careful to qualify his responses to questions like these accordingly.  See, e.g., id. at 74:1-75:16.

\\BA - 66910/0005 - 188558 v5

March 18, he did so with the understanding (shared by Mr. Modell) that the transaction would include a continuing interest in the team for Mr. Modell. And because no obligation to sell attached on March 18, 2004, the Trust's "amended" Ohio prevention claim must fail along with the version it pled.

### C.   Mr. Modell Has Not Breached the Implied Covenant of Good Faith and Fair Dealing.

The Trust's good-faith-and-fair-dealing claim essentially restates its prevention claim.[132] The Trust claims that Mr. Modell breached this duty in the same way that he "prevented" the realization of the finder's fee—by not following through with a sale of his entire stock interest in the team.[133] Motion #3 demonstrated that, as with prevention, no duty of good faith and fair dealing attached as between Mr. Modell and the Trust—again, because the Letter Agreement imposed on Mr. Modell no obligation to enter or complete a transaction for the sale of his stock interest in the football team.

The Trust responds principally by misreading *Galmish v. Ciccini*.[134] Contrary to the Trust's discussion, *Galmish* does not alter the general rule in Ohio, *i.e.*, that the implied covenant of good faith and fair dealing does not impose obligations beyond those contained in the contract itself. Although, as the court put it, "[t]he gravamen of the complaint [was] that [the husband] intended from the

---

[132] The Trust does not disagree with the basic principle, set forth in Motion #3, that the prevention doctrine is really just a subset of the common law duty of good faith and fair dealing. *See, e.g.*, Opposition at 74 ("the Letter Agreement does not reserve for Modell the right to <u>amend existing contractual relationships</u> giving rise to Modell's obligation to pay the finder's fee in order to defeat that obligation. . . .") (emphasis added).

[133] *See* Opposition at 71-77.

[134] 734 N.E.2d 782 (Ohio 2000).

\\\BA - 66910/0005 - 188558 v5

outset to deprive [the wife] of her share of the excess proceeds by delaying completion of the sale,"[135] the issue the court decided was whether the parol evidence rule barred the wife's claim of fraudulent inducement.[136] And on that point, the court held that the evidence that the husband said he "can and will" sell the property was not prohibited by the parol evidence rule because the wife did not introduce the evidence to prove a parol agreement between her and her ex-husband.[137]

Galmish did not hold, as the Trust erroneously suggests, that the implied covenant of good faith required the husband to sell the property within a year, and courts in Ohio and elsewhere have recognized that Galmish was not a good-faith-and-fair-dealing case.[138] Thus, after Galmish, and consistently with the

---

[135] Id. at 785-86. In Galmish, a husband and wife owned a piece of property that the wife took when they divorced. The husband had a connection with a certain developer and believed he could sell the property at a large profit. They entered into an agreement whereby the husband purchased the wife's property for $765,000 and agreed to pay her one-half of all net proceeds in excess of that amount "if said property is sold, transferred or conveyed to [a certain developer] or its agents, representatives, or assigns within one (1) year of the execution of this Agreement." The record contained some evidence that before entering the agreement, the husband told the wife that he "can and will" sell the property to the developer. Although the husband effectively struck a deal with the developer almost immediately, he refused to close the deal until after the one-year period had expired. Id.

[136] Id. at 788, 790 n.2 ("the issue is whether [the contract] is being contradicted under [the wife's] theory of fraudulent inducement.").

[137] "Instead, [it was] offered as part of the surrounding circumstances leading up to the finalized written agreement to show that [the husband] intended from the outset to prevent fulfillment of the condition that would invoke his contractual promise to share the excess proceeds." Id. at 791.

[138] See, e.g., Board of Trustees of Union Twnshp. v. Planned Dev. Co. of Ohio, 2000 WL 1818540, *6 (Ohio Ct. App. 2000) ("Galmish did not concern whether there was an implied duty to act in good faith in the contingent clause. Instead, that case concerned whether parol evidence could be used to prove [the husband's] initial intention to never fulfill the contract. . . . [The husband's] alleged conduct supported the argument that he committed an active fraud at the time the contract was made."); see also Glazer v. Lehman Bros., Inc., 394

44

cases cited in Motion #3,[139] Ohio (and other) courts have continued their appropriate refusal to impose, through the duty of good faith and fair dealing, contract obligations beyond those present in the contracts themselves.[140]

The Trust tries to diminish the strength of these holdings by labeling them "technical compliance"[141] and by attributing to Mr. Modell statements such as "there can be no breach of the implied covenant by a party who is in compliance with the literal terms of the contract at issue."[142] No such language or form-over-substance argument appears in Motion #3.[143] Mr. Modell relies instead on the language of the agreement the Trust seeks to enforce—the Letter Agreement—which explicitly contemplates that Mr. Modell might intermittently sell less than

---

F.3d 444 (6th Cir. 2005) ("Specifically, the issue in *Galmish* was whether parol evidence was admissible to prove a breach of contract claim when the written contract at issue imposed no affirmative duties to engage in certain performance. The court ultimately found that the parol evidence rule did not bar the evidence of the breach of contract claim because the extrinsic evidence went to the making of the contract, not to a provision of that contract."); *Citicasters Co. v. Bricker & Ecker, L.L.P.*, 778 N.E.2d 663, 669 (Ohio Ct. App. 2002) ("The essence of the fraud in *Galmish*, then, was that the defendant did not intend to fulfill, at the time the contract was executed, the express contractual condition that induced the plaintiff to enter into the agreement.").

[139] See Motion #3 at 18-20.

[140] *See Board of Trustees of Union Twnshp.*, 2000 WL at *7 ("To impose obligations not included in the contract . . . would be to mandate requirements of performance for which the parties did not bargain. . . . Where a party wished to impose specific obligations upon the other contracting party . . . those obligations must be bargained for and included in the contract."); *see also Wauseon Plaza Ltd. Partnership v. Wauseon Hardware Co.*, 807 N.E.2d 953, 961-962 (Ohio App. 2004) (cited at Motion #3 at 18-19). Relying on its erroneous understanding of *Galmish*, the Trust states, that the *Wauseon* court "is simply mistaken." *See* Opposition at 73. It is the Trust that is mistaken.

[141] *See* Opposition at 71, heading C.1; *Id.* at 72.

[142] *Id.* at 71-72.

[143] *See* Motion #3 at 14-22.

his full interest,[144] explicitly contemplates that he might hold an interest past his death,[145] and sets forth the outcome if he does either or both.  Mr. Modell's position is not that because the Letter Agreement doesn't explicitly forbid something, he can do it.  To the contrary, the fact that the Letter Agreement allows him to sell some of his interest without being required to sell all of it eliminates at the threshold any duty to act for the Trust's interests when deciding whether and/or how much to sell. The distinction is subtle but vital, and it entitles Mr. Modell to summary judgment on the Trust's good-faith-and-fair-dealing claim.

### D.     The Trust Is Not A Third-Party Beneficiary Of Mr. Modell's Agreements With Mr. Bisciotti.

The Trust agrees that "[f]or a third party beneficiary claim to succeed, the plaintiff must be a part of the class of persons specifically intended to be beneficiaries."[146]  As the Maryland Court of Appeals has interpreted Restatement of Contracts § 133,[147] "[i]t is generally accepted that before a stranger to a contract can avail himself of the exceptional privilege of suing for a breach thereof, he must at least show that it was intended for his direct benefit. . . . In order to recover it is

---

[144] See Letter Agreement at 1-2 ("when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me an amount equivalent to 5% of your net gain from either of those transactions and any intervening sales by you of your Browns stock.") (emphasis added).

[145] The Agreement provides on the one hand that "[i]n the event of [Mr. Modell's] death . . . the amounts payable under this Section shall be payable by [Mr. Modell's] estate. . . ," and on the other that "[t]he payments specified . . . above shall be made in the event of [Mr. Andrews's] death to [his] estate."

[146] See Opposition at 79 (citing Shofer v. Stuart Hack Co., 723 A.2d 481, 529) (Md. Ct. Spec. App. 1999).

[147] The Opposition cites the Restatement (Second) of Contracts § 133 in support of its argument at 78-79.  The provision is unrelated.  The Trust likely meant to cite that provision in the Restatement (First) of Contracts.

46

essential that the beneficiary shall be the real promisee; *i.e.*, that the promise shall be made to him in fact though not in form."[148]

The Trust offers no evidence to counter the PUPA's specific disclaimer of any intent to benefit third parties: "Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties hereto and their respective successors and assigns, any rights, obligations, or liabilities under or by reason of this Agreement."[149]  Instead, the Trust argues generally, citing only inadmissible newspaper articles,[150] that "Modell entered into the PUPA and the OPA for the express purpose of paying his creditors."[151]  Even assuming that the newspaper articles qualify as evidence of Mr. Modell's intent (and they do not), the quotations cited by the Trust do not prove that he entered into those transactions for the express purpose of selling the entire team, nor do they in any way refute the evidence and arguments Mr. Modell offered in Motion #3.

Finally, even assuming *arguendo* that Mr. Modell was motivated primarily to benefit the Trust when he sold part of the team in 2000, the law requires that "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary."[152]  The Trust posits that the performance

---

[148] *Weems v. Nanticoke Homes, Inc.*, 37 Md.App. 544, 554 (Md. 1977) (citation omitted).

[149] *See* Motion #3 at 28 & n.91 (citing PUPA § 11.3(e)).

[150] *See, e.g, Dowdell v. Chapman*, 930 F.Supp. 533 (M.D. Ala 1996) (newspaper article was inadmissible hearsay for purposes of summary judgment).  The Trust did not ask Mr. Modell to affirm in his deposition those statements attributed to him in the Trust's newspaper articles.  Thus, at best the articles represent reporters' views of Mr. Modell's reasons, not admissible evidence of the purpose of the transactions they describe.

[151] Opposition at 78 & n.183.

[152] *See* Restatement (Second) of Contracts § 302.

\\\BA - 66910/0005 - 188558 v5

would "undoubtedly do so . . . because as a result of the performance, Modell would have both the means and the obligation to pay the finder's fee. . . ."[153] But providing Mr. Modell with the means and the obligation is a far cry from actually satisfying that obligation. By way of comparison, the Restatement sets forth examples where the promisor actually undertakes an obligation to pay the promisee's creditors (for example, as a surety).[154] The Trust is not an intended beneficiary of the agreements between Mr. Modell and Bisciotti and has no right to any of the proceeds of Mr. Modell's less-than-complete divestiture of his stock interest in the football team.

## CONCLUSION

For the foregoing reasons and those set forth in Mr. Modell's three motions for summary judgment, the Court should grant Mr. Modell summary judgment on all counts in the Amended Complaint.

Respectfully submitted,

_____/s/_____
Michael D. Colglazier, # 05074
Steven F. Barley, # 10049
Douglas R. M. Nazarian, # 23402
Michael J. O'Connor, # 27604
HOGAN & HARTSON L.L.P.
111 South Calvert Street, Suite 1600
Baltimore, Maryland 21202
Telephone: (410) 659-2700
Facsimile: (410) 539-6981

Counsel for Defendant
April 11, 2005                     Arthur B. Modell

---

[153] *See* Opposition at 79.

[154] See Restatement (Second) of Contracts § 302 cmt. b and examples.