IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THOMAS E. MINOGUE, CO-TRUSTEE OF THE PHYLLIS ANDREWS FAMILY TRUST, ET AL. | : : : : |
| v. | : CIVIL NO. CCB-03-3391 |
| ARTHUR B. MODELL | : : |

...o0o...

## MEMORANDUM

The Phyllis Andrews Family Trust has sued Arthur B. Modell to enforce the terms of a February 1963 letter agreement between Modell and Vincent Andrews in which Modell promised a 5% finder's fee to Andrews "when, as and if" Modell ever completely divested himself of all his stock interest in the Cleveland Browns. (Pl.'s Opp. Ex. 15). The Trust contends that Modell's sale of the Ravens to Stephen Bisciotti between 2000 and 2004 triggered an obligation to pay the fee. Relying, in part, on his retention of a 1% interest through another entity, Modell denies that anything is owed to the Trust. He seeks summary judgment.[1] The motions have been fully briefed and oral argument was heard May 18, 2005. For the reasons that follow, Modell's motion for summary judgment will be granted.

In 1961, in Ohio, Modell purchased the Cleveland Browns. Andrews, who introduced Modell

---

[1] Modell filed three motions for summary judgment: one arguing that the Trust lacked standing to enforce the letter agreement, one arguing that the letter agreement was unenforceable because it lacked consideration and that it was voidable due to a conflict of interest, and one arguing that the letter agreement's triggering event has not occurred. (Docket entry nos. 139-141). The Trust filed a consolidated response. (Docket entry no. 157).

1

to the deal, had planned to participate in the purchase but was unable to obtain the necessary funding.[2]

On January 25, 1961, in connection with settlement of the transaction, Andrews signed a release of any claim to a finder's fee. (Def.'s Mot. # 2 Ex. 10). Subsequently, he entered into a business agent arrangement with Modell. In February 1963 Andrews sent Modell a letter agreement, which Modell signed on February 24, 1963, confirming the arrangement.[3] Quarterly payments were made under this

---

[2] Modell found a different source of funds. (Def.'s Mot. # 2 Ex. 4 at 21-22).

[3] Andrews stated, in part, that:

> I write this letter to confirm my understanding of the arrangements to which we agreed some time ago. If my understanding conforms to yours, I would appreciate your executing the enclosed copy of this letter in the space provided at the end thereof and returning it to me, together with your check to my order in the amount of $750, and this arrangement shall become an agreement effective as of the date of this letter.
>
> 1. You hereby retain me as your business manager for the period commencing January 1, 1963, and ending December 31, 1970. You will pay me a compensation of $3,000 for each of the calendar years during that period, with payment to be made as follows: $750 on or before the 15th day of each January, April, July and September, except that in the case of the payment of the payment of $750 otherwise due January 15, 1963, you shall make payment upon your return of the executed carbon copy of this letter.
>
>   In consideration of such retainer, I shall render to you at reasonable times and places such business advice, including the preparation of federal and other income and similar tax returns, as you may request.
>
> 2. In addition to the foregoing, and as a finder's fee payable to me as a result of my efforts in the negotiations and transactions leading to your ownership of stock in Cleveland Browns, Inc., a Delaware corporation ("Browns"), and the acquisition by that corporation on March 22, 1961, of substantially all the assets of Cleveland Browns,

agreement until Andrews died in January 1969. Andrews's wife Phyllis was executrix and residuary legatee of the estate, which apparently was insolvent and never finally closed under New York probate law.

In 1996 Modell moved the team to Baltimore, where it was renamed the Ravens. In 1999, he negotiated the sale of the team to Bisciotti for approximately $600 million. Shortly after announcement of the sale, Andrews's sons Vincent Jr. and Robert formed the Trust, with themselves as trustees.[4] Using $200,000 contributed by Phyllis Andrews, the Trust then "purchased" the letter agreement from her. (Def.'s Mot. # 1 Ex. 33 at 38-39, Ex. 34 at 35). On January 27, 2000, Mrs. Andrews signed, at her sons' direction, a document stating that "the seller is the record owner of the Letter Agreement Interest and has good and marketable title thereto...." (Pl.'s Opp. Ex. 35 at 50157).

The sale of the Ravens was to take place in two stages. In February 2000, Bisciotti's

---

> Inc., an Ohio corporation, you agree that when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me an amount equivalent to 5% of your net gain from either of those transactions and any intervening sales by you of your Browns stock. For the purposes of the preceding sentence, the term "net gain" shall be computed as it would for purposes of federal income taxation, and there shall be taken into account any and every net loss you may sustain on either of those transactions or on any intervening sale. In the event of your death or the gift of any or all of your Browns stock, prior to either of those transactions the amounts payable under this Section shall be payable by your estate or your donee (to the extent of any gift) as the case may be, and "net gain" shall be computed as though your estate or donee were required to use your basis in Browns stock.

(Pl.'s Opp. Ex. 15).

[4] The sons later resigned and were replaced by co-trustees Thomas O. Callaghan and Thomas E. Minogue, the plaintiffs in this case.

Baltimore Football Company ("BFC") purchased 49% of Baltimore Ravens Limited Partnership ("BRLP"), the limited partnership which owned the Ravens. (Def.'s Mot. # 3 Ex. 4). BFC also obtained an option to purchase the remaining 51% on or before December 2005.

In the spring of 2003, Bisciotti asked Modell to retain as much as a 20% minority interest in the team. Modell declined. (Pl.'s Opp. Ex. 25 at 31-33, 37). In May 2003, the Trust filed this lawsuit. That summer, Bisciotti was asked by a friend of Modell whether Modell could retain a 1% interest. Bisciotti was willing but did not sign any agreement. On March 18, 2004, he delivered to Modell an option exercise notice electing to buy the remaining 51% of BRLP. (Pl.'s Opp. Ex. 37). Finally, on April 8, 2004, he and Modell amended their agreement to allow Nevermore, LLC, a company recently formed by Modell, to retain a 1% limited partnership interest in BRLP. (Pl.'s Opp. Ex. 38).

Modell raises several arguments in support of his motion for summary judgment. While the first issue is dispositive, the others also will be briefly discussed.

First, Modell argues that the Trust lacks standing. The Trust contended at oral argument that "standing" was not the proper way to describe the issue. As the Fourth Circuit recently explained, "[t]he standing doctrine, of course, depends not upon the merits, but on 'whether the plaintiff is the proper party to bring [the] suit.'" White Tail Park, Inc. v. Stroube, --- F.3d ---, 2005 WL 1554600, 6 (4th Cir. 2005) (internal citations omitted). As plaintiff, the Trust seeks to assert its own rights under what it claims is its ownership of the letter agreement. Cf. Gonzalez v. Fairgale Props. Co., N.V., 241 F.Supp.2d 512, 515 (D. Md. 2002) (stating that "a plaintiff can only assert her own legal rights and cannot rest her claim on the legal rights or interests of third parties"). Modell denies the Trust has any right to bring this suit.

4

Whether it is an issue of standing or the merits, Modell asserts that the Trust can not establish ownership because there is no admissible evidence to show that Phyllis Andrews took ownership of the letter agreement, either by transferring it to herself as executrix or by operation of law as the estate's residuary legatee.[5]  The Trust agrees that the critical question "is not <u>when</u> Mrs. Andrews distributed the Letter Agreement to herself . . . but simply <u>whether</u> she ever did so."  (Pl.'s Opp. at 24).  As evidence that she did, the Trust offers a written Purchase Agreement signed January 27, 2000, in which Mrs. Andrews represented that she "is the record owner of the Letter Agreement Interest" and had taken "all necessary action required to have been taken by or on [her] behalf . . . by applicable law...." to authorize her to sell the letter agreement to the Trust.  (Pl.'s Opp. Ex. 35 at P50157).  This Purchase Agreement, however, was not sworn to by Mrs. Andrews.  Mrs. Andrews, who is now in her 90's, testified in her June 2004 deposition that she did not remember ever being told the letter agreement was an asset of her husband's estate and that she did not know if there came a time after her husband's death when the letter agreement became her property.  (Def.'s Mot. # 1 Ex. 4 at 27).  There is no evidence in the probate file, or anywhere else that has been proffered to the court, establishing that Mrs. Andrews ever transferred the letter agreement from the estate to herself.[6]  Nor does it appear that

---

[5] The Trust argues that Modell lacks standing to challenge the Trust's standing, stating "[b]ecause Modell had (and has) no financial interest in Vincent Andrews, Sr.'s estate, it follows that he has no standing to object to the way in which Mrs. Andrews has administered that estate."  (Pl.'s Opp. at 23).  Modell is not challenging the way Mrs. Andrews administered the estate.  Rather, he is challenging whether Mrs. Andrews actually transferred the letter agreement from the estate to herself.  If the Trust does not own the letter agreement, it has no claim against Modell.

[6] As late as 1980, Richard Blumenthal wrote to Modell, with a copy to Robert Andrews, representing himself to be an attorney for the estate of Vincent Andrews.  He referred to the February 1963 agreement, and inquired about the status of Modell's stock in the Cleveland Browns.  (Def.'s Mot. # 1 Ex. 30).  This indicates that, at least as of 1980, the estate was not closed and the letter

the agreement, as an asset of the estate, would have passed to her by operation of law, because the estate was insolvent and not finally closed.[7]  Consequently, the Trust can not support its claim that the January 27, 2000 Purchase Agreement gave the Trust ownership of the letter agreement.  Though it is attempting to assert its own rights in enforcing the letter agreement, the Trust has not established it has any rights to assert.  See University Creek Associates II, Ltd. v. Boston American Fin. Group, Inc., 100 F.Supp.2d 1337, 1340 (S.D. Fla. 1998) (holding that the plaintiffs had standing to assert a breach of contract claim because the commitment letter had been properly assigned to them by a party with the right to do so); Armstrong, III v. United States, 7 F.Supp.2d 758, 765 (W.D. Va. 1998) (holding that the plaintiffs lacked standing or an interest in the contract because the transfer of the agreement was void under state law).  Accordingly, Modell's motion for summary judgment based on the Trust's lack of standing to enforce the letter agreement will be granted.[8]

Second, Modell argues that the promised 5% fee is unenforceable for lack of consideration, contending that the only consideration for that promise was Andrews's prior action in connection with finding the Browns.  See Carlisle v. T&R Excavating, Inc., 704 N.E.2d 39, 43-44 (Ohio Ct. App. 1997).  The Agreement, however, is ambiguous on this critical point.  Section 1 states the business manager fee of $3,000.00 per year; Section 2 promises 5% of net gains if the Browns are sold.

---

agreement was an asset of the estate.

[7] In any event, the Trust does not contend that the agreement passed to Mrs. Andrews by operation of law.

[8] Assuming the Trust lacks standing to bring the suit, the court lacks subject matter jurisdiction over the remaining issues.  Nonetheless, as Modell filed separate motions for summary judgment, and in the interests of efficiency, the other motions will be addressed.

Section 2 is introduced by the phrase "In addition to the foregoing, and as a finder's fee...." (Pl.'s Opp. Ex. 15). Modell interprets this phrase merely as a transition between Section 1 and a separate Section 2; also reasonable, however, is the Trust's interpretation that Modell promised Andrews both the quarterly payments and the 5% of net gain in exchange for Andrews's future service to Modell as his business agent. This dispute of fact precludes summary judgment for Modell.

Third, the Trust argues that the triggering event has occurred, despite Modell's retention of an interest through Nevermore, LLC, because the nature of the interest retained does not qualify as a stock interest of the kind Modell held in 1963 but rather as a debt obligation. The experts' opinions on this issue appear to create a dispute of material fact for the jury.[9] Compare Pl.'s Opp. Ex. 53 with Pl.'s Opp. Ex. 54.

Further, the Trust relies on the doctrine of "prevention" recognized under Ohio law, claiming that Modell's retention of a 1% interest by agreement with Bisciotti after the 51% option had been exercised was done in bad faith to avoid paying the finder's fee. There is evidence from which a reasonable jury could conclude that avoidance of the fee was in fact Modell's motive. (Pl.'s Opp. at 60-65; Pl.'s Opp. Exs. 43 at 79-82, 54 at 5-6). As Modell points out, however, nothing in the letter agreement requires him to sell all of his stock at any time. See Shear v. National Rifle Ass'n of America, 606 F.2d 1251, 1256 (D.C. Cir. 1979) (stating "there is no prevention when the contract authorizes a party to prevent a condition from occurring"). The cases relied on by the Trust are distinguishable. In Rohde v. Mass. Mut. Life Ins. Co., 632 F.2d 667 (6th Cir. 1980) (applying Ohio

---

[9] BRLP's recent "liquidation" for tax purposes, however, is not the event contemplated in the agreement ("when the Browns completely liquidate"). The Trust's argument on that point lacks merit.

law) the insurance company had an obligation under the contract to evaluate the health risk of the insured in good faith. The insurance company's failure to evaluate the applicant's health risk in good faith "prevented the occurrence of the condition precedent." Id. at 670. Modell had no such obligation. In Galmish v. Cicchini, 734 N.E.2d 782 (Ohio 2000), while the facts are somewhat similar, the plaintiff's claim rested on fraud in the inducement of the contract: "The gravamen of the complaint is that Cicchini intended from the outset to deprive Galmish of her share of the excess proceeds by delaying completion of the sale...." Id. at 785-86. The letter agreement in this case contemplates payment of a fee only "when, as and if" Modell sells his entire stock interest, or possibly after his death. (Pl.'s Opp. Ex. 15). It imposes no obligation on Modell to sell his interest at any time. Accordingly, while Modell's motives may be, as the Trust suspects, primarily aimed at defeating the fee rather than retaining the right to go to league meetings, (Pl.'s Opp. at 60-65; Pl.'s Opp. Exs. 43 at 79-82, 54 at 5-6), the Trust can not rely on the doctrine of prevention for its claim to succeed.

Finally, Modell belatedly claimed that the letter agreement is voidable because attorney John Wells purportedly represented both Modell and Andrews in connection with the agreement without Modell's consent. There is at least a genuine factual dispute about Modell's knowledge and consent and the extent of Wells's representation of Modell.[10] Further, Modell's remedy, if any, is more likely a malpractice suit against Wells. See Restatement (Third) of the Law Governing Lawyers § 130 cmt. a; § 121 cmt. f (2000).

A separate Order follows.

---

[10]See Pl.'s Opp. at 35-39; Pl.'s Opp. Exs. 4, 14, 51, 2 at 18 and 37.

| | |
|---|---|
| July 22, 2005 | /s/ |
| Date | Catherine C. Blake |
| | United States District Judge |